Joseph J. Haspel, Esq. (JJH-5753)
Attorney for Plaintiffs
40 Matthews Street, Ste. 201
Goshen, NY  10924
845-294-8950

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

MOSDOS CHOFETZ CHAIM INC.; YESHIVA CHOFETZ
CHAIM INC.; RABBI JAMES BERNSTEIN;
MOSHE AMBERS, RABBI MAYER ZAKS;
AND RABBI ARYEH ZAKS,

                              PLAINTIFFS

    -    VS -

THE VILLAGE OF WESLEY HILLS; THE MAYOR AND BOARD
OF TRUSTEES OF THE VILLAGE OF WESLEY HILLS; ROBERT H.
FRANKEL IN HIS INDIVIDUAL AND OFFICIAL CAPACITY;
EDWARD B. MCPHERSON, IN HIS INDIVIDUAL AND OFFICIAL
CAPACITY; DAVID A. GOLDSMITH IN HIS INDIVIDUAL AND
OFFICIAL CAPACITY; ROBERT I. RHODES IN HIS INDIVIDUAL
AND FORMER OFFICIAL CAPACITY; JAY B. ROSENSTEIN IN
HIS INDIVIDUAL AND FORMER OFFICIAL CAPACITY;
THE VILLAGE OF NEW HEMPSTEAD THE MAYOR AND BOARD
OF TRUSTEES OF THE VILLAGE OF NEW HEMPSTEAD ROBERT
A. MOSKOWITZ, TRUSTEE OF THE VILLAGE OF NEW
HEMPSTEAD IN HIS INDIVIDUAL AND FORMER OFFICIAL
CAPACITY;
THE VILLAGE OF POMONA; THE MAYOR AND BOARD OF
TRUSTEES OF THE VILLAGE OF POMONA FORMER MAYOR
HERBERT I. MARSHALL IN HIS INDIVIDUAL AND FORMER
OFFICIAL CAPACITY; MAYOR OF POMONA, NICHOLAS L.
SANDERSON, IN HIS INDIVIDUAL AND OFFICIAL CAPACITY;
THE VILLAGE OF CHESTNUT RIDGE; THE MAYOR AND BOARD
OF TRUSTEES OF THE VILLAGE OF CHESTNUT RIDGE, MAYOR
OF THE VILLAGE OF CHESTNUT RIDGE, JEROME KOBRE IN
HIS INDIVIDUAL AND OFFICIAL CAPACITY; HOWARD L.
COHEN TRUSTEE IN HIS INDIVIDUAL AND OFFICIAL
CAPACITY.
THE VILLAGE OF MONTEBELLO; THE MAYOR AND BOARD OF
TRUSTEES OF THE VILLAGE OF MONTEBELLO, KATHRYN
ELLSWORTH A.K.A. KATHRYN GORMAN, FORMER MAYOR OF
MONTEBELLO IN HER INDIVIDUAL AND FORMER OFFICIAL
CAPACITY;  AND  JEFFREY  OPPENHEIM  MAYOR  OF
MONTEBELLO IN HIS INDIVIDUAL AND OFFICIAL CAPACITY.
JOHN DOE 1-37

                              DEFENDANTS.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

INDEX NO.

# 08 CIV. 0156



## <u>COMPLAINT</u>

Plaintiffs, Mosdos Chofetz Chaim, Inc. ("Mosdos"), Yeshiva Chofetz Chaim, Inc. ("Yeshiva") , Rabbi James Bernstein, Moshe Ambers, Rabbi Mayer Zaks and Rabbi Aryeh Zaks, by and through their attorneys, Joseph J. Haspel, Esq., Ferrick Lynch McCartney, and Leon Charney, Esq. as and for their complaint against Defendants, allege as follows:

## NATURE OF THE CASE

1.    This action brings before this Court the Villages of Wesley Hills, New Hempstead, Pomona, Chestnut Ridge and Montebello (collectively, "Villages") for their Discriminatory conduct in application of the law regarding religious uses within the Town of Ramapo ("Ramapo"), County of Rockland, State of New York.

2.    The Villages have a history of impeding the growth of the ultra-orthodox and Hasidic jewish communities (collectively, "Hasidic Communities") in violation of the Fair Housing Act and the members of the Hasidic Communities Civil Rights. In 1995, the Second Circuit Court of Appeals addressed the phenomenon of incorporating villages within Ramapo as a means to curtail the growth of the Hasidic Communities. *See, Leblanc-Sternberg v.Fletcher*, 67 F.3d 412 (2nd Cir. 1995). While the focus of the *Leblanc-Sternberg* case was the use of residential real property as synagogues, the land use issues addressed therein are similar to the issues presented herein.

3.    Since the Town of Ramapo, which is the Town in which each of the Villages is located, made efforts to amend its zoning laws to accommodate the needs of the Hassidic Communities, the Villages have found a myriad of ways to engage in discriminatory practices and use public funds to further their discriminatory agenda in violation of the civil rights of the Plaintiffs and others in the Hasidic Communities.

4.      Chofetz Chaim is a sect of Orthodox Jewry, and one of the communities which make up the Hasidic Communities.  The Plaintiffs are members of the Chofetz Chaim community and they have been affected by the Villages discriminatory practices.

5.      Plaintiffs bring this action to declare the villages conduct illegal and enjoin the Villages' conduct in connection with a five acre parcel of land which has been developed in accordance with all necessary building permits and in conformance with Ramapo's current zoning ordinances ("Kiryas Radin" f/k/a "Nike Site").  Regrettably, the Villages have engaged in a deliberate attempt to perpetuate their judicially-recognized, racially discriminatory housing practices.

