UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

MOSDOS CHOFETZ CHAIM, INC., YESHIVA
CHOFETZ CHAIM, INC., RABBI JAMES BERNSTEIN,
MOSHE AMBERS, RABBI NAFTOLI SOFER,
NAFTOLI TESHER, BEATRICE ZAKS, and SIMA
ZAKS,

                         Plaintiffs,

     v.

THE VILLAGE OF WESLEY HILLS, THE MAYOR
AND BOARD OF TRUSTEES OF THE VILLAGE OF
WESLEY HILLS, MAYOR DAVID GOLDSMITH, in his
individual and official capacity, ROBERT H. FRANKEL,
in his individual and former official capacity, EDWARD
B. MCPHERSON, in his individual and official capacity,
DAVID A. GOLDSMITH, in his individual and official
capacity, ROBERT I. RHODES, in his individual and
former official capacity, JAY B. ROSENSTEIN, in his
individual and former official capacity, THE VILLAGE
OF POMONA, THE MAYOR AND BOARD OF
TRUSTEES OF THE VILLAGE OF POMONA,
FORMER MAYOR HERBERT I. MARSHALL (of the
Village of Pomona), in his individual and former official
capacity, MAYOR OF POMONA NICHOLAS L.
SANDERSON, in his individual and official capacity;
THE VILLAGE OF CHESTNUT RIDGE, THE MAYOR
AND BOARD OF TRUSTEES OF THE VILLAGE OF
CHESTNUT RIDGE, Mayor of the Village of Chestnut
Ridge JEROME KOBRE, in his individual and official
capacity, HOWARD L. COHEN, TRUSTEE, in his
individual and official capacity, THE VILLAGE OF
MONTEBELLO, THE MAYOR AND BOARD OF
TRUSTEES OF THE VILLAGE OF MONTEBELLO,
KATHRYN ELLSWORTH a/k/a KATHRYN GORMAN,
former mayor of Montebello, in her individual and former
official capacity, JEFFREY OPPENHEIM, MAYOR OF
MONTEBELLO, in his individual and official capacity,
and JOHN DOE 1-37,

                      Defendants.

---

Case No. 08-CV-156 (KMK)

OPINION AND ORDER

<u>Appearances</u>:

Joseph J. Haspel, Esq.
Joseph J. Haspel, PLLC
Goshen, New York
*Counsel for Plaintiffs*

Gregory R. Saracino, Esq.
Milber Makris Plousadis & Seiden, LLP
White Plains, New York
*Counsel for Defendants Village of Pomona, Mayor and Board of Trustees of the Village of Pomona, Herbert I. Marshall, and Nicholas L. Sanderson*

Michael D. Zarin, Esq.
Daniel Richmond, Esq.
Zarin & Steinmetz
White Plains, New York
*Counsel for Remaining Defendants*

KENNETH M. KARAS, District Judge:

        Plaintiffs Mosdos Chofetz Chaim, Inc. ("Mosdos"), Yeshiva Chofetz Chaim, Inc.

("YCC"), Rabbi James Bernstein ("Bernstein"), Moshe Ambers ("Ambers"), Rabbi Naftoli Sofer

("Sofer"), Naftolid Tesher ("Tesher"), Beatrice Zaks, and Sima Zaks (collectively, "Plaintiffs")

bring this action against Defendants the Village of Wesley Hills ("Wesley Hills"), the Mayor and

the Board of Trustees of Wesley Hills, Robert H. Frankel, Edward B. McPherson, David A.

Goldsmith, Robert I. Rhodes, Jay B. Rosenstein (together, the "Wesley Hills Defendants"), the

Village of Pomona ("Pomona"), the Mayor and Board of Trustees of Pomona, Herbert I.

Marshall, Nicholas L. Sanderson (together, the "Pomona Defendants"), the Village of Chestnut

Ridge ("Chestnut Ridge"), the Mayor and Board of Trustees of Chestnut Ridge, Jerome Kobre,

Howard L. Cohen (together, the "Chestnut Ridge Defendants"), the Village of Montebello

("Montebello"), the Mayor and Board of Trustees of Montebello, Kathryn Ellsworth a/k/a

Kathryn Gorman, Jeffrey Oppenheim (together, the "Montebello Defendants"), and John Does

1-37 (collectively, "Defendants").  Plaintiffs allege claims under 42 U.S.C. §§ 1981, 1982, 1983,

and 1985 for violations of and conspiracy to violate their rights under the Free Exercise,

Establishment, and Free Association Clauses of the First and Fourteenth Amendments, and the

Equal Protection Clause of the Fourteenth Amendment of the United States Constitution, as well

as claims under the Fair Housing Act, 42 U.S.C. § 3604, *et seq.* ("FHA"), the New York State

Constitution, Article I, §§ 3 and 11, and New York Civil Rights Law § 40-c.

On March 31, 2010, the Court granted Defendants' motions to dismiss the initial

Complaint, which had been filed on January 8, 2008, without prejudice.  *See Mosdos Chofetz*

*Chaim, Inc. v. Vill. Of Wesley Hills*, 701 F. Supp. 2d 568 (S.D.N.Y. 2010) ("*Mosdos I*").[1]  On

June 3, 2010, Plaintiffs filed an Amended Complaint.  A motion to dismiss has been filed on

behalf of the Wesley Hills Defendants, the Chestnut Ridge Defendants, and the Montebello

Defendants (the "non-Pomona Defendants").  (Dkt. No. 52.)  Another motion to dismiss was

filed on behalf of the Pomona Defendants.  (Dkt. No. 55.)  The Court assumes familiarity with

*Mosdos I* and the facts set forth therein, but discusses them to the extent they are relevant to

deciding the instant motions.  For the reasons stated herein, Defendants' motions to dismiss are

granted in part and denied in part.

## I.  Background

### A.  The Parties

Plaintiffs are religious corporations and individuals affiliated with the Chofetz Chaim

sect of the Orthodox Jewish community, all of whom allege an interest in the operation of Kiryas

---

[1]  The Parties in the initial Complaint were slightly different than those now named in the Amended Complaint currently before the Court.  Two plaintiffs were removed, as were defendants from the Village of New Hempstead.  In addition, as further discussed below, four plaintiffs have been added in the Amended Complaint.

Radin, "a religious educational institution and center for religious activity and prayer," at a location in the Town of Ramapo ("Ramapo") known as the Nike Site. Defendants are four Villages (the "Villages" or "Village Defendants") located within Ramapo, as well as current and former officials of each of those Villages (the "Individual Defendants"). Plaintiffs have filed this action to challenge alleged discriminatory conduct by Defendants, which Plaintiffs argue violates their civil rights.

B. *Mosdos I*

As previously noted, on March 31, 2010, the Court granted Defendants' motions to dismiss, without prejudice. In its Opinion, the Court addressed a number of issues that are relevant to the pending motions.

1. Standing

The Court previously determined that Plaintiffs Mosdos and YCC had adequately pled injury-in-fact because they alleged that they suffered injury from being unable to operate Kiryas Radin, despite spending money and making efforts to complete construction on the Nike Site, and have also expended resources to litigate the state court *Chestnut Ridge* Action.[2] *See Mosdos*

---

[2] As explained in *Mosdos I*, on October 13, 2004, the Village Defendants and two individuals commenced a proceeding in New York Supreme Court, Westchester County (the "*Chestnut Ridge* Action") challenging the enactment of Ramapo's Adult Student Housing Law ("ASHL"), pursuant to Article 78 of the New York Civil Practice Law and Rules. *See Mosdos I*, 701 F. Supp. 2d at 578. The defendants named in the *Chestnut Ridge* Action were Ramapo, the Ramapo Town Board, the Ramapo Planning Board, the Ramapo Board of Appeals, YCC, and Scenic Development, LLC. *See id.* An amended petition subsequently was filed, adding claims challenging the approval of YCC's Nike Site plan. *See id.*

On June 13, 2005, the New York Supreme Court granted an injunction to the two individuals, but dismissed the Villages' claims, holding, inter alia, that they lacked standing. *See id.* On August 14, 2007, the Second Department reversed, holding that: (1) the Villages had standing to raise their challenges to Ramapo's zoning laws under New York's State Environmental Quality Review Act ("SEQRA") and New York General Municipal Law Section 239-m, and (2) Wesley Hills had standing to challenge the issuance of the negative declaration

*I*, 701 F. Supp. 2d at 582.  Plaintiffs Bernstein and Ambers also alleged an injury-in-fact because they plan to study and live at Kiryas Radin but are barred from doing so by Defendants' actions, and the Court found "there is a substantial probability that Bernstein and Ambers will be able to live and study at Kiryas Radin if they get the relief they seek."  *Id.*

The Court concluded that Plaintiffs sufficiently alleged the causation and redressability elements of standing with respect to the pursuit of the *Chestnut Ridge* Action by the Village Defendants.  Plaintiffs expended resources litigating the *Chestnut Ridge* Action, and the filing of that action (and the resulting TRO issued by the state court) prevented Plaintiffs from operating Kiryas Radin on the Nike Site.  *See id.* at 584-85.  However, Plaintiffs did not allege an adequate link between the Village Defendants' allegedly discriminatory zoning laws and Plaintiffs' claimed injuries.  *See id.* at 585.  The Nike Site is not in any of the Villages, and Plaintiffs did not allege that they either had a property interest within any of the Villages, had tried to build or live in the Villages, had been denied a variance of permit from any of the Villages, or planned to take action within the Villages that would subject them to the zoning laws in the near future. The laws also did not delay operation of Kiryas Radin, because the Nike Site is not subject to the zoning laws.  Accordingly, despite Plaintiffs' allegations that the zoning laws discriminate against the Hasidic community in general, they did not allege that they personally were injured by the laws.  *See id.* at 585-86.

---

regarding YCC's site plan under SEQRA.  *See id.*  On September 11, 2007, the Supreme Court issued a temporary restraining order ("TRO") enjoining implementation of the ASHL and occupation of the Nike Site.  *See id.* at 579.  After the TRO was issued, Mosdos was added as a party to that litigation.  *See id.*  The approval process for the Nike Site and the developments in the *Chestnut Ridge* Action are discussed in more detail in *Mosdos I*, 701 F. Supp. 2d at 576-80.

## 2. Compulsory Counterclaims

In *Mosdos I*, the Court also concluded that Plaintiffs Mosdos and YCC are barred from pursuing their claims against the Village Defendants because, under Federal Rule of Civil Procedure 13, those claims should have been filed as compulsory counterclaims in the *Chestnut Ridge* Action. *See id.* at 588. Plaintiffs Mosdos and YCC are named as defendants in the *Chestnut Ridge* Action and the counterclaims that Mosdos and YCC alleged in that action share the same factual background as the instant action. *See id.* at 589. The Court explained that Plaintiffs' allegation in the Complaint that the *Chestnut Ridge* Action was a pretext for illegal actions by the Village Defendants is logically intertwined with the validity of the Village Defendants' legal claims, which will be determined in the *Chestnut Ridge* Action. *See id.* at 590. Thus, Mosdos and YCC were required to raise their claims against the Village Defendants as compulsory counterclaims in the *Chestnut Ridge* Action, and those claims were dismissed. *See id.* Likewise, because the claims against the Individual Defendants sued in their official capacity are duplicative of the claims against the Village Defendants, the claims of Mosdos and YCC against the Individual Defendants in their official capacities also are barred as unpled compulsory counterclaims. *See id.* at 591. However, the Individual Defendants in their individual capacities are not opposing parties under Federal Rule of Civil Procedure 13(a) and, therefore, Mosdos and YCC are not barred from bringing their claims against the Individual Defendants in that capacity. *See id.* at 591-93. In addition, the Individual Plaintiffs, who were not parties to the *Chestnut Ridge* Action, are not barred by Rule 13 from bringing their claims against the Village Defendants or against the Individual Defendants, in either their official or individual capacities. *See id.* at 592 n.15.