## JURISDICTION AND VENUE

6.      This Court has jurisdiction over this action pursuant to, *inter alia*, 28 U.S.C. §§1343 and 2201 and 42 U.S.C. §3613 which confers original jurisdiction on federal district courts in suits to reduce the deprivation of rights, privileges and immunities secured by the laws and Constitutions of the State of New York and the United States, particularly the First and Fourteenth Amendments to the Constitution of the United States, 42 U.S.C. § 1983, 42 U.S.C. §1982, 42 U.S.C. § 1985, 42 U.S.C. § 2000cc, and 42 U.S.C. § 3604.

7.      Venue is proper in this District pursuant to 28 U.S.C. § 1391(b), because the acts and transactions complained of occurred, and continue to occur in this District.

## PARTIES

8.      The Plaintiff Mosdos Chofetz Chaim Inc. is a religious corporation having its principal place of business located at Kiryas Radin Drive, Spring Valley NY, Town of Ramapo, County of Rockland State of New York.  Plaintiff is the owner of certain real property (the Kiryas Radin Campus) located in the Town of Ramapo, County of Rockland, State of New York

also known as Section 9, Lot No. 718 and provides housing for Orthodox Jewish Families at its premises.

9.    Plaintiff Yeshiva Chofetz Chaim, Inc. ("Yeshiva CC") is a religious corporation of the State of New York having its principal place of business located at 82 Highview Road, Suffern, New York, 10901. Town of Ramapo, County of Rockland, State of New York.

10.    Plaintiff Rabbi Aryeh Zaks is a natural person with a religious affiliation to Orthodox Jewry who resides in Monsey, New York  and one of the religious leaders of the Yeshiva CC.

11.    Plaintiff Rabbi Mayer Zaks is a natural person with a religious affiliation to Orthodox Jewry who resides in Monsey, New York  and one of the religious leaders of the Yeshiva CC.

12.    Plaintiff Rabbi James Bernstien is a natural person with a religious affiliation to Orthodox Jewry who resides in Monsey, New York  and wishes to study and live at the Yeshiva's Kiryas Radin campus for the purposes of religious exercise, speech, assembly, and instruction, and who, among others, are prevented from doing so due to the actions of the Defendants.

13.    Plaintiff Moshe Ambers is a natural person with a religious affiliation to Orthodox Jewry who resides in Monsey, New York  and wishes to study and live at the Yeshiva's Kiryas Radin campus for the purposes of religious exercise, speech, assembly, and instruction, and who, among others, are prevented from doing so due to the actions of the Defendants.

14.    Defendant Village of Wesley Hills is a municipal corporation duly formed and existing pursuant to the laws of the State of New York.

15.    Defendant Edward McPherson is a natural person who resides in Wesley Hills, New York  is the Trustee of the Village of Wesley Hills, who has acted and participated in the underlying discrimination set forth in this complaint in both his individual and official capacity.

16.    Defendant Robert Frankel is a natural person who resides in Wesley Hills, New York is the Mayor of the Village of Wesley Hills who has acted and participated in the underlying discrimination set forth in this complaint in both his individual and official capacity.

17.    Defendant David Goldsmith is a natural person who resides in Wesley Hills, New York is the Trustee of the Village of Wesley Hills who has acted and participated in the underlying discrimination set forth in this complaint in both his individual and official capacity.

18.    Defendant Robert Rhodes is a natural person who has resided in Wesley Hills, New York is the former Trustee of the Village of Wesley Hills who has acted and participated in the underlying discrimination set forth in this complaint in both his individual and official capacity.

19.    Defendant Jay Rosenstein is a natural person has resided in Wesley Hills, New York is a former Trustee of the Village of Wesley Hills who has acted and participated in the underlying discrimination set forth in this complaint in both his individual and official capacity.

20.    Defendant Village of Pomona is a municipal corporation duly formed and existing pursuant to the laws of the State of New York.

21.    Defendant Herbert Marshall is a natural person who resides in Pomona, New York is the former Mayor of the Village of Pomona who has acted and participated in the underlying discrimination set forth in this complaint in both his individual and official capacity.

22.    Defendant Nicholas Sanderson is a natural person who resides in Pomona, New York is the current Mayor of the Village of Pomona who has acted and participated in the underlying discrimination set forth in this complaint in both his individual and official capacity.

23.    Defendant Village of New Hempstead is a municipal corporation located within the Town Of Ramapo duly formed and existing pursuant to the laws of the State of New York.

24.     Robert Moskowitz is a natural person who resides in New Hempstead, New York, and is a former Trustee of the Village of New Hempstead, in his individual and official capacity.

25.     Defendant Village of Montebello is a municipal corporation located within the Town Of Ramapo duly formed and existing pursuant to the laws of the State of New York.

26.     Defendant Jeffrey Oppenheim is a natural person who resides in Montebello, New York is the Mayor of the Village of Montebello who has acted and participated in the underlying discrimination set forth in this complaint in both his individual and official capacity.

27.     Defendant Katherine Ellsworth is a natural person who resides in Montebello, New York is the former Mayor of the Village of Montebello who has acted and participated in the underlying discrimination set forth in this complaint in both her individual and official capacity.

28.     Defendant Village of Chestnut Ridge is a municipal corporation located within the Town Of Ramapo duly formed and existing pursuant to the laws of the State of New York.