6

### 3.  First Amendment Right to Petition and the *Noerr-Pennington* Doctrine

In addition, the Court examined whether Defendants' pursuit of the *Chestnut Ridge*

Action was activity protected by the First Amendment and the *Noerr-Pennington* doctrine.[3]

Although the Second Circuit has yet to address the application of the *Noerr-Pennington* analysis

to claims alleging civil rights violations, the Court determined that the *Noerr-Pennington*

framework could be applied in this context.  District courts within the Second Circuit have not

reached consensus on this issue; however, the majority of circuit courts have reached the same

conclusion as this Court.  *See id.* at 595-97.  The Court explained that when government actors

petition the courts in their representative capacity, they should be afforded some measure of

protection under the *Noerr-Pennington* doctrine and the First Amendment, provided that they

---

[3] The *Noerr-Pennington* doctrine derives from two Supreme Court antitrust cases, and is rooted in First Amendment principles.  *See United Mine Workers of Am. v. Pennington*, 381 U.S. 657, 670 (1965) ("Joint efforts to influence public officials do not violate the antitrust laws even though intended to eliminate competition."); *E.R.R. Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 136 (1961) (holding that "the Sherman Act does not prohibit two or more persons from associating together in an attempt to persuade the legislature or the executive [or a court] to take particular action with respect to a law that would produce a restraint or a monopoly").  "Under the *Noerr-Pennington* doctrine, litigation as well as concerted efforts incident to litigation may not serve as a basis for an antitrust claim."  *Viva Optique, Inc. v. Contour Optik, Inc.*, No. 03-CV-8948, 2007 WL 4302729, at *2 (S.D.N.Y. Dec. 7, 2007); *see also T.F.T.F. Capital Corp. v. Marcus Dairy, Inc.*, 312 F.3d 90, 93 (2d Cir. 2002) ("The *Noerr-Pennington* doctrine generally immunizes from liability a party's commencement of a prior court proceeding." (internal quotation marks omitted)).

As the Court previously explained, "the Second Circuit has acknowledged that the doctrine is an application of the First Amendment and courts within the Second Circuit have held that it is therefore relevant outside the context of antitrust actions."  *Mosdos I*, 701 F. Supp. 2d at 594 (alterations, citations, and internal quotation marks omitted); *see also id.* at 594-95 (explaining further the application of the *Noerr-Pennington* doctrine).  The doctrine seeks to protect conduct that falls within the ambit of the First Amendment right to petition, "regardless of [the] intent or purpose" behind that conduct, so long as that conduct does not constitute sham activity.  *Pennington*, 381 U.S. at 670.

petition in a manner that does not violation other applicable constitutional provisions, such as the Equal Protection Clause of the 14th Amendment. *See id.* at 599-602. The Court declined to delineate the precise boundaries of this protection, but determined that the *Chestnut Ridge* Action is the type of petitioning by a municipality that is entitled to some protection, subject to the sham exception to the *Noerr-Pennington* doctrine. *See id.* at 602. The Court further concluded that the *Chestnut Ridge* Action cannot be considered sham litigation, because the state court judge's issuance of a preliminary injunction – which requires finding a likelihood of success of the merits – necessarily indicates that the litigation was not "objectively baseless," the first requirement of the sham exception to the *Noerr-Pennington* doctrine. *Id.* at 602-03.

However, the Court reiterated that the actions of municipalities in pursuing litigation must be consistent with the Constitution. *See id.* at 603. Government actors may not pursue even meritorious claims if they do so in a discriminatory fashion. *See id.* The Court noted that discrimination could be established if Plaintiffs demonstrate that the Village Defendants were improperly selective in litigating to protect their interests. *See id.* By way of analogy, the Court noted that a claim of selective petitioning in violation of the Equal Protection Clause is akin to a selective enforcement claim, where a plaintiff alleges that an otherwise valid law has been selectively enforced against him, but not against other similarly situated people, based on impermissible factors. *See id.* at 601. Thus, to plead a selective petitioning claim in the instant action, Plaintiffs must allege both: (1) that they were selectively treated compared to others similarly situated; and (2) that the selective treatment was motivated by an intention to discriminate based on impermissible considerations, such as religion. *See id.* at 603.

The Court concluded that although the second prong was properly pled in the Complaint, Plaintiffs had not alleged that they were treated differently than others similarly situated. *Id.* In

the Complaint, Plaintiffs alleged that the Village Defendants had approved the development of other multi-family, high-density units in their own villages, "without any alarm over infrastructure or sewer capacity" (Compl. ¶ 56) – the claimed concerns with the Kiryas Radin project – and that other "units were approved by the Villages throughout Ramapo without any opposition," (*id.*).  The Court found this bare allegation of differential treatment to be insufficient because Plaintiffs did not explicitly allege that these other developments were similarly situated to Plaintiffs' proposed development, nor allege facts suggesting that they were similarly situated.  *See Mosdos I*, 701 F. Supp. 2d at 603-04.  The Court specifically pointed out that the Complaint contained no allegations that these other developments were similar in size or scope to the proposed development, that they were approved during the same time frame, or that the Village Defendants allowed the developments to proceed without requiring SEQRA compliance.  *See id.* at 604.  The Court also noted that if Plaintiffs amended their pleading, they should clarify whether they are suing the Individual Defendants in their capacity as village officials or as private citizens because, as private citizens, the Individual Defendants would be entitled to complete immunity under the *Noerr-Pennington* doctrine.  *See id.* at 604 n.22.

Accordingly, the Court concluded that Plaintiffs had not made out a claim that defeated Defendants' qualified immunity, under the *Noerr-Pennington* doctrine and the First Amendment, to prosecute the *Chestnut Ridge* Action and, therefore, Plaintiffs were barred from pursuing claims based on the filing of that action.  *See id.* at 604.  However, the Court granted Defendants' motions to dismiss without prejudice and allowed Plaintiffs leave to amend their Complaint to address this issue.  *See id.*

9

C.  The Amended Complaint

Plaintiffs filed an Amended Complaint on June 3, 2010, containing a number of changes from the original Complaint.

1.  Parties

Sofer, Tesher, Beatrice Zaks, and Sima Zaks were added as Plaintiffs in the Amended Complaint.  Plaintiffs allege that Sofer and Tesher wish to study at Kiryas Radin and that Beatrice Zaks and Sima Zaks wish to pray, study, and teach at Kiryas Radin, and that all four have been prevented from doing so by Defendants' actions.  (Am. Compl. ¶¶ 12-15.)  Based on these allegations, these four Plaintiffs have standing to pursue their claims to the same extent as Plaintiffs Bernstein and Ambers, who are in the same position as the newly added Plaintiffs, and previously were found to have standing.[4]

In addition, David Goldsmith, Mayor of Wesley Hills, was added as a Defendant.[5]

In the caption of the Amended Complaint, Plaintiffs indicate that each Individual Defendant is sued in his/her official and individual capacity, as was the case in the Complaint. In the Amended Complaint's discussion of each Individual Defendant, Plaintiffs further allege

---

[4] Pomona Defendants attempt to argue that the entire action should be dismissed for lack of standing.  (Defs.' Mem. of Law in Supp. of Cross-Mot. to Dismiss ("Pomona Mem.") 10-14.) Pomona Defendants are directed to the Court's discussion on standing in *Mosdos I*, in which, as explained above, the Court determined that Plaintiffs did have standing to bring claims stemming from Defendants' pursuit of the *Chestnut Ridge* Action.  The Court will not revisit this conclusion.

[5] The Court notes that David A. Goldsmith was listed as a Defendant in the initial Complaint and remains in the Amended Complaint (in addition to David Goldsmith).  The Amended Complaint describes David Goldsmith as the Mayor of Wesley Hills (Am. Compl. ¶ 17), and David. A. Goldsmith as "currently the Mayor" and "formerly . . . a Trustee" of Wesley Hills, (*id.* ¶ 20).  The Court assumes these references are to the same person even though they are listed separately in the caption and the description of the Parties.

10

with respect to each individual that he or she "acted and participated in the underlying discrimination set forth in this complaint in both his [or her] individual and official capacity," but also specify that Plaintiffs are suing each Individual Defendant "in his [or her] individual capacity as a current and former [or just former] village official." (Am. Compl. ¶¶ 17-22, 24-25, 27-28, 30-31.)

### 2. Challenge to Zoning Regulations

Plaintiffs now state that the action is "both a facial and as-applied change [sic] to the imposition and implementation of land use regulations." (Am. Compl. ¶ 1.) The initial Complaint challenged only the application of the law. Plaintiffs also allege that the regulations burden the religious practice of Orthodox communities in the Villages' jurisdiction (*id.* ¶ 2), and claim that Plaintiffs are members of Chofetz Chaim, a sect of Orthodox Jewry, and "have been affected by the Villages' discriminatory practices and actions," (*id.* ¶ 36). Plaintiffs allege that the Villages were discriminatorily established to control Hasidic immigration, land use, and religious exercise. (*Id.* ¶¶ 42-43.)

Plaintiffs' challenge to the laws as applied fails for the same reasons discussed in *Mosdos I* – namely, that Plaintiffs lack standing to challenge the laws because they have not alleged adequately the causation and redressability elements of standing. *See Mosdos I*, 701 F. Supp. 2d at 585-86. The Nike Site is not subject to the zoning regulations, because it is within the jurisdiction of Ramapo and not any of the Village Defendants. Nor do Plaintiffs allege that they have attempted to live or build in any of the four Village Defendants, or that they would live in these Villages if not for the laws; therefore, they do not have standing to challenge the Villages' zoning regulations.

The Court also notes that Defendants did not address Plaintiffs' newly-added facial challenge in their motions to dismiss. The Court is skeptical as to the basis for any facial challenge, given that there has been no allegation that the regulations are discriminatory on their face. However, because Defendants did not raise this argument, the Court will not evaluate it at this time.

### 3. Claims Related to *Chestnut Ridge* Action

In *Mosdos I*, the Court concluded that Plaintiffs had standing with respect to Defendants' pursuit of the *Chestnut Ridge* Action in state court. However, the Court concluded that to be actionable, Defendants must have selectively chosen to bring suit regarding the Nike Site while treating other similarly situated properties differently. In the Amended Complaint, Plaintiffs allege that the Village Defendants "joined forces to extend their bias and discrimination beyond their own borders and have selectively chosen to attack this religious land use project for religious Jewish education while ignoring many other land use projects of greater impact and size not built for the ultra-Orthodox Jewish community." (Am. Compl. ¶ 3.) Plaintiffs further allege that when Ramapo sought to revise its "Master Plan" to accommodate Hasidic growth in Ramapo, the Villages decided that no zoning expanding allowable new construction could take place "due to possible water shortages and increases in traffic." (*Id.* ¶ 46.) However, Plaintiffs allege that although the Village Defendants "opposed the Master Plan ostensibly due to density and lack of resources," they "approved or did not oppose the development of hundreds of multi-family, high-density units, including at least one operated by a religious non-Jewish entity, in their own . . . or in neighboring villages without raising any alarm over infrastructure or sewer capacity." (*Id.* ¶ 51.) In addition, according to Plaintiffs, none of the Village Defendants instituted a lawsuit against any other municipality and, although "the neighboring villages were

12

notified as interested municipalities in these projects," there were "no letters of opposition or concern to these large projects" in the relevant planning files.  (*Id.*)

The Amended Complaint specifically mentions eight projects that Plaintiffs claim the Defendants did not oppose.  Plaintiffs allege that:  (1) Airmont Gardens is in the Village of Airmont, borders Montebello, was built in 2003, and is a large project of multiple residential buildings with 140 units (Am. Compl. ¶ 52(a)); (2) Pulte Homes is in the Village of Airmont, borders Montebello, was built in 2002, and is a large project with seven large residential apartment buildings with 20 units per building (*id.* ¶ 52(b)); (3) the Salvation Army is a non-Jewish religious entity that built a student center with 16 attached units for families in close proximity to Montebello in 1997 and built additional residential dwellings and housing for cadets in 2007, without opposition to the project by any Village Defendant (*id.* ¶ 52(c)); (4) Sycamore Crest is in the Village of Spring Valley, is in close proximity to Chestnut Ridge, and is a large project with a residential apartment building with multifamily units (*id.* ¶ 52(d)); (5) Harbors of Haverstraw is in the Village of Haverstraw, is close to Pomona, and is a large project with multiple residential apartment buildings approved for 400 units (*id.* ¶ 52(e)); (6) Avalon at Crystal Hill is in the Town of Haverstraw, is near Pomona, and is a large project of multiple residential apartment buildings with 174 units (*id.* ¶ 52(f)); (7) Misisceonga Park is in the Town of Haverstraw, is close to Pomona, and is a large project of multiple residential apartment buildings with 200 units (*id.* ¶ 52(g)); and (8) Montebello Commons is a large project with a "massive residential apartment building" with about 100 units that was approved and built in Montebello, which Montebello "reviewed . . . in the ordinary course, but . . . did not seek to subvert . . . in the same manner as Kiryas Radin," (*id.* ¶ 52(h)).  Plaintiffs also allege that for each of these eight projects, none of the Village Defendants inquired as to the environmental

13

review being conducted for the project or voiced any environmental concerns during the approval process.  (*Id.* ¶ 52.)[6]

In addition, Plaintiffs allege that as claimed in ¶ 52 of the Amended Complaint (the paragraph setting forth the eight comparators), Pomona discriminated against Hasidic Jews when it selectively chose to review and challenge land use developments which allow for the expansion of Hasidic communities – specifically Mosdos's Kiryas Radin project – and that the discrimination was in furtherance of Pomona's bias against a specific group of people based on their religious practice and faith.  (*Id.* ¶ 88.)  Plaintiffs further allege that Pomona "has not targeted other similarly situated land uses and developments which are being prosecuted [sic] by non-Hasidic/ultra-Orthodox, even where such developments would affect the same purported governmental interests of water, sewer and traffic in a much greater fashion."  (*Id.* ¶ 89.)