29.     Defendant Jerome Kobre is a natural person who resides in Chestnut Ridge, New York is the Mayor of the Village of Chestnut Ridge who has acted and participated in the underlying discrimination set forth in this complaint in both his individual and official capacity.

30.     Defendant Howard Cohen is a natural person who resides in Chestnut Ridge, New York is a trustee of the Village of Chestnut Ridge who has acted and participated in the underlying discrimination set forth in this complaint in both his individual and official capacity.

### FACTUAL BACKGROUND

31.     Mosdos is currently the owner of the Kiryas Radin Campus f/k/a the Nike Site.   It is on the Kiryas Radin site that Mosdos and the former owner Yeshiva CC has been the subject of religious discrimination in the past.

32.     Yeshiva CC is the owner of a property at 82 Highview Road in Suffern, NY.  It is the Highview Road Site that Mosdos is currently attempting to expand its center of advanced learning.

33.     Yeshiva CC and Mosdos' project (Kiryas Radin), are a singular religious community designed to include the housing of scholars, students, and others who follow the teachings of the Torah and Talmud as taught by their founder, Rabbi Israel Mayer Kagan.

34.     Rabbi Kagan founded Yeshiva Chofetz Chaim in Radin, Belarus[1] in 1864 and led it until his death in 1933.  Rabbi Kagan was recognized worldwide as the leader of world Jewry.  The Yeshiva in Radin was a Torah learning community and a communal center for religious students with over 400 students.  Except for a short period of time during the Holocaust, the Yeshiva Chofetz Chaim has been continuously serving the local Jewish community.

35.     In the 1920's Rabbi Mendel Zaks married the daughter of Rabbi Kagan and joined the Rabbi Kagan as primary leader of the Yeshiva and in all other communal affairs.  Rabbi Zaks incredible knowledge of the Talmud coupled with a photographic memory attracted more students to the Yeshiva and grew it greatly.

36.     The Yeshiva first incorporated in the United States in 1925.  That year, the Yeshiva sent emissaries to the United States to raise money for the operation of the Yeshiva and its multiple missions; which by this time had grown to include a Free Loan Fund, a Study Program for Young Married Adults (Kolel Kodoshim), a Charity Fund for the Poor, a Burial Society, a Marriage Assistance Fund, a Publication Fund, Day Schools, and many other community based programs.

37.     Upon Rabbi Kagan's death in 1933 Rabbi Mendel Zaks began leadership of the Yeshiva.  He continued Rabbi Kagan's record of training up the best and brightest Jewish

---

[1] When the Yeshiva was founded, Radin was part of Poland, but the territory is now part of Belarus.

scholars: scholars who founded well-respected Yeshivas elsewhere across the world. But like many other times in the life of the Jewish people, the Yeshiva was forced to flee.

38.    In 1941, the Yeshiva was closed and its members forced to flee the town of Radin. Rabbi Zaks escaped to the United States and restarted the Chofetz Chaim Yeshiva in New York by gathering survivors of the Holocaust who came to the United States shores (to escape persecution). In 1950, Rabbi Mendel Zaks' son, Rabbi Gershon Zaks—who also survived the war—joined his father in the United States. A Kolel and school were reestablished. Together, the two managed to raise up the Yeshiva and restore some of its prior prominence.

39.    The Yeshiva moved to Suffern, New York in the 1960's and settled in its current 14 acre location. The Yeshiva flourished at its location. However, nearly fifty years have passed at the present site and growth must be accommodated. The current needs of the Plaintiffs outstrip the ability of the Yeshivas to deliver, and thus it needs to expand.

40.    The Kiryas Radin Campus is a "Yeshiva" (religious educational institution and center for religious activity and prayer) physically located near the boundaries of the Village of New Hempstead, New York, though not a part of the incorporated Village. It was assumed back into the unincorporated Town of Ramapo (Town) pursuant to agreement and stipulation between the Village, the Town, and the former owner Yeshiva Chofetz Chaim Kiryas Radin, Inc. in a federal court action entitled *Yeshiva Chofetz Chaim v. The Village of New Hempstead*.

41.    The Nike site is critical to the continued religious practice of the Plaintiffs. The Construction includes a synagogue, a prayer/study hall, classrooms, a library/Talmudic research center, kitchen/dining facilities, living facilities, and a Mikvah. The residential facilities consist of two-story attached units utilized in two-bedroom and four-bedroom layouts. The entire site will be enclosed with fencing gates, and partition walls. Furthermore, the site has visually pleasing buffers to improve and enhance the beauty of the site.

42.    The operational plan calls for an almost entirely self-sufficient facility.  The site is designed with full automatic fire sprinkler systems.  The Plaintiffs must provide for their own sanitation, and will be responsible for all road maintenance, snow removal, and upkeep of the facilities.  Additionally, over one hundred children will be living in the site premises.  The education for these children will be provided at the Yeshivas in the area.  Therefore, the children will place no strain on the public school system.

43.    This proposed development is consistent with their religious teachings.  Jewish religion and custom teaches that Yeshivas are a necessary and vital part of the Jewish life. Yeshivas serve as communities of learning for intense Torah study, charitable works, outreach, and continuous religious practice.  According to the Plaintiffs' bona fide religious beliefs, everyone in the learning community, from spouses to children, benefits from the intense religious atmosphere.  The creation of a Yeshiva and its communal setting furthers the teachings of the Torah, the goals of the Jewish religion, and it is central to the religious vision of the Plaintiffs.