Plaintiffs also allege that as stated in ¶ 52 of the Amended Complaint, "Wesley Hills has not targeted other non-religious and religious non-Jewish similarly situated land uses and developments, even where such developments would affect the same purported governmental interests of water, sewer and traffic in a much greater fashion."  (*Id.* ¶ 102.)  Plaintiffs further allege that the Mayor of Wesley Hills "was clear that he had no real concerns with the Mosdos project regarding water, sewer or traffic," and that the "underlying cause of the continuing action was the direct need to stop the yeshiva project due to anti-Hasidic/Orthodox bias by all the plaintiff villages in the state matter."  (*Id.* ¶ 106.)  Additionally, Plaintiffs allege that despite

---

[6] In the Amended Complaint, Plaintiffs also added an allegation that the Village Defendants did not file opposition to an additional 1,000 units north of Ramapo that were planned to be connected to Ramapo's infrastructure; that upon information and belief, other projects were approved throughout Ramapo without opposition from Defendants; and that Defendants did not oppose these other projects because they were not meant to accommodate Orthodox Jewish religious use.  (Am. Compl. ¶ 53.)

14

acknowledging that, based on the state court's determination, Wesley Hills is the only Village with standing to make a SEQRA challenge to Kiryas Radin, "Mayor David Goldsmith indicated that he must act in concert and coordination with Pomona, Chestnut Ridge and Montebello to further their collective agenda and therefore he was unable to discuss settlement with Mosdos/Y[CC]." (*Id.* ¶ 107.) Plaintiffs further allege that: (1) as stated in ¶ 52 of the Amended Complaint, "Chestnut Ridge has not targeted other non-Orthodox, similarly situated land uses and developments, even where such developments would affect the same purported governmental interests of water, sewer and traffic in a much greater fashion"; (2) "Chestnut Ridge is over 4 miles away from the Kiryas Radin project and miles away from any proposed Adult Student Housing location"; and (3) Chestnut Ridge's "participation with the other Defendants is to collectively stop the growth of the Hasidic/ultra-Orthodox community." (*Id.* ¶¶ 110-11.) Lastly, Plaintiffs allege that as stated in ¶ 52, "Montebello has not targeted other non-Orthodox and non-Hasidic, similarly situated land uses and developments, even where such developments would affect the same purported governmental interests of water, sewer and traffic in a much greater fashion." (*Id.* ¶ 113.)

### 4. Individual Defendants

Plaintiffs specify that the Defendants include "individuals whose biased edicts or acts were done selectively under the color of official policy." (*Id.* ¶ 1.) Plaintiffs also allege that the named Individual Defendants "were involved individually in the Villages' campaign against land use regulation that accommodates Plaintiffs and other members of the Hasidic Community." (*Id.* ¶ 63.) Plaintiffs further state that "the retention of counsel and the prosecution of litigation in the name of the Villages was a discretionary act of the individual defendants and done to further their and the Villages' participation in the effort to target the Hasidic and ultra religious

15

community under the guise of proper municipal action." (*Id.* ¶ 74.)  Plaintiffs do make additional allegations with respect to some specifically identified Individual Defendants, but not all of them.  The Court notes that there are no specific allegations particular to the individually named Pomona Defendants, as will be discussed further below.

### 5.  Other Allegations

Plaintiffs allege that after the Villages were dismissed as plaintiffs in the *Chestnut Ridge* Action for lack of standing, an organization called Preserve Ramapo, which sought to prevent Plaintiffs from enjoying the right to utilize their own property for the religious purposes intended, asked people to send contributions to Wesley Hills Village Hall to help stop the Yeshiva project; in addition, Wesley Hills allegedly allowed meetings at its Village Hall to advance the anti-Hasidic agenda.  (Am. Compl. ¶¶ 96-98.)  According to Plaintiffs, Wesley Hills also allowed a mulching operation – a purportedly dangerous health hazard and nuisance – to continue operating after Wesley Hills had obtained a permanent injunction to shut it down, allegedly to prevent a Yeshiva from buying the land for religious land use.  (*Id.* ¶ 103.)  Plaintiffs also allege a variety of other comments purportedly made by Wesley Hills officials that indicated bias against Orthodox Jews and an attempt to keep yeshivas from buying property and building in the Village.  (*Id.* ¶¶ 92, 99-100, 105.)[7]

---

[7] The Court notes that these allegations, although condemnable if true, have a limited impact on the pending motion.  In these allegations, Plaintiffs are alleging incidents and statements against Orthodox Jews in general; not against Plaintiffs in particular.  Thus, these allegations suffer from a standing problem and do not appear to state an actionable claim for which Plaintiffs may seek relief.  However, these allegations are relevant to the second prong of Plaintiff's selective enforcement Equal Protection claim, in which, as previously explained, Plaintiffs must allege that the selective treatment that they allegedly received was motivated by an intent to discriminate based on impermissible considerations, such as religion.

### 6. Newly Added Causes of Action

Plaintiffs added a number of additional causes of action in the Amended Complaint, including claims under the Free Exercise Clause, the Establishment Clause, 42 U.S.C. §§ 1981 and 1985(3), and the Fair Housing Act.  These claims will be discussed *infra* Section II.F.

### II. Discussion

### A. Standard of Review

The Supreme Court has held that "[w]hile a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (alteration and citations omitted).  Instead, the Supreme Court has emphasized that "[f]actual allegations must be enough to raise a right to relief above the speculative level," *id.*, and that "once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint," *id.* at 563.  A plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." *Id.* at 570.  If a plaintiff "ha[s] not nudged [his] claims across the line from conceivable to plausible, [his] complaint must be dismissed." *Id.*; *see also Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1950 (2009) ("Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.  But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged — but it has not 'shown' — 'that the pleader is entitled to relief.'" (alteration and citation omitted) (quoting Fed. R. Civ. P. 8(a)(2))).

Generally, "[i]n adjudicating a Rule 12(b)(6) motion, a district court must confine its consideration to facts stated on the face of the complaint, in documents appended to the complaint or incorporated in the complaint by reference, and to matters of which judicial notice may be taken." *Leonard F. v. Isr. Disc. Bank of N.Y.*, 199 F.3d 99, 107 (2d Cir. 1999) (internal quotation marks omitted). "To be incorporated by reference, the [c]omplaint must make a clear, definite and substantial reference to the documents." *Thomas v. Westchester Cnty. Health Care Corp.*, 232 F. Supp. 2d 273, 275 (S.D.N.Y. 2002). "The court may . . . consider matters of which judicial notice may be taken, even if the corresponding documents are not attached to or incorporated by reference in the complaint." *Munno v. Town of Orangetown*, 391 F. Supp. 2d 263, 268 (S.D.N.Y. 2005); see also *Kramer v. Time Warner Inc.*, 937 F.2d 767, 774 (2d Cir. 1991) (holding that district court properly took judicial notice on a motion to dismiss of public documents filed with the SEC). In the motion to dismiss context, however, a court should generally take judicial notice "to determine what statements [the documents] contain[ ] . . . not for the truth of the matters asserted." *Kramer*, 937 F.2d at 774.

The Second Circuit has emphasized that "before materials outside the record may become the basis for a dismissal, several conditions must be met." *Faulkner v. Beer*, 463 F.3d 130, 134 (2d Cir. 2006). "For example, even if a document is 'integral' to the complaint, it must be clear on the record that no dispute exists regarding the authenticity or accuracy of the document . . . [and] that there exist no material disputed issues of fact regarding the relevance of the document." *Id.*; see also *Landon v. Cnty. of Orange*, No. 08–CV–8048, 2009 WL 2191335, at *5 n.5 (S.D.N.Y. July 23, 2009) ("[T]he court may consider a document that is 'integral' to the complaint, partially quoted in the complaint, or relied upon by the plaintiff in drafting the

complaint if there is no dispute regarding the document's authenticity or accuracy, and there is no issue of fact as to its relevance.").

Here, the non-Pomona Defendants have submitted a number of documents with their motion to dismiss. The Court may take judicial notice of many of these documents. For example, the Court may consider decisions or pleadings from other court actions. (Aff. Of Michael Zarin ("Zarin. Aff.") Exs. 2-3.) The Court may also take judicial notice of village and town maps, resolutions, and declarations. (*Id.* Exs. 4-16, 18-35, 38-40.) However, there is no basis for the Court to consider letters submitted from a town official to another town and, accordingly, the Court has not considered letters from the Montebello Planning Board Chairman to the Village of Airmont, or from the Mayor of Pomona to the Planning Board of the Town of Haverstraw, in deciding this motion. (*Id.* Exs. 17, 37.) In addition, although the Court has taken judicial notice of the majority of Defendants' submitted documents, the Court reiterates that it has done so "to determine what statements [the documents] contain[,] . . . not for the truth of the matters asserted." *Kramer*, 937 F.2d at 774. In addition, as will be discussed below, there are "material disputed issues of fact regarding the relevance of [some] of the[se] document[s]." *Faulkner*, 463 F.3d at 134.

### B. *Noerr-Pennington* Immunity for Municipalities

The non-Pomona Defendants argue that the Village Defendants are entitled to immunity under the *Noerr-Pennington* doctrine, even if they selectively commenced the *Chestnut Ridge* Action with discriminatory intent. (Mem. of Law in Supp. of Defs.' Mot. to Dismiss ("Defs.' Mem.") 2-3, Sept. 20, 2010.) The Pomona Defendants adopted this argument in their motion. (Defs.' Mem. of Law in Supp. of Cross-Motion to Dismiss ("Pomona Mem.") 4, Oct. 3, 2010.) The Court already fully addressed this argument in *Mosdos I* and, although it did not delineate a

precise boundary of protection, it concluded that the Village Defendants would *not* be entitled to complete *Noerr-Pennington* immunity if they had selectively chosen to sue Plaintiffs, and not other similarly situated projects, for discriminatory reasons.  Defendants have not provided the Court with any reason to revisit this conclusion, and the Court declines to do so here.

### C.  Selective Treatment

Defendants next argue that Plaintiffs have failed to allege facts necessary to defeat any qualified immunity that the *Noerr-Pennington* doctrine would provide the Village Defendants. In *Mosdos I*, the Court explained that Plaintiffs could establish that the *Chestnut Ridge* Action was pursued for discriminatory reasons by showing that Plaintiffs were selectively treated.  The Equal Protection Clause of the Fourteenth Amendment requires the government to treat all similarly situated individuals alike.  *See City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985).  To establish a denial of equal protection based on selective treatment, Plaintiffs must allege that:  "(1) . . . compared with others similarly situated, [they were] selectively treated, and (2) the selective treatment was motivated by an intention to discriminate on the basis of impermissible considerations, such as race or religion, to punish or inhibit the exercise of constitutional rights, or by a malicious or bad faith intent to injure the person."  *Zahra v. Town of Southold*, 48 F.3d 674, 683 (2d. Cir. 1995) (internal quotation marks omitted); *see also Abel v. Morabito*, No. 04-CV-7284, 2009 WL 321007, at *4 (S.D.N.Y. Feb. 10, 2009) (citing *Harlen Assocs. v. Inc. Vill. of Mineola*, 273 F.3d 494, 499 (2d Cir. 2001)).  "A showing that the plaintiff was treated differently compared to others similarly situated" is a "prerequisite" and a "threshold matter" to a selective treatment claim.  *Church of the Am. Knights of the Ku Klux Klan v. Kerik*, 356 F.3d 197, 210 (2d Cir. 2004).  As previously explained, the Court granted Defendants' motions to dismiss in *Mosdos I* without prejudice because, although "Plaintiffs ha[d] alleged that

Defendants had improper motives in pursuing the *Chestnut Ridge* Action, Plaintiffs ha[d] not sufficiently alleged that they were treated differently than others similarly situated." *Mosdos I*, 701 F. Supp. 2d at 603.  In the instant motions to dismiss the Amended Complaint, Defendants argue that Plaintiffs still have failed to sufficiently plead that any similarly situated comparators were treated differently.