### THE TOWN AND THE VILLAGES

44.    The Town of Ramapo's Jewish population including Orthodox Jews has grown substantially and now represents approximately 50% of the population of the unincorporated Town of Ramapo.  While the Town of Ramapo has attempted to work with the growth and expansion of the Orthodox and Hasidic Jewish communities, the Villages have consistently illegally acted to restrain their growth.

45.    Within the Town of Ramapo in the County of Rockland, a 'village incorporation movement' began in the late 1970's, when orthodox and Hasidic Jewish families began to reside in the Town of Ramapo in increasing numbers.

46.    In opposition to the influx of Orthodox and Hasidic Jews within the Town of Ramapo, residents began to establish villages for the purpose of controlling who resided within each village. Within the Town of Ramapo, the Villages of Montebello, Chestnut Ridge, Wesley Hills and New Hempstead were formed as part of this trend.

47.    The purpose of the village formation movement was to exercise control over zoning and planning and not provide for or otherwise accommodate influx of people the local villages deemed undesirable.

48.    The attitude towards the Orthodox and Hasidic Jewish communities in the area has been the platform of the local politicians who have run their campaigns on platforms of containing the spread of the Orthodox and/or Hasidic Jewish communities.

49.    Recognizing the need to undertake a review of the Master Plan, so that natural growth could continue, in 2001 the Town of Ramapo initiated a review of its Master Plan.

50.    When the Town of Ramapo indicated its desire to begin a revision of the Master Plan the Villages took their position that no new construction could take place in the Town.

51.    In 2000, a new Supervisor was elected who undertook a reevaluation of the needs of the Town. This new Supervisor, Christopher St. Lawrence, supported a Master Plan that addressed the needs of the growing community and its surrounding regions (the "Master Plan").

52.    The Master Plan allowed for the inclusion of multi-family zones and accessory apartments that would accommodate the needs of the Hassidic Communities.

53.    During its Master Plan review, the Town of Ramapo learned that there is a distinct population in the jurisdiction that are in need for adequate housing. Many of them are married and single students of the several large religious educational centers in the Town of Ramapo. These are Jewish students who continue their religious studies after marriage. As married couples studying Jewish teachings full-time, these students do not have much income.

The Yeshivas wanted to build adequate living quarters for these students that would benefit them for their physical living needs, and assist them in reaching their spiritual goals on their campuses. However, there were no Town codes available to set guidelines for this type of construction. In order to accommodate any expansion of the Yeshivas, either a variance had to be granted or the zoning code had to be amended to allow multi-family housing to be built in the Town of Ramapo.

54. This Master Plan draft was initially promulgated in 2001 to address the needs of the entire Town of Ramapo, including those people who struggle economically. Multi-family zones and accessory apartments—necessary for poor and low-income families—were allowed, but only in areas far from any villages. One large area initially zoned for single-family homes on two acres was rezoned to one acre zoning so as to be in conformance with the surrounding areas. Over one thousand acres of land were set aside as open space and park areas. The Town adopted a new comprehensive plan following completion of an environmental review on or about January 29, 2004.

55. The approval of the Comprehensive Plan did not make any actual zoning changes in any area of the town. The Comprehensive Plan is simply a policy statement about goals, plans, etc. The areas selected for Multi-Family District zoning were recommended because they contain characteristics that make them suitable for such zoning (e.g., easy access to major roads). Because most of the land in the Town of Ramapo falls into either dedicated parkland or one of the incorporated villages, the Town only has zoning control for less than 30% of the land in the entire town lands.

56. During this period of review and comment on the Comprehensive Plan, the Villages who complained about the Comprehensive Plan based upon issues of density still approved the development of over one thousand multi-family, high-density units in their own

respective villages without any alarm over infrastructure or sewer capacity. In addition, an additional 1,200 units north of the Town of Ramapo are being, or have been connected to the town's infrastructure. In addition, over eighty senior units were approved by the Villages throughout Ramapo without any opposition. These newly approved projects were not a concern to the Villages, as they are residential units not for Orthodox or Hasidic Jews.

57.     The Yeshiva approached the Town with a site plan for approval on the campus at the former Nike missile base in 2001. The Plaintiff requested the Town allow expansion of the religious Yeshiva Campus pursuant to the then newly passed RLUIPA legislation. The Town accepted the proposed project under RLUIPA provided that the development could be reconciled with all applicable Federal, State and Local Law.

58.     In September of 2002, the Ramapo Town Attorney provided one of the plaintiffs a letter that recapped the property history and approved the proposed Yeshiva project: "The proposed plan as projected is a genuine religious project in furtherance of religious goals and as such would meet all the requirements for such religious land use."

59.     Based upon the recommendation given by the Town of Ramapo's Attorney, a site plan under the R15 zoning bulk table was submitted. The proposed site plan contained a unit count less than what was permitted under R15 zoning for seniors, which was the most generous zoning in the Town at that time. After submitting the plans for review the Town Attorney's office and the building department requested that the project be redesigned to fit within the dormitory zoning code.

60.     At great expense and delay, the Yeshiva redesigned the site to accommodate the Town's requests. Only after submitting their redesigned Yeshiva site plans did the Community Design Review Committee (CDRC) inform them that the dormitory zoning ordinance does not fit housing for married students.

61.     This project includes spaces for married students, and single students.  According to the Chofetz Chaim's teachings, life at the Yeshiva is central to the student's religious experience and includes many rituals and constant religious practice on a 24/7 basis in the home areas for the students, their spouses, and their children.  This religious community would be free from the outside secular influence of mass media, such as television viewed as immoral under the religious Chofetz Chaim teaching.