### 1.  Similarly Situated Standard

There are two types of equal protection claims that require similarly situated comparators.  The first, selective enforcement or selective treatment claims pursuant to *LeClair v. Saunders*, 627 F.2d 606, 608 (2d Cir. 1980), arise when plaintiffs claim that they were treated differently based on impermissible considerations, such as membership in a protected class or to punish plaintiffs for exercising a constitutional right.  *See Tasadfoy v. Ruggiero*, 365 F. Supp. 2d 542, 551 (S.D.N.Y. 2005).  The second, "class of one" claims, occur when plaintiffs claim that they were "intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment."  *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000).  Both types of claims require a showing of similarly situated individuals or groups who were treated differently.  However, there is disagreement within the Second Circuit regarding the precise standard for determining whether comparators are similarly situated for each of these types of claims.  Unsurprisingly, Plaintiffs and Defendants also disagree as to the proper standard to apply in determining whether two comparators are similarly situated.

The Second Circuit set forth the test for similarly situated in the "class of one" context in *Neilson v. D'Angelis*, 409 F.3d 100 (2d Cir. 2005), *overruled on other grounds by Appel v. Spiridon*, 531 F.3d 138 (2d Cir. 2008) (per curiam).  The Second Circuit explained that the standard of similarity in "class of one" cases is different than that used in cases where

21

discrimination based on membership in a specific class is claimed. *Id.* at 104. In a "class of one" case, the "level of similarity between plaintiffs and the persons with whom they compare themselves must be extremely high," *id.*, because, in such a case, the existence of more favorably-treated, similarly situated people is used "to provide an inference that the plaintiff was intentionally singled out for reasons that so lack any reasonable nexus with a legitimate government policy that an improper purpose – whether personal or otherwise – is all but certain," *id.* at 105. Because of the particular posture of a "class of one" claim, the comparators's circumstances must be "prima facie identical." *Id.* Thus, "a plaintiff in such a 'class of one case' [is required] to show that: (i) no rational person could regard the circumstances of the plaintiff to differ from those of a comparator to a degree that would justify the differential treatment on the basis of a legitimate government policy; and (ii) the similarity in circumstances and difference in treatment are sufficient to exclude the possibility that the defendant acted on the basis of a mistake." *Id.* The Second Circuit has applied this standard to "class of one" claims in the land use context. *See Clubside, Inc. v. Valentin*, 468 F.3d 144, 159 (2d Cir. 2006).

Defendants argue that this test should also be applied to selective treatment claims of the type alleged here by Plaintiffs, relying primarily on the Second Circuit decision in *Skehan v. Village of Mamaroneck*, 465 F.3d 96 (2d Cir. 2006), *overruled on other grounds by Appel*, 531 F.3d at 140. In *Skehan*, the plaintiffs, police officers who claimed that they were disciplined for violating departmental rules after speaking out about department misconduct, alleged that they were treated more harshly than other officers who had committed similar violations. *Id.* at 110. The district court denied the defendants' motion for summary judgment on qualified immunity grounds and, on appeal, the Second Circuit only addressed the qualified immunity argument.

22

The issue of whether the officers were in fact similarly situated was not before the court on appeal, and the court did not consider whether they were similarly situated.  However, the court did cite the *Neilson* test in explaining what plaintiffs must show to prevail on a selective treatment claim.  *Id.*  The non-Pomona Defendants have latched onto this citation and argue that the Second Circuit "*expressly* extended the *Neilson* analysis of 'similarly situated' to selective enforcement claims" in *Skehan*.  (Defs.' Mem. 6 n.10.)  The non-Pomona Defendants also assert that *Neilson* distinguished traditional equal protection claims (of the type set forth in *Pyke v. Cuomo*, 258 F.3d 107 (2d Cir. 2001)) – which require no showing of similarly situated comparators – from "class of one" claims.

The Court disagrees.  In *Neilson*, the Court compared "class of one" claims to those in which plaintiffs claim selective treatment based on membership in a protected class.  There is no indication that the comparison was to a traditional claim requiring *no* comparators at all.  Moreover, although the Second Circuit did cite the *Neilson* language in *Skehan*, the Court does not agree that the test was "expressly extended," when the issue of whether the comparators were similarly situated was not even before the *Skehan* court.  Thus, the citation of that test is more akin to dicta.  In addition, the Second Circuit's opinion in *Appel*, the case that overruled both *Neilson* and *Skehan*, indicates that the *Appel* court believed that *Skehan* actually was a "class of one" case.  *See Appel*, 531 F.3d at 141 (noting that the Second Circuit had recognized "class of one" liability in the public employment context in *Skehan* and *Neilson* but, because the Supreme Court held that the "class of one" theory is not viable for public employees in *Engquist v. Oregon Department of Agriculture*, 553 U.S. 591 (2008), *Skehan* and *Neilson* were overruled to the extent they conflicted with *Engquist*).  Therefore, the Court concludes that it is not bound to apply the "class of one" similarly situated test in the present case.

23

It is true that some district courts within the Second Circuit have stated that the similarly

situated test is the same in selective enforcement and "class of one" cases and, thus, have

required plaintiffs asserting a selective enforcement claim to show an extremely high degree of

similarity between themselves and the claimed comparators.  *See, e.g.*, *Kamholtz v. Yates Cnty.*,

No. 08-CV-6210, 2008 WL 5114964, at *5 (W.D.N.Y. Dec. 3, 2008) (stating that the similarly

situated standard for the plaintiff's selective prosecution claim was the same as for "class of one"

claims, without citation or explanation), *aff'd* 350 F. App'x 589 (2d Cir. 2009);[8] *Dones v. City of*

*New York*, No. 07-CV-3085, 2008 WL 2742108, at *7, *9 (S.D.N.Y. July 9, 2008) (citing

*Skehan* and applying "very high standard of similarity" to claim of selective treatment based on

racial animus, without explanation); *Spanierman v. Hughes*, 576 F. Supp. 2d 292, 307 (D. Conn.

2008).  Others have used the *Neilson* standard in the *LeClair* context without much explanation.

*See, e.g.*, *Brisbane v. Milano*, No. 08-CV-1328, 2010 WL 3000975, at *10 (D. Conn. July 27,

2010) (noting in the summary judgment context that the level of similarity between comparators

must be extremely high, with prima facie identical circumstances, in a case alleging selective

prosecution based on race); *Ehrlich v. Inc. Vill. of Sea Cliff*, No. 04-CV-4025, 2007 WL

---

[8] The precise nature of the *Kamholtz* plaintiff's claim is unclear.  The facts indicate that the plaintiff believed he was selectively treated in retaliation for exercising his right to free speech.  However, in discussing the plaintiff's selective enforcement equal protection claim, the court noted that "[t]he Second Circuit has warned . . . that 'cases predicating constitutional violations on selective treatment motivated by ill-will, rather than by protected-class status or an intent to inhibit the exercise of constitutional rights, are lodged in a murky corner of equal protection law in which there are surprisingly few cases and no clearly delineated rules to apply.'"  *Kamholtz*, 2008 WL 5114964, at *5 (quoting *Bizzarro v. Miranda*, 394 F.3d 82, 86 (2d Cir. 2005)).  The Plaintiffs in the instant case are not asserting that they were negatively treated based on ill-will; instead, they maintain that their equal protection rights were violated because they are Hasidic Jews.  Accordingly, if the *Kamholtz* court applied the "class of one" test because the case resided in this "murky corner," that reasoning would be inapplicable to the present case.

1593211, at *4 (E.D.N.Y. May 31, 2007) (applying *Neilson* formulation to a claim of selective treatment based on religion without mentioning "class of one").

However, several district courts have continued to apply different standards to selective treatment and "class of one" claims after *Skehan*.  For example, in *Abel*, 2009 WL 321007, at *5 n.6, the court rejected the defendants' argument that the *Neilson* test applied to the plaintiff's claim that a town selectively sued him for back taxes in response to his exercise of free speech. The court explained that "the *Neilson* court explicitly noted [that] its definition of similarly situated is simply an adaptation of the rational review standard applicable to equal protection class of one cases."  *Id.* (citation and internal quotation marks omitted).  The rational review standard and, therefore, the *Neilson* definition of similarly situated, were inapplicable to claims based on membership in a suspect class or violations of constitutional rights, as was the case in *Abel*.  *See id.*; *see also Walker v. City of New York*, No. 05-CV-1283, 2010 WL 5186779, at *7 n.21 (E.D.N.Y Dec. 15, 2010) (characterizing *Skehan* as a "class of one" claim that required a higher showing of similarity and declining to apply that standard to the plaintiff's claim of discriminatory treatment based on membership in a protected class).  Other courts have acknowledged that a disagreement exists, but continued to apply different standards.  *See, e.g.*, *Frank Sloup & Crabs Unlimited, LLC v. Loeffler*, 745 F. Supp. 2d 115, 130 (E.D.N.Y. 2010) ("Although some district courts in the Second Circuit have stated that the standard for similarly situated when bringing a selective enforcement claim is the same as in a 'class of one' claim, the Court employs the slightly different formulations set forth by the Second Circuit for each claim . . . . [I]f anything, the two standards differ in that the similarly situated standard for class of one claims is more stringent." (citation and internal quotation marks omitted)); *Mangino v. Inc. Vill. of Patchogue*, 739 F. Supp. 2d 205, 255-56 (E.D.N.Y. 2010) (same); *Faulks v. City of*

*Hartford*, No. 08-CV-270, 2010 WL 259076, at * 7 (D. Conn. Jan 19, 2010) (acknowledging that

more courts have treated selective enforcement and "class of one" as separate claims with

distinct elements of proof); *Vassallo v. Lando*, 591 F. Supp. 2d 172, 184 n.9 (E.D.N.Y. 2008)

(applying different standards to the plaintiffs' selective enforcement and "class of one" claims).[9]

    These courts have applied a slightly less stringent similarly situated standard in the

selective enforcement context.  They have held that plaintiffs claiming selective enforcement

must compare themselves to individuals that are "similarly situated in all material respects" and,

in cases claiming selective treatment based on membership in a protected class, demonstrate that

they were treated differently from similarly situated individuals who were not in the protected

class.  *Vassallo*, 591 F. Supp. at 184; *see also Walker*, 2010 WL 5186779, at *7 ("Individuals are

'similarly situated' when their circumstances are alike in all material respects." (citing *Shumway*

*v. United Parcel Serv., Inc.*, 118 F.3d 60 (2d Cir. 1997))); *Abel*, 2009 WL 321007, at *4

(explaining that to establish different treatment from similarly situated individuals, plaintiffs

must show that (1) the persons to whom they compare themselves are similarly situated in all

material respects and (2) the defendants knew there were similarly situated individuals and

consciously applied a different standard to plaintiffs).  "Similarly situated does not mean

identical, but rather a reasonably close resemblance of the facts and circumstances of plaintiff's

--------

    [9] Other courts have acknowledged the disagreement without deciding which standard
should apply.  *See, e.g.*, *Gentile v. Nulty*, No. 05-CV-7090, 2011 WL 724663, at *5-6 (S.D.N.Y.
Feb. 25, 2011) (noting that "courts are in some disagreement as to the meaning of 'similarly
situated' in the selective enforcement context," but declining to decide which standard to apply
on summary judgment because, under any standard, the plaintiff had not shown that there was a
question of fact as to whether he was similarly situated to any comparators); *Wood v. Town of E.
Hampton*, No. 08-CV-4197, 2010 WL 3924847, at *20 (E.D.N.Y. Sept. 30, 2010) (explaining
that the court "need not resolve this disagreement because, under any of the standards
articulated," the plaintiff had failed to allege that he was similarly situated to the proffered
comparator).

and comparator's cases, to the extent that an objectively identifiable basis for comparability exists." *Walker*, 2010 WL 5186779, at *7 (citations and internal quotation marks omitted).

To satisfy this less-demanding test in the selective enforcement context, plaintiffs "must identify comparators whom a prudent person would think were roughly equivalent[, but] [p]laintiff[s] need not show an exact correlation between [themselves] and the comparators." *Abel*, 2009 WL 321007, at *5 (citation, alterations, and internal quotation marks omitted).  Put another way:

> The test is whether a prudent person, looking objectively at the incidents, would think them roughly equivalent and the protagonists similarly situated.  Much as the lawyer's art of distinguishing cases, the 'relevant aspects' are those factual elements which determine whether reasoned analogy supports, or demands, a like result.  Exact correlation is neither likely or necessary, but the cases must be fair congeners.  In other words, apples should be compared to apples.