62.     Inclusion of the "Adult Married Student" housing classification in the Town's Comprehensive Plan, notwithstanding its limited extent, met with vehement opposition from Villages.

63.     The Town used a Generic Environmental Impact Statement (GEIS) in preparation of putting together a Comprehensive Plan.  Pursuant to the GEIS, public opinions (including those from the Villages) were thoroughly solicited and considered over the course of three years.

64.     The Villages, realizing that the Master Plan allowed for the growth of the Orthodox and Hasidic communities, started an organized campaign to defeat and block the Master Plan and the Adult Student Housing law from adoption.

65.     The individual defendants were behind the Villages campaign to defeat Plaintiffs, and other members of the Hasidic Community, in their desire to extend their communities into the Villages' jurisdiction.

66.     Defendants used racist remarks and racial stereotyping to install fear and misinformation in regards to the passage of the Master Plan.  Articles were written and speeches were given, deriding the Orthodox and Hasidic Communities, including Chofetz Chaim, because of their religious beliefs and religious mode of dress.  These articles and statements were made by officials of the Villages acting individually and in their official capacity.

67.    The Defendants mounted a concerted effort to subvert and dominate the Town of Ramapo meetings, in their opposition to passage of the new Comprehensive Plan.

68.    On June 15, 2004 at a special meeting, Town adopted Resolution No. 2004-358, finding no significant adverse impact on the environment in permitting Adult Student Housing, and issued a Negative Declaration. The Town subsequently amended the zoning code to permit Adult Student Housing as a conditional use, to be known as Local Law #9-2004.

69.    The Town passed the Adult Student Housing law to address the need for a guidepost and planning tool for secular educational institutions and religious institutions in planning campus development. The law was passed with the understanding that the law will not address all religious needs and some religious institutions will need to obtain variances from the Town zoning board for any deviations from this zoning law.

70.    Subsequently, the Yeshiva redesigned the project to conform to this new student housing code. The Plaintiff submitted its revised plans to the town for site plan approval. Included with this plan was a list of several matters requiring zoning board variances.

71.    Once the Villages learned that Mosdos intended to utilize the law (including RLUIPA) to build housing for its students, the Villages filed suit to stop the promulgation of the law. Although the pretext of the lawsuit is environmental concerns, the goal of the Village is to prevent the spread of the Orthodox and Hasidic communities through intimidation.

72.    The individual defendants were instrumental in the Villages' decisions to retain counsel for the purpose of keeping the Hasidic Community, including Plaintiffs from encroaching upon their neighborhoods.

73.    The retention of counsel and the prosecution of litigation in the name of the Villages was a discretionary act of the individual defendants and done to further their personal agendas, albeit done under the guise of proper municipal action.

74.    At the time the individual defendants took their action in the name of the Villages, they were aware of Plaintiffs rights, including, but not limited to the right to the free exercise of religion, their right under the Fair Housing Act and their rights under RLUIPA.

75.    The actions of the individual Defendants, under color of municipal authority, did not have any effect beyond its intended target, *i.e.* the Hasidic Community, including Plaintiffs.

76.    The Defendants have continually attempted to block any attempts of the Yeshiva to improve its Nike / Kiryas Radin Site campus according to their religious beliefs.  The Defendants have gone so far as to contact federal and state agencies with contrived environmental concerns.  When the federal agencies dismissed those complaints, the Defendants continued to assert environmental problems, with no basis in fact or law.

77.    The Villages' challenge to the Town's Recent Enactments, which are set forth in the instant lawsuit, was designed to create a forum to impede the development of Mosdos's Real Property through the use of the judicial process.

## THE VILLAGE OF NEW HEMPSTEAD

78.    Plaintiffs repeat and reiterate the allegations contained in Paragraphs 1 through 77 as if fully set forth herein.

79.    The Village of New Hempstead was incorporated to, *inter alia,* provide local zoning regulations inconsistent with the religious practices of the Orthodox and Hasidic Jewish communities.

80.    Kiryas Radin and the Village of New Hempstead were adversary parties in a litigation which came to fruition after the Kiryas Radin property was purchased from the United States government (the "Prior New Hempstead Litigation").

81.    At or around the time of the purchase of the Nike (Kiryas Radin) property, officials of New Hempstead informed various governmental agencies, including *inter alia,* the

Occupational Safety & Health Administration, the U.S. Army Corps of Engineers, and the

Environmental Protection Agency, that the subject property was contaminated with lead and

friable asbestos (the "Federal Environmental Representations").

82. The Federal Environmental Representations were false.

83. The Federal Environmental Representations were made to thwart the Yeshiva's

development and religious use of the subject property.

84. In addition to the Federal Environmental Representations, officials of the Village

of New Hempstead informed the East Ramapo Local School Board that the work involved in

renovating the property would endanger the young lives attending the Colton School, which

School's property is in close proximity to Kiryas Radin (the "Local Representations").

85. The Local Representations were false.

86. The Local Representations were made to thwart the Yeshiva's development and

religious use of the subject property.

87. As a result of the Local Representations, the Colton School was closed creating

and atmosphere of animosity between the Yeshiva and local residents.

88. In addition to the Federal Environmental Representations and the Local

Representations, officials of New Hempstead informed the New York State Department of

Environmental Conservation ("DEC") that the Kiryas Radin property was unsafe due to the

presence of asbestos (the "State Representations").

89. The State Representations were false.

90. The State Representations were made to thwart the Yeshiva's development and

religious use of the subject property.

91. The DEC evaluated the property and found no merit behind New Hempstead's

Claims.