*T.S. Haulers, Inc. v. Town of Riverhead*, 190 F. Supp. 2d 455, 463 (E.D.N.Y. 2002) (citing *Dartmouth Review v. Dartmouth Coll.*, 889 F.2d 13, 19 (1st Cir. 1989)); *see also Tasadfoy*, 365 F. Supp. 2d at 552 (same); *Estate of Morris v. Dapolito*, 297 F. Supp. 2d 680, 686 (S.D.N.Y. 2004) ("To be similarly situated, the persons with whom plaintiff compares [itself] must be similarly situated in all material aspects.  Exact correlation, however, is neither likely nor necessary[;] the test is whether a prudent person would think them roughly equivalent." (citations, alterations, and internal quotation marks omitted)); *Penlyn Dev. Corp. v. Inc. Vill. of Lloyd Harbor*, 51 F. Supp. 2d 255, 264 (E.D.N.Y. 1999) (same).

The Court agrees with these courts that have employed a different, more demanding standard of similarity for "class of one" claims than for other selective enforcement claims.  An extremely high level of similarity is required in the "class of one" context because plaintiffs asserting those claims are attempting to prove that the government's treatment was arbitrary and

irrational.  However, in the present case, Plaintiffs are not alleging that Defendants sued them in

the *Chestnut Ridge* Action to block the Kiryas Radin project for no reason at all; instead, they

have specifically and repeatedly alleged that Defendants have targeted their project because they

are Hasidic Jews.  Defendants are correct that the Court required Plaintiffs to show that similarly

situated projects were treated differently in order to defeat *Noerr-Pennington* immunity by

demonstrating that Defendants sued Plaintiffs for discriminatory reasons.  Plaintiffs are not

pursuing a *Pyke* claim, and they are required to show comparators.  However, they are still

claiming disparate treatment based on religion.  Accordingly, the Court believes it is appropriate

to utilize a less stringent standard than would apply if Plaintiffs were claiming there was simply

no rational reason for the disparate treatment.[10]

---

[10] In advocating for the more stringent similarly situated test, the non-Pomona Defendants argue that "the similarly situated requirement must be enforced with particular rigor in the land use context because zoning decisions will often, perhaps almost always, treat one landowner differently from another."  (Defs.' Mem. 8 (citing *Mattison v. Black Point Beach Club Ass'n*, 376 F. App'x 92, 94 (2d Cir. 2010) (summary order) (internal quotation marks omitted)).  However, *Mattison* involved a "class of one" claim.  In addition, as Plaintiffs point out, they are not challenging a zoning decision by the Defendants; instead, they are claiming that Defendants violated their equal protection rights by affirmatively deciding to bring suit regarding another jurisdiction's allowance of a particular land use, and to sue Plaintiffs Mosdos and YCC, the owners of that site, to block their planned use of a site outside the jurisdiction of any of the Village Defendants.

Defendants also cite the recent decision in *Ruston v. Town Bd. of Skaneateles*, 610 F.3d 55 (2d Cir. 2010), which also involved a "class of one" claim.  (Defs.' Mem. 9, 11; Pomona Mem. 4-5.)  The *Ruston* court applied the extremely high degree of similarity standard and concluded that after *Iqbal*, plaintiffs asserting equal protection claims must allege facts that plausibly suggest the plaintiffs are entitled to relief.  However, the Court does not read *Ruston* as implying that the extremely high standard should be applied in all land use cases outside the "class of one" context.  Instead, pursuant to *Ruston*, Plaintiffs must allege specific facts that suggest that it is plausible that the given comparators are similarly situated to Plaintiffs under whatever may be the appropriate standard for similarity, which, in the instant case, the Court has determined to be less stringent than the "class of one" standard.  Although an "apples to apples" comparison is required, the Court rejects Defendants' contention that in the land use context "projects must be prima facie identical in all respects."  (Defs.' Mem. 10.)

## 2.  Plaintiffs' Allegations of Similarly Situated Comparators

Therefore, the Court must determine whether Plaintiffs have adequately alleged that any of their eight proffered comparators is similarly situated in all material respects and that a prudent person would think it roughly equivalent.  Defendants maintain that Plaintiffs have failed to do so.  Generally, whether two projects "are similarly situated is a factual issue that should be submitted to the jury."  *Harlen Assocs.*, 273 F.3d at 499 n.2.  However, the Second Circuit has held that this rule is not absolute and explained that "a court can properly grant summary judgment where it is clear that no reasonable jury could find the similarly situated prong met."  *Id.*  Thus, at the summary judgment stage of selective enforcement claims, courts ask whether based on the evidence, a reasonable jury could conclude that the plaintiff and the proposed comparators are similarly situated.  At the motion to dismiss stage, such evidence is not necessary; however, a court still must determine whether, based on a plaintiff's allegations in the complaint, it is plausible that a jury could ultimately determine that the comparators are similarly situated.  Thus, "[w]ell-pled facts showing that the plaintiff has been treated differently from others similarly situated remains an essential component of such a claim [and] [c]onclusory allegations of selective treatment are insufficient to state an equal protection claim."  *Bishop v. Best Buy, Co.*, No. 08-CV-8427, 2010 WL 4159566, at *11 (S.D.N.Y. Oct. 31, 2010) (citation and internal quotation marks omitted) (dismissing the plaintiff's equal protection claim because he failed to allege any similarly situated individuals who were treated differently).

Defendants argue that Plaintiffs have not alleged the necessary facts to show that the comparators are similarly situated.  Defendants have decided that the relevant factors that must be similar are types of land use, project density, zoning of the site, the surrounding zoning, and the environmental review undertaken pursuant to SEQRA.  (Defs. Mem. 13.)  Defendants have

29

not explained how they determined that this was the appropriate list of factors, or why all of these factors must be similar for the Court to determine at this stage that the comparators are sufficiently similar to the Nike Site to satisfy the *Twombly* plausibility standard.  In contrast, Plaintiffs maintain that a proper "comparable in this case is any land use project involving multiple family dwellings of a size similar to or larger than Mosdos's project within Rockland County and within a reasonable distance of any of the defendant municipalities . . . [because] any project of this description would have an impact on environmental issues like County water and sewer, traffic flow and community character."  (Mem. of Law in Opp'n to Defs.' Mot. to Dismiss ("Pls.' Opp'n") 4, Oct. 22, 2010.)

In *Mosdos I*, the Court concluded that Plaintiffs had not alleged that other projects were similarly situated to the proposed development.  The Court specifically mentioned that the Complaint lacked allegations "that the other developments were similar in size or scope to the proposed development, or that they were approved during the same time frame."  *Mosdos I*, 701 F. Supp. 2d at 604.  The Court also pointed out that there was no allegation that the Defendants allowed these developments to proceed without requiring SEQRA compliance, which was the basis of the claim in the *Chestnut Ridge* Action.  *See id.*

In contrast, the Amended Complaint does contain such allegations.  Plaintiffs allege that: (1) Airmont Gardens borders Montebello, was built in 2003, and is a large project of multiple residential buildings with 140 units (Am. Compl. ¶ 52(a)); (2) Pulte Homes borders Montebello, was built in 2002, and is a large project with seven large residential apartment buildings with 20 units per building (*id.* ¶ 52(b)); (3) the Salvation Army is a non-Jewish religious entity in close proximity to Montebello, has a student center with 16 attached units for families that was built in 1997 and additional residential dwellings and housing for cadets that were built in 2007 with no

opposition by any of the Defendant Villages (*id.* ¶ 52(c)); (4) Sycamore Crest is in close proximity to Chestnut Ridge and is a large project with a residential apartment building with multifamily units (*id.* ¶ 52(d)); (5) Harbors of Haverstraw is close to Pomona and is a large project with multiple residential apartment buildings approved for 400 units (*id.* ¶ 52(e)); (6) Avalon at Crystal Hill is near Pomona and is a large project of multiple residential apartment buildings with 174 units (*id.* ¶ 52(f)); (7) Misisceonga Park is close to Pomona and is a large project of multiple residential apartment buildings with 200 units (*id.* ¶ 52(g)); and (8) Montebello Commons is a large project with a "massive" residential apartment building with about 100 units, approved and built in Montebello, which Montebello reviewed "in the ordinary course" but "did not seek to subvert . . . in the same manner as Kiryas Radin," (*id.* ¶ 52(h)). Plaintiffs also allege that for each of these eight projects, none of the Village Defendants inquired as to the environmental review being conducted for the project or voiced any environmental concerns during the approval process.  (*Id.* ¶ 52.)  Thus, based on Plaintiffs' allegations, seven of the eight comparator projects are large residential apartment buildings with multiple units per building.  One of the eight, the Salvation Army, is a student center with attached housing.  All of the eight projects are alleged to border or be near one of the Village Defendants.  Plaintiffs have alleged that three of the projects were approved during the same time period that Plaintiffs sought to build Kiryas Radin.  Thus, Plaintiffs have heeded the Court's guidance in *Mosdos I* and provided facts alleging that other projects of similarly-large size were approved and built without being challenged by Defendants.

The Court does note that in paragraph 52 of the Amended Complaint, which lists these projects, Plaintiffs do not specifically state:  (1) that these projects are similarly situated to the Nike Site/Kiryas Radin; (2) that the projects would have comparable impacts on the traffic,

water, and sewer issues raised by Defendants; or (3) with the exception of the Salvation Army site, that these projects are owned and operated by non-Orthodox Jews.  However, later in the Amended Complaint, Plaintiffs do refer back to paragraph 52 and state that these other similarly situated, non-Orthodox land use developments were not challenged by the Village Defendants even where they would affect the same purported government interests of water, sewer, and traffic in a greater fashion.  (*Id.* ¶¶ 89, 102, 110, 113.)  Assessing the Amended Complaint as a whole, Plaintiffs' failure to specifically allege these facts individually for each development is not fatal to their claim.[11]  Thus, based on Plaintiffs' allegations, it is plausible that a prudent person could decide that these projects were similar in material respects to the Nike Site and that they were roughly equivalent.  Pomona Defendants maintain that dismissal is warranted because Plaintiffs have not alleged that the comparators are identical to the Nike Site and the proposed Kiryas Radin project.  (Pomona Mem. 6.)  However, as already explained, under the applicable legal standard such an allegation is not necessary.  Plaintiffs' allegations indicate that they are comparing apples to apples, and that it is plausible that developments of the size alleged by Plaintiffs would have comparable impacts on water, traffic, sewer, and community character concerns in nearby Villages that might prompt Village intervention if those issues were the concerns fueling the *Chestnut Ridge* Action.

---

[11] Pomona Defendants also argue that the Amended Complaint fails to allege how the proposed comparators were treated differently.  (Pomona Mem. 6.)  This assertion is without merit because Plaintiffs allege that the Village Defendants did not inquire into the environmental review of these other projects, voice environmental concerns regarding the review process, or oppose these developments, let alone bring a state court action to halt the developments.

32

### 3.  Defendants' Evidence

In addition to arguing that Plaintiffs' allegations were insufficient to conclude that the properties are similarly situated, Defendants assert that based on evidence they believe the Court may consider, no rational person could find the comparators to be similarly situated.  The non-Pomona Defendants describe the relevant aspects of the Nike Site as follows:  (1) the project consists of residential units accessory to an educational institution where the institution is only 10% of the total land; (2) the residential portion consists of 60 units on 4.7 acres, equaling a density of 12.8 units per acre; (3) the project is a high density multi-family residential development in an area that, without Ramapo's ASHL approval, would be a low density single-family residential zoning district; (4) the project borders Wesley Hills' low density single-family residentially zoned neighborhoods; and (5) a Negative Declaration was issued instead of an Environmental Impact Statement ("EIS") being required under SEQRA.  (Defs.' Mem. 13-14.) The non-Pomona Defendants have attempted to demonstrate why each of Plaintiffs' proposed comparators is actually different than the Nike Site in these aspects.  The Pomona Defendants have adopted these arguments.