92.    This Federal Environment Representations, the Local Representations and the State Representations had the effect of chilling community relations and creating an environment of fear and hatred towards the Yeshiva and the local Hasidic community.

93.    Within the Prior New Hempstead Litigation, the parties stipulated fact that the Kiryas Radin property was not subject to the regulations of the Village of New Hempstead and was only subject to the codes of the Town of Ramapo.  The Stipulation further provided for the continued jurisdiction of the District Court to enforce the letter and spirit of the Stipulation's terms.

94.    Notwithstanding the Prior New Hempstead Litigation, and the determinations that there was no environmental concerns at the Kiryas Radin property, on or about December 3, 2004, New Hempstead contacted the Planning Board of the Town of Ramapo and stated that it was their understanding "that the buildings in question have, or may contain asbestos." (the "Continued Representations").

95.    The Continued Representations were false.

96.    The Continue Representations were made to thwart the Yeshiva's development and religious use of the subject property.

97.    Through the Continued Representations and other actions, the Village of New Hempstead has continually engaged in a pattern of behavior to keep out the Plaintiffs and 'their kind' for fear that the Plaintiffs were 'undesirable' people.

98.    New Hempstead's zoning is designed to create enormous difficulty for ultra religious and Hasidic Jews to reside within its boundaries.

**VILLAGE OF POMONA**

99.    Plaintiffs repeat and reiterate the allegations contained in Paragraphs 1 through 98 as if fully set forth herein.

100. The Village of Pomona was incorporated to, *inter alia,* provide local zoning regulations inconsistent with the religious practices of the Orthodox and Hasidic Jewish communities.

101. The Defendant Village of Pomona has enacted laws that are so restrictive that they prevent Yeshivas of any form or kind from coming into their jurisdiction. These laws restrict development to the point of unfairly discriminating against people of the Jewish faith because of their religion. These restrictions are the subject of a lawsuit entitled *Congregation Rabbinical College of Tartikov, Inc. v. Village of Pomona,* which is presently pending in the United States District Court for the Southern District of New York (Case No.07-6304).

102. The Code of the Village of Pomona is zoned exclusively for single family residential housing. There are no zoning provisions that allow for churches, or other religious development within their jurisdiction. According to the Village of Pomona Code Book, "[t]he entire area of the Village of Pomona is hereby designated as a residential district with a minimum of 40,000 square feet per lot, hereinafter referred to as the "R-40 District."

103. This purposeful exclusion serves to keep out 'undesirable' people from the neighborhood. The Village of Pomona has chosen to impose and implement a land use regulation that totally excludes religious assemblies from a jurisdiction. Further, it unreasonably limits religious assemblies, institutions, or structures within their jurisdiction.

104. Additionally, the Village of Pomona and its leaders in the State Court action is in concert with the other Plaintiffs in that action. The goal of the litigation is to prohibit the Town of Ramapo from enacting its Master Plan which would allow for the development of Yeshivas.

105. The Village of Pomona along with the several Defendant villages commenced a lawsuit in the Supreme Court of the State Of New York in Westchester to vacate and set aside the Master Plan of the Town in May 2004. The Defendants, realizing that the Master Plan

allowed for the growth of the ultra orthodox and Hasidic community, started an organized campaign to defeat and block the Master Plan from adoption.

## VILLAGE OF WESLEY HILLS

106.   Plaintiffs repeat and reiterate the allegations contained in Paragraphs 1 through 105 as if fully set forth herein.

107.   The Village of Wesley Hills was incorporated to, *inter alia,* provide local zoning regulations inconsistent with the religious practices of the Orthodox and Hasidic Jewish communities.

108.   During much of the times germane to this lawsuit, Robert Rhodes was a Trustee of Village of Wesley Hills and as such spoke for the Village.

109.   During his tenure as Village Trustee, Robert Rhodes ("Rhodes") advocated fertility testing and complained about the birth rate of religious groups within the Town of Ramapo.  At one point, Robert Rhodes advocated fertility testing of the local Jewish population in order to gauge how fast the Hasidic Jewish population will grow.  In attempting to defend himself Defendant Rhodes stated:

> The village's own consultant estimates that the village is growing at the rate of 5.9 percent a year! You may recall that I had estimated that the Hasidic community in Rockland is growing at the rate of 100 percent a decade. Why the modest discrepancy? (Six percent doubles in 12 years, not ten years.) I suspect that there is no in-migration at Kiryas Joel. But this tells us that even without immigration that a Hasidic community can expect to almost double in size in ten years.
>
> You may recall that when I suggested to the county legislature that it hire a competent demographer to look at our own population trends our good friend, the vicious county legislator and Ramapo Finance Director Ian Schoenberger, suggested my name should be Joseph Goebbels. No one on the legislature chastised him publicly, or apologized privately to me. Obviously, this august body

cannot be counted upon for responsible planning.[2]

110.    Wesley Hills through Rhodes, has been a force in the creation of "The Preserve Ramapo" organization ("Preserve Ramapo").

111.    Preserve Ramapo is a political organization formed to create separation from and feigned plausible deniability between the elected officials advocating against the ultra Orthodox / Hasidic communities and the municipal government, *i.e.* the Village of Wesley Hills.

112.    As an indication of the unity between Wesley Hills and Preserve Ramapo, Preserve Ramapo has used, without cost, the Village of Wesley Hills Town Hall for its political purposes.

113.    In addition, Wesley Hill participates in Preserve Ramapo's fund raising, including receipt of donations earmarked for Preserve Ramapo activities at the Village of Wesley Hills municipal building.