### a.  Airmont Gardens

Defendants argue that the land use for Airmont Gardens "is entirely different" than the Nike Site because the Airmont Gardens development was approved as 140 one-and-two-bedroom senior citizen rental apartments, rather than adult student housing accessory to an educational institution.  (Defs.' Mem. 15.)[12]  Defendants assert that Airmont Gardens has a much

---

[12] These facts are obtained from the Resolution of the Planning Board of the Village of Airmont addressing Airmont Gardens' application for zoning approval (Zarin Aff. Ex. 13), of which the Court is able to take judicial notice.

lower density than the Nike Site, because Airmont Gardens purportedly "would result in a population increase closer to 280 people on its 8.5 acres, in contrast to the approximately 330 people on the 4.7 acre Nike Site." (*Id.* at 15-16.)  In addition, Defendants maintain that Airmont Gardens is located in a district that was originally zoned for higher density uses. (*Id.* at 16.) Next, Defendants argue that Airmont Gardens is different because it borders areas in Montebello zoned for office and local neighborhood land use, instead of the single-family residential zoning in Wesley Hills bordering the Nike Site. (*Id.*)  Finally, Defendants reiterate that the project "did not have the potential . . . to adversely impact the community character of Montebello's single-family neighborhoods, as compared to the Nike Site project." (*Id.* at 17.)[13]

The Court disagrees with Defendants' conclusion.  None of the purported differences necessitate a finding, for purposes of this motion, that Airmont Gardens is not similarly situated to the Nike Site.  First, the non-Pomona Defendants emphasize that some courts have determined that type of land use is relevant to a similarly situated determination.  For example, in *Ruston*, where the plaintiffs claimed the proposed subdivision of their property into fourteen residential units (for which the defendant had refused to allow them to connect to the village sewer system) was similar to two houses, a country club, a luxury spa, a large commercial building, and two other properties that had been connected to the village sewer system for decades and were not described further, the court concluded that the offered comparator properties were not similar to

---

[13] Defendants also claim that Montebello did submit a comment letter regarding Airmont Gardens. (Defs.' Mem. 16.)  However, as explained earlier, this comment letter (Zarin Aff. Ex. 17) is not a public document of which the Court may take judicial notice.  In addition, even if the Court could consider this document, it could be viewed as demonstrating that Airmont Gardens did implicate many of the same environmental concerns as those at issue with the Nike Site and, that at least one of the Village Defendants was clearly aware of those concerns, but chose not to challenge the project through litigation.

the plaintiffs' proposed multi-unit residential development because some were commercial and the others were single homes.  *See Ruston*, 610 F.3d at 60.  The Eleventh Circuit also has explained that the use of a proposed development is quite relevant in any type of zoning situation.  *See Campbell v. Rainbow City*, 434 F.3d 1306, 1314 (11th Cir. 2006).  As in *Ruston*, the *Campbell* court determined, in a "class of one" case requiring the comparators to be prima facie identical, that a commercial development could not be considered similarly situated to an apartment building, and reversed the district court's denial of the defendant's motion for judgment as a matter of law, because the evidence of similarity was insufficient to submit to the jury.  *See id.* at 1314-16.  However, these decisions are not dispositive here.  In addition to those courts applying a stricter standard for similarity due to the "class of one" context, the projects offered as comparables in *Ruston* and *Campbell* are far different than the disparity Defendants are claiming here.  Even if Airmont Gardens is a senior citizen rental unit development, and not family residential units accessory to an educational institution, the important aspect is that they are both large multi-unit residential developments.  At this stage of the litigation, the Court sees no reason to define type of land use as narrowly as Defendants suggest.  In this respect, senior citizen rental apartments are not so different a land use as to be an unfair comparison to Kiryas Radin.

    In addition, although the court in *Clubside* did point to differing density levels in determining that two properties were not similarly situated, that case involved the difference between 28 units and 288 units under the prima facie identical standard.[14]  *See Clubside*, 468

_____

[14] In *Clubside*, the court concluded that the plaintiff's proposed 288 unit development of duplex and triplex townhouses was materially different than a 28 lot single family home comparator because the differences of type and scale would impose significantly different burdens on the town's sewer and water systems; however, the proposed development was

F.3d at 160.  Moreover, Defendants have provided no factual support either for their purported population figures at Kiryas Radin and Plaintiffs' comparators or for their associated density calculations.  The Court has been provided with no evidence of the actual number of people residing in each of the sites and, accordingly, will not consider Defendants' unsupported allegations regarding density in deciding this motion.

Defendants next focus on the zoning of areas near the proposed comparators.  The Court may consider the maps provided by Defendants concerning the zoning of the properties and their surrounding areas as public documents, of which judicial notice may be taken.  However, at the motion to dismiss stage, the Court does not infer from these maps that the properties are entirely dissimilar.  For example, Defendants argue that Airmont Gardens does not abut a single-family residential zone in any of the Defendant Villages.  However, the Nike Site only borders such a zone in Wesley Hills; the Nike Site does not abut Montebello, Pomona, or Chestnut Ridge at all. Yet those three Villages still sued YCC and Mosdos and, through that suit, have prevented the Individual Plaintiffs from studying at Kiryas Radin.  Although the differing neighboring zoning is a factor to be considered, the Court is unable to conclude that no prudent person could consider these properties to be roughly equivalent.  Defendants' contention that the project did not have the potential to adversely impact the community character is a factual finding that the Court cannot accept as true on a motion to dismiss.[15]  Although the properties are not identical, it

_____

deemed to be sufficiently similar to a 285 unit multi-family development that was approved for an extension of the sewer district. *See Clubside*, 468 F.3d at 160.

[15] The non-Pomona Defendants again assert in their reply memorandum of law that Plaintiffs are required to "cite a project that similarly affects community character in the Villages as the Nike Site Project."  (Reply Mem. of Law in Further Supp. of Defs.' Mot. to Dismiss ("Defs.' Reply") 3, Nov. 5, 2010 (emphasis omitted).)  However, the Court reiterates that whether a project "affects community character" is a factual issue, not appropriately resolved on

is reasonable to infer that a large project of residential buildings with 140 units could implicate

the same concerns as the Nike Site.  In fact, as Plaintiffs point out, Defendants have not argued

that Airmont Gardens will not impact water, sewer, and traffic concerns.  Based on Plaintiffs'

allegations and the documents provided by Defendants that the Court may consider, it is

plausible that Airmont Gardens is similarly situated to the Nike Site.

### b.  Pulte Homes

Defendants argue that like Airmont Gardens, Pulte Homes is a senior residential

development with a lower density level than the Nike Site.  (Defs.' Mem. 17.)  Defendants also

argue that the Pulte Homes property features different zoning; is separated from Montebello by

other properties in Airmont and by a highway; that Montebello did submit a comment letter; and

that the project did not have the potential to adversely impact community character.  (*Id.* at 17-

18.)  Defendants' arguments with respect to Pulte Homes similarly are unpersuasive.  As the

Court concluded with respect to Airmont Gardens, a large senior residential development is not a

different enough land use to render the project dissimilar.  Again, the density figures are

unsupported and inappropriate to consider on a motion to dismiss.  Although the existence of a

highway separating the property from Montebello may make the relationship between Pulte

Homes and Montebello different than the Nike Site's relationship to Wesley Hills, that

difference is inapplicable to the other three Villages that do not border the Nike Site.

Additionally, there is no basis for the Court to consider the comment letter.  And, Defendants'

allegation that Pulte Homes would not impact community character is an unsupported

_____

a motion to dismiss.

conclusion.  Accordingly, it is plausible that Pulte Homes and the Nike Site could be found to be fair comparators.

### c.  The Salvation Army

Defendants concede that as an educational institution with accessory housing, the Salvation Army site has a similar land use to the Nike Site.  However, Defendants maintain that the sites are otherwise different because the Salvation Army site was approved for 2 units per acre as opposed to the 12.8 units per acre on the Nike Site; the nearby zoning districts were different; and the site did not abut a single-family low density neighborhood in Montebello, the nearest Defendant Village.  (*Id.* at 18-19.)  For the same reasons discussed with respect to the other comparators, these differences are insufficient to conclude that the Salvation Army site is not plausibly similarly situated to the Nike Site.

### d.  Sycamore Crest

Defendants argue that Sycamore Crest, a 96 unit senior citizen apartment building on 2.75 acres, "differs in land use and related impacts from the Nike Site."  (*Id.* at 19.)  Defendants also claim that the population would be approximately 192 people, which Defendants assert is 58% the population density of the Nike Site and, that, because of the applicable zoning, the project was not required to obtain special permit approval from Spring Valley, the town in which Sycamore Crest is located.  (*Id.*)  In addition, Defendants contend that the project was surrounded by higher density zoned districts than is the case with the Nike Site.  (*Id.* at 20.)  The Court again concludes that the land use is not different enough to render the properties implausibly similar.  Moreover, in addition to the fact that Defendants' population figure of 192 is again unsupported, the Court notes that Defendants have neglected to point out that the Sycamore Crest site is significantly smaller than the Nike Site.  Defendants referred to the unit

38

per acre figure for the comparators when that figure was in their favor; here, Defendants only

mention the total population and not the density per acre when that figure cuts the other way.

Finally, the differences in surrounding zoning, though a factor that the Court notes, is not enough

to render the similarity of the properties implausible at the motion to dismiss stage.

### e.  Harbors of Haverstraw

Defendants argue that Harbors of Haverstraw is dissimilar to the Nike Site because it was

undertaken by a private developer, in conjunction with the Village of Haverstraw, as a

comprehensive public/private waterfront redevelopment urban renewal project.  (*Id.*)  In

addition, Defendants contend that it underwent years of public review and a comprehensive EIS;

therefore, Defendants argue that they could not have brought suit to annul a Negative

Declaration where one did not exist.  (*Id.* at 21.)  The Court agrees with Defendants that this site

is not similarly situated to the Nike Site.  In the *Chestnut Ridge* Action, Defendants sought to

annul the Negative Declaration afforded by Ramapo to the Nike Site because they argued a full

EIS should have been conducted.  The fact that an EIS was done for the Harbors of Haverstraw

project makes the property, and Defendants' reaction (or lack thereof) to the project, sufficiently

dissimilar from the Nike Site.

### f.  Avalon at Crystal Hills

Defendants argue that this property is not similarly situated to the Nike Site because it is

not a residential development accessory to an educational institution and is over a mile away

from the nearest Village Defendant.  (*Id.*)  Neither of these differences is sufficient to defeat

Plaintiffs' allegation that the properties are similarly situated.  The Avalon at Crystal Hills

project is still a large project of multiple residential buildings, despite the lack of connection to

an educational institution.  And, as already explained, the lack of proximity is not a compelling

difference, given the lack of proximity between the Nike Site and Pomona, Montebello, and Chestnut Ridge, all of which brought action to enjoin the planned use of the Nike Site.

### g.  Minisceongo Park

Defendants argue that the Minisceongo Park project is different from the Nike Site because, inter alia, it was required to prepare a full EIS.  (*Id.* at 22.)  As with Harbors of Haverstraw, the full EIS conducted by Minisceongo Park does lead the Court to conclude that a prudent person could not view it as similar to the Nike Site.  The Village Defendants could not have brought an Article 78 proceeding to compel an EIS when one was already conducted.

### h.  Montebello Commons

Defendants contend that Montebello Commons is dissimilar because it is a senior citizen rental housing development, rezoning was not necessary to approve the project, and the site abuts parcels zoned for office buildings.  (*Id.* at 23.)  Again, the Court concludes that the difference between senior housing and the housing planned at the Nike Site is not a different enough land use to render the properties dissimilar.  Likewise, the difference in surrounding zoning does not, for purposes of a motion to dismiss, indicate that the project could not have similar effects on traffic, water, sewer, and the overall community character.

### 4.  Defendants' Other Arguments Against Similarity

The Court notes that with one exception, all of the cases cited by Defendants in support of their view that Plaintiffs have not met the standard of similarity required in the land use context were "class of one" cases and, thus, were analyzed under a different, more stringent standard for similarly situated.  As previously noted, plaintiffs asserting a "class of one" claim are required to show that the comparators are so similar that no rational person could view them as different.  *See, e.g.*, *Ruston*, 610 F.3d at 60.  In contrast, under the standard the Court is

applying in the instant case, the test is whether a prudent person could view the comparators as similar.