114.    At all times relevant herein the Preserve Ramapo arm of Wesley Hills has sought, under color of local law, to deny the Plaintiffs the right to utilize their own property for the religious purposes intended.   Preserve Ramapo literature has stated:

> Preserve Ramapo is a town-wide coalition of Ramapo citizens from every ethnic, religious, economic and political party affiliation. We began as a grass roots effort to fight the Town's Master Plan for land use which proposed widespread high-density housing throughout Ramapo. Realizing our Town Board was more concerned with catering to developers and special interest groups than in representing the interests of ALL Ramapo residents, we launched a full-out effort to stop the Town Board from destroying our Town.
>
> Thousands of people became involved and spoke out against the Master Plan at many public hearings, yet our Town Board passed the Plan anyway. Why? Because our Town Board cares more about the special interest groups that will benefit from this Plan (and their bloc vote) than they care about the majority of Ramapo residents.

---

[2] Robert Rhodes, Save Ramapo: An Account of the Cabal that Controls Politics in the Town of Ramapo, *online at*: http://www.saveramapo.blogspot.com/, Aug. 10, 2004.

The Town is now in the process of scheduling Zoning Board hearings to adopt the new zoning for the Master Plan. No area of town will be untouched. We all will be facing massive increased housing density in our neighborhoods as a result of this Master Plan. We do not have the water, roads, sewers and schools to sustain this kind of development.

No wonder our villages are suing the Town. Seven Ramapo villages (Wesley Hills, Chestnut Ridge, Montebello, Suffern, Airmont, Sloatsburg and Pomona) are suing the Town for the irresponsible environmental consequences that the new Master Plan will bring upon the people of Ramapo.

115.    Rhodes further stated:

"In the four years since RLUIPA was passed the law has been cited successfully to allow the construction and expansion of houses of worship in many parts of the United States. Its opponents have criticized the law as both an intrusion on local zoning and a bludgeon used to intimidate municipalities which, under the law, are forced to pay the legal costs of religious organizations that win RLUIPA lawsuits.

RLUIPA has been most controversial where it has been cited in order to allow other activities carried out by religious organizations. The response of federal courts has varied from court to court. In some cases the force of RLUIPA has been confirmed while in other cases federal courts have held either that the activity is not protected under RLUIPA, or that RLUIPA is a violation of the Establishment Clause of our Constitution's First Amendment.

In Ramapo RLUIPA was used by our town board as the legal justification for its new "Adult Student Housing Law" (ASH). Michael Klein, our town attorney, informed the town board that under RLUIPA it could not prevent religious institutions from creating "Adult Student Housing" connected to schools providing "post-secondary education." The first school to cite the law in its application to build apartment houses in a single family residential district is Kiryas Radin.

* * *

This ruling suggests that Ramapo's Adult Student Law will not be upheld in New York unless or until the Supreme Court of the United States decides otherwise. This has not discouraged Dennis Lynch, Kiryas Radin's attorney, from invoking the law in two different arenas.

Four villages, including my village of Wesley Hills, have sued to prevent the implementation of ASH. They brought the case in the New York Supreme Court where they argue that when Ramapo passed ASH it made a variety of procedural, and substantive errors. Dennis Lynch asked the

federal district court to accept the case under RLUIPA. The federal court
rejected his request and the case is now back in the New York State
Supreme (lower). …

116.    In addition to Mr. Rhodes, the Mayor and other Trustees, including Robert
Frankel, Edward McPherson, Jay Rosenstein, and David Goldsmith have all taken part in this
effort to restrict the Orthodox/Hasidic Jewish population in the Town of Ramapo and its
environs.

117.    This purposeful exclusion serves to keep out ultra religious and Hasidic people
entirely from the Village of Wesley Hills, and it has chosen to impose and implement a land use
regulation that is design to repel totally excludes religious assemblies from a jurisdiction.

## VILLAGE OF CHESTNUT RIDGE

118.    Plaintiffs repeat and reiterate the allegations contained in Paragraphs 1 through
117 as if fully set forth herein.

119.    The Village of Chestnut Ridge was incorporated to, *inter alia,* provide local
zoning regulations inconsistent with the religious practices of the Orthodox and Hasidic Jewish
communities.

120.    The Village of Chestnut Ridge and its leadership have participated with the other
Villages in the campaign to stop the Hasidic Community from encroaching upon their
jurisdiction.

## VILLAGE OF MONTEBELLO

121.    Plaintiffs repeat and reiterate the allegations contained in Paragraphs 1 through
120 as if fully set forth herein.

122.    The Village of Montebello was incorporated to, *inter alia,* provide local zoning
regulations inconsistent with the religious practices of the Orthodox and Hasidic Jewish
communities.

AS AND FOR A FIRST CAUSE OF ACTION
(Violation of the Civil Rights Act of 1866, 42 U.S.C. § 1982.)

123.    Plaintiffs repeat and reallege paragraphs 1 through 122, as if fully set forth

herein.

124.    The Defendants' discriminatory practices, motivated by malice and/or callous

disregard for the rights of the Plaintiffs, deprive the Plaintiffs of their right to use their property i

on the basis of race, national origin and familial status in violation of the Civil Rights Act of

1866, 42 U.S.C. §1982.

AS AND FOR A SECOND CAUSE OF ACTION
(Violation of the Civil Rights Act of 1871, 42 U.S.C. § 1983.)

125.    Plaintiffs repeat and reallege paragraphs 1 through 122, as if fully set forth

herein.