In addition, the Court already has distinguished *Ruston*, *Clubside,* and *Campbell* factually from the instant case.  The other cases cited by Defendants also differ from the allegations in the Amended Complaint.  *See Mattison v. Black Point Beach Club Assocs.*, 376 F. App'x 92, 94 (2d Cir. 2010) (summary order) (determining that a reasonable person could not find that a "class of one" plaintiff who was denied an easement to her non-landlocked property was similarly situated to a person who was granted an easement to his landlocked property); *Purze v. Vill. of Winthrop Harbor*, 286 F.3d 452, 455 (7th Cir. 2002) (concluding that the alleged comparators were not identically situated to the "class of one" plaintiff because they requested different variances than the plaintiffs, submitted the requests during different time periods, and had their variances granted by different boards); *Ehrlich*, 2007 WL 1593211, at *4-5 (applying "prima facie identical" standard to claim of selective treatment based on religion, and denying plaintiffs' motion to compel inspection of a purportedly similarly situated property, because the property in question was sufficiently dissimilar as it (1) was publicly owned, unlike the plaintiffs' privately owned property; (2) was a garage instead of a restaurant; (3) had one environmental concern instead of a variety of zoning issues; (4) was not proximate to historic structures, unlike plaintiffs' property; (5) had its SEQRA determinations made by a different body; and (6) was not associated with a restrictive covenant, unlike plaintiffs' property).[16]

_____

[16] Defendants also have asked the Court to consider *Third Church of Christ Scientist v. City of New York*, 626 F.3d 667 (2d Cir. 2010), which was decided after the motions were submitted in this case.  In *Third Church*, the Second Circuit assessed a claim under the Religious Land Use and Institutionalized Persons Act.  The court determined that the two proffered secular comparators were similar to the church because they were in the same residential-zoned areas and operated restaurants and event facilities in ways that allegedly violated their certificates of

All of those cases feature differences between the properties that were relevant to the courts' determinations but are less relevant here.  As Plaintiffs have argued, they are not challenging a jurisdiction's refusal to permit them a zoning variance.  Instead, they are alleging that the Village Defendants chose to bring a state court action to prevent the planned use of Plaintiffs' site – which is not located within any of the Village Defendants – because of concerns over the impact of the Kiryas Radin project on the water, traffic, sewer, and community character of the Village Defendants, and that the Village Defendants did not challenge similar projects in the same general vicinity that potentially would implicate the same stated concerns.  To reiterate, Plaintiffs need not allege that their comparators are identical; instead, they simply must be substantially equivalent.  Moreover, to survive a motion to dismiss, Plaintiffs need only allege that one comparable property was similarly situated but treated differently.  *See Frank Sloup & Crabs*, 745 F. Supp. 2d at 129 ("Evidence of even one similarly situated individual is adequate to support a [selective treatment] claim.").  The Court concludes that Plaintiffs have made sufficient allegations for six such properties.[17]

occupancy.  *See id.* at 670-71.  The Circuit's reasoning in *Third Church* does not change this Court's analysis.  The fact that the comparators in *Third Church* were all in the same residential zone does not compel the conclusion that properties must be found dissimilar if they are in different zones, particularly because the context of the claim in *Third Church* is entirely different than the one presently before the Court.  In addition, although the *Third Church* court indicated that organizations subject to different land use regimes may not be sufficiently similar to support a discriminatory enforcement challenge, *see id.* at 671, that determination is inapposite to the instant case, where Plaintiffs claim that the same decision-making bodies – namely, the Village Defendants – selectively chose to challenge the Nike Site plan and not projects on other properties with the potential to create the same environmental concerns.

[17] This conclusion is not meant to imply that the properties are similarly situated.  Whether the properties are in fact similarly situated is not for the Court to decide at the motion to dismiss stage.  *See T.S. Haulers*, 190 F. Supp. 2d at 464 (noting that the merits of an equal protection claim should not be argued in the context of a 12(b)(6) motion to dismiss).  Indeed, the properties later may prove not to be sufficiently similar.  However, the Court concludes that

In addition, to the extent that courts have required defendants to know that there were similarly situated individuals, yet consciously apply a different standard to the plaintiff, *see, e.g.*, *Abel*, 2009 WL 321007, at *6, it is a plausible inference from Plaintiffs' allegations that Defendants had such knowledge.  Finally, the Court previously concluded that Plaintiffs had adequately alleged the second prong of the selective treatment claim, which requires allegations that the treatment was motivated by an intent to discriminate on the basis of impermissible considerations, such as, inter alia, race or religion.  *See Mosdos*, 701 F. Supp. 2d at 603.  The Amended Complaint likewise contains numerous, specific claims that the selective treatment was motivated by an intent to discriminate against Hasidic Jews.[18]  Accordingly, the Court concludes that the Amended Complaint alleges, in a manner sufficient to survive the instant motions to dismiss, that the Village Defendants brought the *Chestnut Ridge* Action against Plaintiffs in violation of Plaintiffs' equal protection rights.  To the extent that the facts,

---

taking Plaintiffs' allegations as true, a finding that they are similarly situated is plausible.  To ultimately survive summary judgment or prevail at trial on the merits, Plaintiffs will need to provide evidence demonstrating that these comparators are in fact similarly situated to a degree that did not warrant disparate treatment.

[18] Pomona Defendants argue that the Amended Complaint is deficient because it fails to differentiate among the actions or conduct of the various Defendants.  (Pomona Mem. 8.)  However, it is undisputed that the four Village Defendants all sued Mosdos and YCC to enjoin the planned use of the Nike Site.  Accordingly, Plaintiffs have adequately alleged conduct by each of the Villages.

In addition, in their reply memorandum of law, the non-Pomona Defendants argue that they have treated similarly situated projects the same, because Pomona also sued over a proposed high-density adult student multi-family housing project on the Patrick Farm Site that borders a low density, single family residential neighborhood.  (Defs.' Reply 9-10.)  However, the Amended Complaint alleges that this development was also developed by, and anticipated to be used by, Hasidic Jews.  (Am. Compl. ¶ 89.)  The fact that one of the Village Defendants has also sued another similarly situated Hasidic development could be viewed as buttressing, rather than defeating, Plaintiffs' claim of selective treatment based on religion.

developed after discovery, do not substantiate Plaintiffs' allegations, Defendants may seek summary judgment.

### D.  Claims Against the Individual Defendants in their Individual Capacity

Notwithstanding the Court's decision in *Mosdos I*, Plaintiffs have sued several Defendants in their individual capacity.  These Defendants are entitled to *Noerr-Pennington* immunity.  *See Mosdos I*, 701 F. Supp. 2d at 604 n.22.  Because the pursuit of the *Chestnut Ridge* Action is the only conduct by Defendants that Plaintiffs have standing to challenge, there are no viable claims against the Individual Defendants in their individual capacity.  Accordingly, the claims against the Individual Defendants in their individual capacity are dismissed.

### E.  Claims of Mosdos and YCC

In addition, the Court previously concluded that all claims by Mosdos and YCC against the Village Defendants and against the Individual Defendants in their official capacities, arising from Defendants' pursuit of the *Chestnut Ridge* Action, are barred as unpled compulsory counterclaims.  *See Mosdos I*, 701 F. Supp. 2d at 591 (noting that because claims against officials in their official capacities are duplicative of claims against governmental entities, the Individual Defendants, when sued in their official capacities, are "one and the same" as the Village Defendants and, thus, are "opposing parties" within the meaning of Rule 13(a)).  Accordingly, Mosdos and YCC are unable to maintain claims against any of the Defendants and the claims of Mosdos and YCC are dismissed.

Thus, the remaining claims are those of the Individual Plaintiffs against the Village Defendants and against the Individual Defendants to the extent that they are sued in their official capacity, arising from those Defendants' pursuit of the *Chestnut Ridge* Action.

F.  Additional Causes of Action

As mentioned *supra*, the Amended Complaint contains other causes of actions besides the federal Equal Protection claim.  Plaintiffs also allege that:  (1) Defendants' laws and actions violate the First Amendment's Free Exercise Clause "[a] by discriminating against and targeting Hasidic/ultra-Orthodox Jews in general and Plaintiffs in particular for disfavor; [b] by treating religious assemblies and institutions on less than equal terms as nonreligious assemblies and institutions; and [c] by substantially burdening the Plaintiffs' religious exercise without a compelling governmental interest" (Am. Compl. ¶ 115); (2) Defendants' laws and actions violate the First Amendment's Establishment Clause "by favoring non-Hasidic/ultra-Orthodox land use and property owners over Hasidic/ultra-Orthodox land use and property owners" (*id.* ¶ 119); (3) Defendants violated 42 U.S.C. § 1981 by impairing Plaintiffs' right to make and enforce contracts based on racial discrimination (*id.* ¶ 135); (4) Defendants violated 42 U.S.C. § 1982 by impairing Plaintiffs' right to purchase and use real property based on racial discrimination (*id.* ¶ 138); (5) Defendants violated 42 U.S.C. § 1985(3) by conspiring with one another and with others for the purpose of depriving the Plaintiffs of equal protection and equal privileges and immunities under the laws and Constitution of the United States (*id.* ¶ 141); (6) Defendants conspired to selectively, discriminatorily, and improperly violate Plaintiffs' First Amendment right to Freedom of Association (*id.* ¶ 144); (7) Defendants violated Plaintiffs' right to the Free Exercise of Religion as guaranteed by the New York State Constitution, Article I, § 3 (*id.* ¶ 147); (8) Defendants violated Plaintiffs' Equal Protection rights as guaranteed by the New York State Constitution, Article I, § 11 (*id.* ¶ 150); and (9) Defendants violated Plaintiffs' Equal Protection rights as guaranteed by New York Civil Rights Law, § 40-c (*id.* ¶ 153).

To the extent Plaintiffs are challenging the Village Defendants' zoning laws in these causes of action, Plaintiffs lack standing for the same reasons discussed in *Mosdos I*.  As to Defendants' actions in pursuing the *Chestnut Ridge* Action, the claims by Mosdos and YCC against the Village Defendants are barred as unpled compulsory counterclaims.  However, because the Court has concluded that the Individual Plaintiffs have alleged a selective enforcement claim against the Village Defendants and the Individual Defendants in their official capacity sufficient to defeat *Noerr-Pennington* immunity at this stage of the litigation, the rest of these causes of actions may proceed on behalf of the Individual Plaintiffs as well.  Defendants have not argued that Plaintiffs failed to state a claim as to any of these causes of action based on their elements; instead, Defendants argue that there should be total immunity under *Noerr-Pennington*, an argument already rejected by the Court.

In addition, the Amended Complaint also contains two causes of action pursuant to the Fair Housing Act ("FHA").  Unlike the rest of the claims, these claims are alleged specifically by the Individual Plaintiffs against the Individual Defendants acting in their individual capacity. Plaintiffs allege that "Defendants, by their conduct, acts, and legislative enactments, [(1)] have discriminated against the Plaintiffs by making unavailable and denying a dwelling to the Plaintiff because of its members' race, or religion in violation of 42 U.S.C. § 3604(a)," and (2) "have interfered with the Plaintiffs' exercise or enjoyment of rights protected by 42 U.S.C. § 3604, in violation of 42 U.S.C. § 3617."  (Am. Compl. ¶¶ 127, 131.)  Plaintiffs have not specified which conduct, acts, and legislative enactments by the Individual Defendants form the basis for their FHA claims.  The conduct of the Individual Defendants in their individual capacity in pursuing the *Chestnut Ridge* Action is completely protected under *Noerr-Pennington*.  If Plaintiffs are referring to other conduct or acts that are not subject to such immunity – and that Plaintiffs

46

would have standing to pursue – they have not indicated which acts.  Accordingly, these claims are dismissed.

G. Statute of Limitations

Pomona Defendants also argue that the action should be dismissed as time-barred by the applicable statute of limitations.  (Pomona Mem. 14-15.)[19]  Pomona Defendants assert that actions brought pursuant to § 1983, such as this one, are subject to a three year limitation period, and that the instant action was commenced on January 8, 2008, more than three years after the *Chestnut Ridge* Action was commenced in May 2004.  (*Id.* at 15.)  According to the Pomona Defendants, there are no later acts complained of in the Amended Complaint.  (*Id.*)

It is true that the *Chestnut Ridge* Action was commenced more than three years prior to the initiation of the present lawsuit.  However, as Pomona Defendants acknowledge, a § 1983 action accrues "when the plaintiff knows or has reason to know of the injury which is the basis of his action."  *Pearl v. City of Long Beach*, 296 F.3d 76, 80 (2d Cir. 2002).  YCC was named as a defendant in the *Chestnut Ridge* Action, and Mosdos was added shortly after.  However, the Individual Plaintiffs – who are the only Plaintiffs with surviving claims in the present action – are not parties to the *Chestnut Ridge* Action.  These Individual Plaintiffs did not know of their injury – and, in fact, had not suffered an actual injury – until Defendants sought to enjoin the planned use of the Nike Site and the state court issued the TRO preventing the Individual Plaintiffs from studying at Kiryas Radin.  Defendants filed an Order to Show Cause to halt the occupancy of the Nike Site on September 5, 2007.  (Pls.' Opp'n Ex. D.)  Even if Mosdos and

---

[19] Pomona Defendants assert that Plaintiffs' failure to timely bring their claims deprives the Court of subject matter jurisdiction pursuant to Fed. R. Civ. P. Rule 12(b)(1).  However, the law is well-established that statute of limitations is an affirmative defense that can be waived and is not jurisdictional.  *See* Fed. R. Civ. P. 8(c).  Accordingly, Rule 12(b)(1) is not implicated.