126.    The Defendants' discriminatory practices, motivated by malice and/or callous

disregard for the rights of the Plaintiffs, deprive the Plaintiffs of their right of equal access to

housing under color of law in violation of the Federal Civil Rights Act of 1871. 42 U.S.C. §1983.

AS AND FOR A THIRD CAUSE OF ACTION
(Violation of the Equal Protection Clause of the Fourteenth Amendment to the
Constitution of the United States.)

127.    Plaintiffs repeat and reallege paragraphs 1 through 122, as if fully set forth

herein.

128.    The Defendants' discriminatory practices, motivated by malice and/or callous

disregard for the rights of the Plaintiffs, deprives the Plaintiffs of their rights under the Equal

Protection Clause of the United States Constitution with regard to practicing their religion.

AS AND FOR A FOURTH CAUSE OF ACTION
(Violation of the First Amendment to the Constitution of the United States.)

129.    Plaintiffs repeat and reallege paragraphs 1 through 122, as if fully set forth

herein.

130.    Defendants have conspired to selectively, discriminatorily and improperly deny f Plaintiffs' right to the Free Exercise of Religion as guaranteed by the First Amendment to the United States Constitution.

131.    The Defendants unlawful aim is to prevent Plaintiffs from residing in proximity to or in the Defendant's Villages because the Plaintiffs' different religious belief system.

132.    As a direct and proximate result of the above-referenced violations of Plaintiffs' First Amendment rights by Defendants, Plaintiffs have suffered and continue to suffer substantial losses. The amount of such losses shall be determined at trial, but in no event less than $100,000,000.00 jointly and severally. .

AS AND FOR A FIFTH CAUSE OF ACTION
(Violation of the First Amendment to the Constitution of the United States.)

133.    Plaintiffs repeat and reallege paragraphs 1 through 122, as if fully set forth herein.

134.    Defendants have conspired to selectively, discriminatorily and improperly violated Plaintiffs' right to Free Assembly as guaranteed by the First Amendment to the United States Constitution. The Defendants' actions were done in order to prevent Plaintiffs free assembly for religious purposes within or in close proximity to their jurisdiction.

135.    As a direct and proximate result of the above-referenced violations of Plaintiffs' First Amendment rights by Defendants, Plaintiffs have suffered and continue to suffer substantial losses. The amount of such losses shall be determined at trial, but in no event less than $100,000,000.00 jointly and severally.

AS AND FOR A SIXTH CAUSE OF ACTION
(Violation of the New York State Constitution)

136.    Plaintiffs repeat and reallege paragraphs 1 through 122, as if fully set forth herein.

137. The Defendants have conspired to selectively, discriminatorily and improperly, violated of Plaintiffs' right to the Free Exercise of Religion as guaranteed by Article I, § 3 of the New York Constitution. The Defendants actions have both the motive and intent to discriminate against the Plaintiffs because of their religious preference.

138. As a direct and proximate result of the above-referenced violations of Plaintiffs' rights by Defendants, Plaintiffs have suffered and continue to suffer substantial losses. The amount of such losses shall be determined at trial, but in no event less than $100,000,000.00 jointly and severally.

AS AND FOR A SEVENTH CAUSE OF ACTION
(Violation of the New York State Constitution)

139. Plaintiffs repeat and reallege paragraphs 1 through 122, as if fully set forth herein.

140. The Defendants have conspired to selectively, discriminatorily and improperly, violated Plaintiffs' right to the Equal Protection of the law as guaranteed by Article I, § 11 of the New York Constitution. The Defendants actions have both the motive and intent to discriminate against the Plaintiffs because of their religious preference.

141. As a direct and proximate result of the above-referenced violations of Plaintiffs' Constitutional rights by Defendants, Plaintiffs have suffered and continue to suffer substantial losses. The amount of such losses shall be determined at trial, but in no event less than $100,000,000.00 jointly and severally.

AS AND FOR A EIGHTH CAUSE OF ACTION
(Violation of § 40-c of the New York Civil Rights Law)

142. Plaintiffs repeat and re-allege paragraphs 1 through 122 as if fully set forth herein.

143.    Defendants have selectively, discriminatorily and improperly applied the laws of the State of New York in violation of Plaintiffs' right to the Equal Protection of the law as guaranteed by the New York Civil Rights Law.  The Defendants' actions were done in order to prevent Plaintiffs from obtaining proper use of their property via the local zoning law in violation of the Plaintiff's constitutional rights.

WHEREFORE, Plaintiffs respectfully request that this Court grant the following relief:

(a)    A permanent injunction restraining Defendants, their officers, agents, employees, and attorneys from enforcing or endeavoring to prohibit Plaintiffs from using their property in the Town of Ramapo, New York as a place of worship;

(b)    Award compensatory damages against Defendants in favor of Plaintiffs as the Court deems just for the loss of Plaintiffs' free exercise of religion, freedom of speech, freedom of assembly, deprivation of Plaintiffs' right to equal protection and due process under the laws, and expenses incurred by Plaintiffs and caused by the Zoning Ordinance and Defendants' actions;

(c)    An award to Plaintiffs of full costs and attorney's fees arising out of this litigation; and

(d)    Such other and further relief as this Court may deem just and appropriate.

DEMAND FOR JURY
Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, plaintiffs hereby demand a trial by jury in this action of all issues so triable?


January 4, 2008                                    Respectfully submitted,


                                                   _____
                                                   Joseph J. Haspel (JJH-5753)
                                                   *Attorney for Plaintiffs*
                                                   40 Matthews Street
                                                   Suite 201
                                                   Goshen, New York  10924
                                                   845-294-8950