YCC were injured prior to then by being forced to defend the *Chestnut Ridge* Action, the Individual Plaintiffs were not injured until that date.  As that date is well less than three years before Plaintiffs commenced the present action, the remaining claims in this lawsuit are timely.

H.  Notice of Claim

Pomona Defendants argue that Plaintiffs' claims pursuant to the New York Constitution and New York Civil Rights Law are barred because Plaintiffs failed to file a notice of claim pursuant to N.Y. Gen Mun. L. §§ 50-e and 50-i.  (Pomona Mem. 15-16.)

"[I]n a federal court, state notice-of-claim statutes apply to *state*-law claims."  *Hardy v. N.Y.C. Health & Hosps. Corp.*, 164 F.3d 789, 793 (2d Cir. 1999); *see also Warner v. Vill. of Goshen Police Dep't*, 256 F. Supp. 2d 171, 175 (S.D.N.Y. 2003) ("The notice of claim requirements apply equally to state court claims brought as pendent claims in a federal civil rights action.").  New York law "provides that no tort action shall be prosecuted or maintained against a municipality or any of its officers, agents, or employees unless: (1) a notice of claim has been served against the [municipality]; (2) the [municipality] has refused adjustment or payment of the claim; and (3) the action is commenced within one year and ninety days after the event upon which the claim is based occurred."  *Gibson v. Comm'r of Mental Health*, No. 04-CV-4350, 2006 WL 1234971, at *5 (S.D.N.Y. May 8, 2006) (citing N.Y. Gen. Mun. Law § 50-i).  Plaintiffs are required to serve the notice of claim "within ninety days after the claim arises."  N.Y. Gen. Mun. Law § 50-e(1)(a).  This notice of claim requirement is "construed strictly by New York state courts," and a "[f]ailure to comply with these requirements ordinarily requires a dismissal for failure to state a cause of action."  *Hardy*, 164 F.3d at 793-94 (internal quotation marks and citation omitted).  While "New York's notice of claim requirements are not applicable to section 1983 claims brought in federal court . . . the requirements do apply to state law

48

personal injury claims that are brought in federal court as related to section 1983 cases."
*Gibson*, 2006 WL 1234971, at *5 (footnote omitted).

Therefore, the relevant inquiry is whether Plaintiffs' claims brought pursuant to the New

York State Constitution and New York Civil Rights Law are subject to New York's notice of

claim requirement.  In their memorandum of law, Plaintiffs argue that they were not required to

file a notice of claim because they maintain that §§ 50-e and 50-i only apply to state tort law

claims and not state constitutional or civil rights claims.  (Pls.' Opp'n 28.)[20]  Plaintiffs are correct

with respect to civil rights claims.  *See Swinton v. City of New York*, 877 N.Y.S. 2d 68, 70 (N.Y.

App. Div. 2009) ("[A] notice of claim is not required to assert a claim for civil rights

violations."); *Liu v. N.Y.C. Police Dep't*, 627 N.Y.S. 2d 683, 685 (N.Y. App. Div. 1995)

("Contrary to defendants' claim, actions against the municipality to recover for Federal and State

civil rights violations are not subject to the notice of claim requirements in General Municipal

Law § 50–i."); *see also Pratt v. Indian River Cent. Sch. Dist.*, No. 09-CV-411, 2011 WL

1204804, at *7 (N.D.N.Y. Mar. 29, 2011) (concluding that under New York law, claims pursuant

to New York Civil Rights Law are not subject to the notice of claim provisions).

However, in *Pratt*, the court concluded that under New York law, unlike civil rights

claims, state *constitutional* claims *are* subject to the notice of claim requirement.  *See Pratt*,

2011 WL 1204804, at *7.  In support of this contention, the court explained that the "New

[York] Court of Appeals has held that the notice-of-claim provisions of the General Municipal

Law § 50–i are applicable to a cause of action for 'constitutional torts' in violation of the New

---

[20] Plaintiffs also asserted that the notice of claim provisions do not apply to actions seeking to vindicate a public interest, without explaining why this lawsuit should be considered such an action.  (Pls.' Opp'n 28.)

York State Constitution." *Id.* (citing *423 S. Salina St., Inc. v. City of Syracuse*, 503 N.E.2d 63,

71 n.5 (N.Y. 1986)). However, the footnote cited in *423 S. Salinas St.* indicates that the *423 S.*

*Salinas St.* court based that determination on the Supreme Court's characterization, in *Wilson v.*

*Garcia*, 471 U.S. 261 (1985), of § 1983 actions as involving claims for personal injury, such that

"constitutional tort" actions would be within the notice of claim requirements. *423 S. Salinas*

*St.*, 503 N.E.2d at 71 n.5.

Based on the lack of clarity in New York law (and the rather brief analysis of this issue in

the memoranda of law submitted to the Court), at oral argument the Court pointed the Parties to

the *423 S. Salinas St.* case and requested that Plaintiffs and the Pomona Defendants submit

letters to the Court further addressing the applicability of the notice of claim requirement. On

July 20, 2011, Plaintiffs submitted a letter to the Court apparently conceding that, based on *423*

*S. Salinas St.*, New York considers state constitutional claims to be torts subject to the notice of

claim requirement. (Dkt. No. 68.) Accordingly, Plaintiffs request an order "extending the time

to file a Notice of Claim with each of the municipalities which are defendants herein." (*Id.*)

However, this Court does not have jurisdiction to grant leave to serve a late notice of

claim. New York law provides that "[u]pon application, the court, in its discretion, may extend

the time to serve a notice of claim," and lists several factors to consider in determining whether

to grant an extension. N.Y. Gen. Mun. Law § 50-e(5). The statute goes on to state that "[a]ll

applications under this section shall be made to the supreme court or to the county court . . . ."

*Id.* § 50-e(7). The Second Circuit has not definitively ruled on whether a federal district court

may grant a request to extend time to serve the notice of claim. *See Corcoran v. N.Y. Power*

*Auth.*, 202 F.3d 530, 540 (2d Cir. 1999) (noting that the "appropriate state court may extend the

time to file a notice of claim" under § 50-e, but declining to decide "whether the federal court

has such jurisdiction" because the request for leave to file a late notice of claim was properly denied on the merits); *cf. Parise v. N.Y.C. Dep't of Sanitation*, No. 03-CV-1673, 2007 WL 2746912, at *7 (E.D.N.Y. Sept. 19, 2007) ("[T]here is an open question as to whether a federal district court, as opposed to a state supreme court or a county court, has jurisdiction to permit the amendment of a notice of claim."), *aff'd*, 306 F. App'x 695 (2d Cir. 2009).

However, district courts within this Circuit "have routinely found that they lack jurisdiction to even consider such an application." *Humphrey v. Cnty. of Nassau*, No. 06-CV-3682, 2009 WL 875534, at *21 (E.D.N.Y. Mar. 30, 2009) ("This [c]ourt agrees with the overwhelming weight of authority among district courts in the Second Circuit and finds that Section 50-e(7) permits only certain state courts – the supreme court or the county court in certain counties – to consider and to grant an application for an extension of time in this context." (alteration and internal quotation marks omitted) (collecting cases)); *see also Houston v. Nassau Cnty.*, No. 08-CV-197, 2011 WL 477732, at *7-8 (E.D.N.Y. Feb. 2, 2011) (agreeing with the "overwhelming weight of authority" among Second Circuit district courts that only certain state courts are permitted to grant leave to file a late notice of claim and, "[t]herefore, in this case, the [district c]ourt lacks jurisdiction, pursuant to Section 50-e(7), to deem plaintiff's state law claims against the [municipal] defendant timely filed or to grant an extension of time to file"); *Harris v. Howard*, No. 08-CV-4837, 2010 WL 2404293, at *1 (S.D.N.Y. June 15, 2010) ("A federal judge does not have the power to authorize the filing of a late notice of claim against [a municipality]."); *Costabile v. Cnty. of Westchester*, 485 F. Supp. 2d 424, 431 (S.D.N.Y. 2007) (holding that district court "lack[ed] jurisdiction to decide plaintiffs' application to serve a late notice of claim"); *Gibson*, 2006 WL 1234971, at *5 ("Federal courts do not have jurisdiction to hear complaints from plaintiffs who have failed to comply with the notice of claim requirement,

51

or to grant permission to file a late notice."); *Polite v. Button*, 999 F. Supp. 705, 708 (N.D.N.Y. 1998) (concluding that district court lacked "jurisdiction to entertain plaintiff's motion for leave to file a late notice of claim," because "[s]uch applications must be made to the supreme or county court"); *Brown v. Metro. Transp. Auth.*, 717 F. Supp. 257, 260 (S.D.N.Y. 1989) ("Until the state legislature amends § 50-e(7) to include federal trial courts, [the court has] no choice but to dismiss for lack of jurisdiction plaintiff's application to file a late notice of claim or to have his notice of claim deemed timely filed."). Therefore, this Court lacks jurisdiction, under § 50-e(7), to grant an extension of time to file a late notice of claim and such requests must be directed to the appropriate state court. Accordingly, Plaintiffs' claims against the Pomona Defendants pursuant to the New York State Constitution are dismissed without prejudice.

    I.  Qualified Immunity

    Pomona Defendants argue that the individually named Pomona Defendants – the Mayor Nicholas Sanderson ("Sanderson"), the former Mayor Herbert Marshall ("Marshall"), and the Board of Trustees – are entitled to qualified immunity. (Pomona Mem. 17.) As already discussed, the claims against the Individual Defendants in their individual capacity are dismissed pursuant to the immunity afforded by the *Noerr-Pennington* doctrine. At this time, the Court need not address whether qualified immunity would be available to Sanderson and Marshall in their official capacity because Pomona Defendants are correct that the Amended Complaint contains no specific allegations regarding these individuals. Besides the caption, the only mention of Sanderson and Marshall is in the description of the Parties, where Plaintiffs state that Sanderson and Marshall each have "acted and participated in the underlying discrimination set forth in this complaint." (Am. Compl. ¶¶ 24-25.) Such conclusory statements, without any factual allegations as to the discriminatory conduct of these individuals, are insufficient to state a

plausible claim under *Twombly*. Accordingly, the claims against Sanderson and Marshall in their official capacity are dismissed.

### III.  Conclusion

For the reasons stated herein, the claims of Plaintiffs Mosdos and YCC are dismissed in their entirety.  The claims by the Individual Plaintiffs against the Individual Defendants in their individual capacity also are dismissed, as are the claims against Sanderson and Marshall in their official capacity, though without prejudice.  To the extent Plaintiffs are challenging the Village Defendants' zoning regulations and laws, those claims are dismissed.  Plaintiffs' claims against the Pomona Defendants under the New York State Constitution are dismissed without prejudice. The motions to dismiss are denied in all other respects.  The Clerk of Court is respectfully directed to terminate the pending motions.  (Dkt. Nos. 52 and 55.)


SO ORDERED.

Dated:          White Plains, New York
                September 26 , 2011

                                              KENNETH M. KARAS
                                              UNITED STATES DISTRICT JUDGE

Service List (via ECF)

Joseph J Haspel, Esq.
Joseph J. Haspel, PLLC
40 Matthews Street
Goshen, NY 10924
(845) 294-8950
Fax: (845) 294-3843
Email: jhaspel@haspellaw.net
Counsel for Plaintiffs

Gregory R. Saracino, Esq.
Milber Makris Plousadis & Seiden, LLP
3 Barker Avenue; 6th Floor
White Plains, NY 10601
(914) 260-5097
Fax: (914) 681-8709
Email: gsaracino@milbermakris.com
Counsel for Defendants Village of Pomona, Mayor and Board of Trustees of the Village of
Pomona, Herbert I. Marshall, and Nicholas L. Sanderson

Michael D. Zarin, Esq.
Daniel Richmond, Esq.
Zarin & Steinmetz
81 Main Street, Suite 415
White Plains, NY 10601
(914) 682-7800
Fax: (914) 683-5490
Email: mzarin@zarin-steinmetz.net
Counsel for Remaining Defendants