UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

RABBI JAMES BERNSTEIN, et al.,

                             Plaintiffs,

    v.

THE VILLAGE OF WESLEY HILLS, et al.,

                             Defendants.

---

THE VILLAGE OF CHESTNUT RIDGE, et al.,

                             Plaintiffs/Counterclaim
                             Defendants,

    v.

MOSDOS CHOFETZ CHAIM, INC.,

                             Defendant/Counterclaim
                             Plaintiff.

---

Case Nos. 08-CV-156 (KMK)
            12-CV-8856 (KMK)

OPINION AND ORDER

Appearances:

Joseph J. Haspel, Esq.
Joseph J. Haspel, PLLC
Goshen, New York
*Counsel for Plaintiffs/Counterclaim Plaintiff*

Philip J. Murphy, Esq.
Philip J. Murphy, PLLC
New York, NY
*Counsel for Counterclaim Plaintiff*

Gregory R. Saracino, Esq.
Milber Makris Plousadis & Seiden, LLP
White Plains, New York
*Counsel for Village of Pomona in Case No. 08-CV-156*

Michael D. Zarin, Esq.
Jody Tamar Cross, Esq.
Zarin & Steinmetz
White Plains, New York
*Counsel for Remaining Defendants in Case No. 08-CV-156,*
*and Counterclaim Defendants in Case No. 12-CV-8856*

KENNETH M. KARAS, District Judge:

Plaintiffs are religious corporations and individuals affiliated with the Chofetz Chaim

sect of Orthodox Judaism, and they allege an interest in the operation of Kiryas Radin, a

religious educational institution and center for religious activity and prayer, located on 4.7 acres

of unincorporated land in the Town of Ramapo ("Ramapo") known as the Nike Site.  Defendants

are four Villages, each located within Ramapo, and current and former officials of those

Villages.  Plaintiffs bring claims under federal and state law relating to a 2004 lawsuit filed by

Defendants against Ramapo pertaining to the Nike Site.

Before the Court are three Motions for Summary Judgment arising in a consolidated

Action.  The pending Motions pertain to surviving claims in Case No. 08-CV-156 (the "2008

Action") and counterclaims in Case No. 12-CV-8856 (the "*Chestnut Ridge* Action").  Plaintiffs

Mosdos Chofetz Chaim, Inc. ("Mosdos"), Rabbi James Bernstein ("Bernstein"), Moshe Ambers

("Ambers"), Rabbi Mayer Zaks ("M. Zaks"), and Rabbi Aryeh Zaks ("A. Zaks") (without

Mosdos, the "Individual Plaintiffs") (collectively, "Plaintiffs") filed a Motion for Summary

Judgment.  (Dkt. No. 108).  Defendants David A. Goldsmith (former Trustee and current Mayor,

Village of Wesley Hills ("Wesley Hills")) ("Goldsmith"), Edward B. McPherson (Trustee and

Deputy Mayor, Wesley Hills) ("McPherson"), Robert H. Frankl (former Mayor, Village of

Wesley Hills) ("Frankl"), Robert I. Rhodes (former Trustee, Wesley Hills) ("Rhodes"), Jay B.

Rosenstein (former Trustee, Wesley Hills) ("Rosenstein"), Howard L. Cohen (Trustee, Village of

Chestnut Ridge ("Chestnut Ridge")) ("Cohen"), Jerome Kobre (former Mayor, Chestnut Ridge)

("Kobre"), Jeffrey Oppenheim (former Trustee and current Mayor, Village of Montebello

("Montebello")) ("Oppenheim"), Kathryn Ellsworth (former Mayor, Montebello) ("Ellsworth")

(together, the "Individual Defendants"), Wesley Hills, Chestnut Ridge, Montebello (together

with the Individual Defendants, "non-Pomona Defendants"), and the Village of Pomona

("Pomona") (together with Chestnut Ridge, Montebello, and Wesley Hills, the "Villages")

(collectively, "Defendants"), filed two Motions for Summary Judgment.  Pomona joined the first

Motion for Summary Judgment filed by the non-Pomona Defendants, (Dkt. No. 101), and also

filed its own Motion, (Dkt. No. 106).[1]

 For the reasons stated herein, Defendants' Motions for Summary Judgment are granted,

and Plaintiffs' Motion for Summary Judgment is denied.

---

[1] Unless otherwise noted, all docket numbers refer to those in Case No. 08-CV-156. Defendants filed an identical Motion for Summary Judgment in Case No. 12-CV-8856, (No. 12-CV-8856 Dkt. No. 39), though in that case it was also filed on behalf of Pomona; Pomona did not file a separate motion.  Plaintiffs also filed an identical Motion for Summary Judgment in the same case.  (No. 12-CV- 8856 Dkt. No. 44.)  The documents filed in response to the Motions in that case are also identical to those filed in Case No. 08-CV-156.

The Court also notes a few inconsistencies on the docket.  First, Frankl is listed on the docket as "Robert H. Frankel."  (*See* Dkt.)  Based on his declaration, however, the proper spelling of his last name is Frankl.  (*See* Decl. of Robert Frankl (Dkt. No. 120).)  Accordingly, all references to Frankl in this Opinion refer to the Defendant listed as "Frankel" on the docket. Second, McPherson is listed as terminated on the docket as of the date that Plaintiffs filed their Amended Complaint.  (*See* Dkt.)  However, Plaintiffs' Amended Complaint includes claims against McPherson, and the Court accordingly includes him as a Defendant.  (*See* Am. Compl. (Dkt. No. 45).)  Third and finally, Milton B. Shapiro and Dr. Sonya Shapiro are listed as Plaintiffs/Counterclaim Defendants in Case No. 12-CV-8856.  (*See* No. 12-CV-8856 Dkt.) Mosdos's counterclaims do not contain any allegations against these Plaintiffs, and no Party appears to have even mentioned them, other than including them in the case caption, in their summary judgment memoranda.  Accordingly, they are not listed as Plaintiffs here, and any claims against them are dismissed.

Additionally, while Mosdos's only surviving claims in this Action are its counterclaims, the Court refers to all Parties who have claims against Defendants as Plaintiffs.

I.  Background

The heart of Plaintiffs' case is their allegation that Defendants colluded to file the

*Chestnut Ridge* Action—which claimed, in relevant part, that Ramapo's environmental review of

Kiryas Radin prior to its approval was insufficient under state law—for discriminatory reasons.

Plaintiffs allege that Defendants, "[h]iding behind a false façade as protectors of the environment

. . . utilized municipal government authority to advance their campaign against the spread of

Orthodox Jewery in the Town of Ramapo."  (Pls.' Mem. of Law in Supp. of Mosdos Claimants

Mot. for Summ. J. ("Pls.' Mem.") 3 (Dkt. No. 110).) [2]

In the 2008 Action, Plaintiffs alleged claims under 42 U.S.C. §§ 1981, 1982, 1983, and

1985(3) for violations of, and conspiracy to violate, their rights under the Free Exercise,

Establishment, and Free Association clauses of the First and Fourteenth Amendments, and the

Equal Protection Clause of the Fourteenth Amendment of the United States Constitution, as well

as claims under the Fair Housing Act ("FHA"), 42 U.S.C. § 3604, et seq., Article I, Section 3

(Free Exercise) and Article I, Section 11 (Equal Protection) of the New York State Constitution,

and § 40-c of the New York Civil Rights Law.  (*See* Am. Compl. ¶¶ 114–154 (Dkt. No. 45).)  At

this stage of the litigation, the only claims remaining from the 2008 Action are the Individual

Plaintiffs' §§ 1981, 1982, 1983, 1985(3) and New York Civil Rights Law claims against the

Villages and the Individual Defendants sued in their official capacities, and the Individual

Plaintiffs' New York State Constitution claims against the same Parties, except for Pomona.  *See*

*Mosdos Chofetz Chaim, Inc. v. Village of Wesley Hills,* 815 F. Supp. 2d 679, 711 (S.D.N.Y. Sept.

26, 2011) ("*Mosdos II*").

---

[2] The Court notes that Plaintiffs' Memorandum of Law is far longer than the Court's 25-page limit.  Plaintiff did not request, nor did the Court grant, permission to exceed this limit.

4

In the *Chestnut Ridge* Action, Mosdos filed counterclaims against the Villages under 42 U.S.C. § 1983 for violations of the Free Exercise and Free Speech clauses of the First and Fourteenth Amendments, the Religious Land Use and Institutionalized Persons Act of 2000 ("RLUIPA"), 42 § U.S.C. 2000cc, et seq., and the FHA.  (No. 12-CV-8856, Notice of Removal Ex. B ("Counterclaims") ¶¶ 368–94 (Dkt. No. 1).)  The remaining claims in the 2008 Action, together with the counterclaims in the *Chestnut Ridge* Action, are the subject of the Motions before the Court.  (*See* Defs.' Joint Rule 56.1 Statement ("Defs.' 56.1") ¶¶ 17, 98 (Dkt. No. 102) (noting consolidation and that only the counterclaims survive in the *Chestnut Ridge* Action).)

In support of their claims, Plaintiffs make allegations against the Individual Defendants, claiming that they acted with a discriminatory purpose.  Despite structuring their claims as against all Defendants, however, Plaintiffs make no individual allegations against Cohen, Kobre, Oppenheim, or Ellsworth.  (Defs.' 56.1 ¶¶ 157–59.)  Counsel for Plaintiffs confirmed the lack of allegations at oral argument, and agreed to the dismissal of Plaintiffs' allegations against these Defendants for that reason.  While Plaintiffs also only make one allegation against each of McPherson, Frankl, and Rosenstein, namely an "'effort to restrict the Orthodox/Hasidic Jewish population in . . . Ramapo and its environs,'" (*id.* ¶¶ 158–59 (quoting Am. Compl. ¶ 100)), their primary allegations are against Rhodes.  According to Plaintiffs, Rhodes "'advocated fertility testing and complained about the birth rate of the Orthodox Hasidic community within . . . Ramapo'" in a blog post he authored as chairman of an organization called "Preserve Ramapo." (*Id.* ¶¶ 164–65, 173 (quoting Am. Compl. ¶ 92).)[3]  Plaintiffs contend that that Wesley Hills and

---

[3] Plaintiffs also allege that Preserve Ramapo has used the Wesley Hills Village Hall for political purposes, free of cost.  (Defs.' 56.1 ¶ 172.)  The blog posts appear to have been written for an organization called "Save Ramapo."  (*See* Aff'n of A. Zaks ("A. Zaks June Aff'n") Ex. A (June 20, 2014) (Dkt. No. 114).)  It is not clear what difference there is between these two organizations, if any.

Rhodes are active in, and helped found, Preserve Ramapo, which Plaintiffs allege was "'formed to create separation and feigned plausible deniability between the elected officials advocating against the ultra-orthodox/Hasidic communities and the municipal government.'"  (*Id.* ¶¶ 170–71 (quoting Am. Compl. ¶ 94).)[4]

By Plaintiffs' own admission, their claims at this stage of the litigation are dependent on their allegation that Defendants did not bring legal challenges against development projects that were, other than not being run by members of the Hasidic community, similar to Kiryas Radin in all material respects.  (*See, e.g.,* Pls.' Mem. 5 ("[T]o successfully establish that [Defendants] violated [Plaintiffs'] civil rights, it is incumbent upon the [Plaintiffs] to show that [Defendants] selectively treated [Plaintiffs] in instituting their failed legal proceedings regarding Kiryas Radin . . . .").)  It is by proving these allegations that Plaintiffs intend to show that they have been selectively treated.

A.  Factual Background

Over the last several decades, Orthodox and Hasidic Jews have resided in Ramapo in increasing numbers.  Beginning in the late 1960s, several Villages in Ramapo incorporated with the stated purpose of preserving existing zoning in their communities.  (*See* Pls.' Rule 56.1 Statement ("Pls.' 56.1") ¶ 7 (Dkt. No. 113); Defs.' Joint Response to Pls.' Rule 56.1 Statement ("Defs.' Counter 56.1") ¶ 7 (Dkt. No. 117).)[5]  In 1997, Yeshiva Chofetz Chaim of Radin

---

[4] In response, Rhodes testified that Preserve Ramapo exists to ensure zoning laws are obeyed and that environmental impact is adequately investigated.  (*See* Defs.' 56.1 ¶ 174.) Additionally, Goldsmith, Frankl, and McPherson testified that they were unaware of any time that Preserve Ramapo used the Wesley Hills Village Hall.  (*See id.* ¶¶ 175–78.)

[5] Plaintiffs allege that Montebello, Chestnut Ridge, and Wesley Hills "were established for the discriminatory purpose of controlling Hasidic Jewish immigration and land use within each village and what religious exercise would be tolerated," but Defendants contend that the

("YCC") purchased the Nike Site and "applied for site plan approval to use the Nike Site as a religious school and community center, with dormitories consisting of 44 units in the 12 pre-existing residential buildings" on the site. *In re Village of Chestnut Ridge v. Town of Ramapo*, 953 N.Y.S.2d 75, 79 (App. Div. 2012) ("*Chestnut Ridge II*"). On July 3, 2003, the County of Rockland Department of Planning issued a disapproval of the YCC proposal, "citing concerns relating to traffic and community character." *Id.*

In 2000, Christopher St. Lawrence was elected Town Supervisor of Ramapo, and preparations for an update of the Ramapo's Comprehensive Master Plan ("Comprehensive Plan") were initiated. (Pls.' 56.1 ¶¶ 9–10; *see also* Defs.' Counter 56.1 ¶¶ 9–10.)[6] Following the completion of an environmental review, Ramapo adopted a new Comprehensive Plan on or about January 29, 2004, which included a provision for student housing. (*See* Pls.' 56.1 ¶¶ 13–14; Defs.' Counter 56.1 ¶¶ 13–14.) Ramapo subsequently considered a zoning amendment, the Adult Student Housing Law ("ASHL"), designed to permit adult student housing, by permit, in all residential zones as an accessory to approved postsecondary institutions. *Chestnut Ridge II*, 953 N.Y.S.2d at 79. (*See also* Defs.' 56.1 ¶ 43 (describing the ASHL as permitting "high density multi-family housing [as an] accessory to an educational institution").) After making many of

---

Villages were established in response to concerns about Ramapo's zoning practices. (*Id.* ¶¶ 99–101, 103–04.) The Court takes judicial notice of the fact that Pomona was incorporated in 1967, Wesley Hills was incorporated in 1982, and Chestnut Ridge and Montebello were incorporated in 1986. (*See* Pls.' Mem. 11; Joint Decl. of Jody T. Cross and Gregory R. Saracino ("Defs.' Decl.") Ex. P (McPherson Dep. Tr.), at 11 (Dkt. No. 104); *id.* Ex. S (Oppenheim Dep. Tr.), at 17; *id.* Ex. T (Kobre Dep. Tr.), at 20.)

[6] According to the New York State Appellate Division, Second Department ("Second Department"), this was the first substantial revision of the Ramapo Comprehensive Plan since 1978, and such revision was designed to address "zoning in the unincorporated areas of" Ramapo. *Chestnut Ridge II*, 953 N.Y.S.2d at 79.

the modifications to the law recommended by the County of Rockland Department of Planning, and following the completion of a separate environmental review, Ramapo adopted the ASHL as part of a new Comprehensive Zoning Law, on or about November 22, 2004.  *Chestnut Ridge II*, 953 N.Y.S.2d at 79–80.  (*See also* Defs.' Counter 56.1 ¶ 14 (discussing passage of this law).)

Prior to the adoption of the ASHL, and subject to variances, legislative action, and other applicable laws, the land on which the Nike Site is located was zoned as R-25 (one dwelling per 25,000 sq. ft.), meaning that only eight units could have been erected on the site.  (Defs.' 56.1 ¶¶ 48, 121; *see also* Pls.' Counter Rule 56.1 Statement ("Pls.' Counter 56.1") ¶¶ 48, 121 (Dkt. No. 115).)  The ASHL thus facilitated YCC's plans to develop a facility for religious study on the Nike Site.  (*See* Defs.' 56.1 ¶¶ 47; Pls.' 56.1 ¶ 15.)

While the ASHL was being considered, YCC submitted an updated site plan for 60 units of multifamily housing on the Nike Site.  (*See* Pls.' 56.1 ¶ 17; Defs.' Counter 56.1 ¶ 17).  *See also Chestnut Ridge II*, 953 N.Y.S.2d at 80.[7]  The proposal included a "traffic impact study" which concluded that the project would "not result in a significant negative impact on the area roadways."  *Chestnut Ridge II*, 953 N.Y.S.2d at 80.  On April 15, 2004, the County of Rockland Department of Planning issued a disapproval of YCC's updated site plan, noting the requisite changes in Ramapo zoning law had not yet been adopted.  *Id.*  On November 30, 2004, however, following the adoption of the ASHL and a public hearing, the Ramapo Planning Board issued a negative declaration for the proposal, approving the project and certifying that it would not have

---

[7] The Nike Site was one of four sites in the unincorporated portion of Ramapo "likely [to] be developed" under the ASHL.  (Defs.' Decl. Ex. D (*Chestnut Ridge* Action amended petition) ¶ 112.)  *See also In re Vill. of Chestnut Ridge v. Town of Ramapo*, 841 N.Y.S.2d 321, 326 (App. Div. 2007) (explaining that ASHL "anticipated to be applicable initially only to four sites in the unincorporated area of" Ramapo).

a "significant adverse environmental impact," meaning that construction could proceed without further environmental review.  (Defs.' 56.1 ¶ 61; Joint Decl. of Jody T. Cross and Gregory R. Saracino ("Defs.' Decl.") Ex. X (negative declaration) (Dkt. No. 104).)  *See also* N.Y. Comp. Codes R. & Regs. tit. 6, § 617.2(y) (defining "negative declaration" as a "written determination by a lead agency that the implementation of [an] action as proposed will not result in any significant adverse environmental impacts"); *Westchester Day Sch. v. Village of Mamaroneck*, 504 F.3d 338, 345–46 (2d Cir. 2007) (defining a "negative declaration" as a "finding that the project would have no significant adverse environmental impact and thus that consideration of the project could proceed").[8]  The negative declaration cited the aforementioned traffic study, but also required that a barrier-separated bus stop be created, and that plantings be used to minimize the impact of the proposal on the community character of the surrounding neighborhood.  (*See* Defs.' Decl. Ex. X (negative declaration).)  *See also Chestnut Ridge II*, 953 N.Y.S.2d at 80.

    B.  State Court History

    In October 2004, the Villages, together with four other individuals (the "*Chestnut Ridge* Plaintiffs"), brought suit against Ramapo and certain of its administrative boards in New York Supreme Court, Westchester County.  (Defs.' 56.1 ¶¶ 1, 59.)  In this lawsuit, the Chestnut Ridge Plaintiffs alleged that Ramapo's adoption of the ASHL, as well as its approval of the first project thereunder, a "sixty . . . unit multi-family adult student housing development"—Kiryas Radin, did not comply with the New York State Environmental Quality Review Act ("SEQRA"), N.Y. Envtl. Conserv. Law § 8-0101, et seq.  (*Id.* ¶¶ 1; *see also id.* ¶¶ 42–43, 47.)  The *Chestnut Ridge* Action initially consisted of twelve causes of action, all of which were directed at the ASHL; the

---

    [8] Defendants suggest that, despite the ASHL, the Nike Site plan required additional zoning variances in order to be built.  (Defs.' 56.1 ¶ 52.)

*Chestnut Ridge* Plaintiffs amended their Petition on December 23, 2004 to add a challenge to Ramapo's approval of Kiryas Radin.  (*See id.* ¶¶ 62–63; Defs.' Decl. Ex. D (*Chestnut Ridge* Action amended petition).)  *See also Village of Chestnut Ridge v. Town of Ramapo*, No. 07-CV-9278, 2008 WL 4525753, at *5 (S.D.N.Y. Sept. 30, 2008) (describing amendment).  In their Petition, the *Chestnut Ridge* Plaintiffs specifically alleged that Ramapo "short-circuited the SEQRA process[] and failed to rationally study and mitigate the potential significant adverse environmental impacts of the ASHL and the Nike Site [p]roject," including "traffic, sewer capacity, water usage, and community character," which they alleged could have been mitigated through a reduction in the planned housing density.  (Defs.' 56.1 ¶¶ 44–46.)  The Petition also named YCC, which at the time still owned the Nike Site, and Scenic Development LLC, an owner of a property known as "Patrick Farm," which at the time was also advancing a proposal under the ASHL.  (*Id.* ¶¶ 2–3.)

 In January 2005, the *Chestnut Ridge* Plaintiffs sought a preliminary injunction "enjoin[ing], inter alia, the issuance of any additional approvals by [Ramapo] under the ASHL [and] . . . the issuance of building permits in connection with the Nike Site."  (Defs.' 56.1. ¶ 64 (italics omitted).)  On August 2, 2005, Judge Nicolai of the New York Supreme Court granted a preliminary injunction to two of the individual *Chestnut Ridge* Plaintiffs, but dismissed the claims brought by the other *Chestnut Ridge* Plaintiffs, determining that they lacked standing.  (*Id.* ¶¶ 65, 67 (citing *Village of Chestnut Ridge v. Town of Ramapo*, No. 04-1686 (N.Y. Sup. Ct. Aug. 2, 2005)).)  *See also Chestnut Ridge II*, 953 N.Y.S.2d at 81.  The preliminary injunction lapsed because the *Chestnut Ridge* Plaintiffs who were granted the injunction failed to post the necessary financial undertaking, and Kiryas Radin was completed thereafter.  (Defs.' 56.1 ¶¶ 68–69; Pls.' Counter 56.1 ¶ 69.)

10

On August 14, 2007, upon appeal of Judge Nicolai's decision, the New York State Appellate Division, Second Department ("Second Department") held, inter alia, that all four Villages—Wesley Hills, Montebello, Chestnut Ridge, and Pomona—had standing to challenge the ASHL, and that Wesley Hills had standing to challenge Kiryas Radin.  (Defs.' 56.1 ¶ 70 (citing *In re Vill. of Chestnut Ridge v. Town of Ramapo*, 841 N.Y.S.2d 321, 333 (App. Div. 2007) ("*Chestnut Ridge I*")).)  The court held that the Villages had "'established a basis for legitimate concern . . . that the development permitted by the [ASHL] [would] have a substantial detrimental effect on the roads in their community, their shared water supply and sewer systems, and the character of their neighborhoods," (*id.* ¶ 71 (quoting *Chestnut Ridge I*, 841 N.Y.S.2d at 338 (first and second alterations in original))), but that only Wesley Hills had "alleged any such interest in the [Nike Site] plan application," *Chestnut Ridge I*, 841 N.Y.S.2d at 339 (noting that "[t]he Villages have established a demonstrated interest in the potential environmental impacts of the adult student housing law" (internal quotation marks omitted)).[9]  Based on that finding, Judge Nicolai issued another injunction on September 11, 2007, prohibiting, inter alia, occupation of Kiryas Radin.  (Defs.' 56.1 ¶ 72 (citing *Village of Chestnut Ridge*, 2008 WL 4525753, at *5).)

In the interim, in December 2005, YCC conveyed the deed for the Nike Site to Mosdos; Mosdos was added as a party in the *Chestnut Ridge* Action for that reason, at Judge Nicolai's direction, on September 26, 2007.  (*Id.* ¶¶ 4, 73–75, 81.)  *See also Village of Chestnut Ridge*, 2008 WL 4525753, at *5 (describing this process).[10]  In its Answer, Mosdos included several

___

[9] On April 2, 2009, the New York Court of Appeals denied the *Chestnut Ridge* Defendants' request for leave to appeal.  *See Village of Chestnut Ridge v. Town of Ramapo*, 906 N.E.2d 1072 (N.Y. 2009).

[10] As discussed below, Mosdos's ownership of the Nike Site has been called into question in related case *Mosdos Chofetz Chaim Inc. v. RBS Citizens,* No. 12-CV-7067 (S.D.N.Y. filed September 9, 2012).  (Pls.' Counter 56.1 ¶ 14.)

counterclaims, alleging that by filing the *Chestnut Ridge* Action, the *Chestnut Ridge* Plaintiffs

violated its civil rights.  (*Id.* ¶ 78; *see also* Counterclaims ¶¶ 368–94.)  Mosdos removed the case

to federal court on October 16, 2007, but the Villages successfully sought a remand from this

Court on September 30, 2008.  (Defs.' 56.1 ¶ 80.)  *See also Village of Chestnut Ridge*, 2008 WL

4525753, at *1 (remanding case).[11]

On December 8, 2009, Judge Nicolai dismissed the *Chestnut Ridge* Plaintiffs' ASHL

claims, but held, inter alia, that Ramapo's review of the Nike Site violated SEQRA.  (*See* Defs.'

56.1 ¶¶ 87–96.)  Judge Nicolai found that Ramapo had failed to take the required "hard look" at

several areas of environmental concern, including community character, traffic, sewer, and water

impacts, and made insufficient, conclusory statements in its negative declaration.  (*Id.* ¶¶ 87–92.)

*See also Mosdos Chofetz Chaim Inc. v. Village of Wesley Hills*, 701 F. Supp. 2d 568, 579

(S.D.N.Y. 2010) ("*Mosdos I*") (discussing this opinion).  On appeal, on October 17, 2012, the

Second Department dismissed the *Chestnut Ridge* Action in its entirety, finding that while the

lower court properly dismissed the ASHL claims, it incorrectly ruled that Ramapo's

environmental review of Kiryas Radin violated SEQRA.  (Defs.' 56.1 ¶¶ 94–96 (citing *Chestnut

Ridge II*, 953 N.Y.S.2d at 84).)  The ruling did not address Mosdos's counterclaims, however.

C.  Federal Court History

On January 8, 2008, Plaintiffs commenced an action in this Court against the Villages,

contending, as Mosdos did in its counterclaims, that the *Chestnut Ridge* Action violated their

civil rights.  (Defs.' 56.1 ¶¶ 6–7, 82; *see also* Compl. (Dkt. No. 1).)  Plaintiffs alleged that the

Villages engaged in "[d]iscriminatory conduct in application of the law regarding religious uses

---

[11] The case was previously removed to federal court, and remanded back to state court, in 2004.  *See Village of Chestnut Ridge*, 2008 WL 4525753, at *2.

within . . . Ramapo."  (Compl. ¶ 1.)  On March 31, 2010, this Court granted Defendants' Motion To Dismiss the Complaint, without prejudice, finding that the claims filed by the Mosdos Plaintiffs should have been brought as compulsory counterclaims under Federal Rule of Civil Procedure 13 in the *Chestnut Ridge* Action, but granting leave to amend the Complaint.  (Defs.' 56.1 ¶¶ 83–85).  *See also Mosdos I*, 701 F. Supp. 2d at 590, 592–93.  In dismissing the Complaint, the Court also found that the *Chestnut Ridge* Action was protected by the First Amendment under the *Noerr-Pennington* doctrine, subject to limitations imposed by the Equal Protection Clause of the Fourteenth Amendment.  *See Mosdos I*, 701 F. Supp. 2d at 602.  The Court explained that Defendants' immunity under the doctrine could be defeated, and Plaintiffs' claims could survive, if Plaintiffs alleged, with reference to similarly-situated comparator sites, that Defendants used environmental concerns as mere pretext for singling out the Nike Site because of its association with the Hasidic community.  *See id.* at 603–604.

On June 3, 2010, Plaintiffs filed the instant Amended Complaint.  (*See* Am. Compl.)  On September 26, 2011, the Court granted Defendants' Motion To Dismiss the Amended Complaint in part, dismissing all claims brought by the Mosdos (and YCC, who was a Plaintiff at the time), all claims brought by the Individual Plaintiffs against the Individual Defendants in their official capacities, all claims challenging the Villages' zoning regulations and laws (which were newly alleged in the Amended Complaint), and all claims against Pomona and Pomona officials based on the New York State Constitution.  *See Mosdos II,* 815 F. Supp. 2d 679, 711.

On December 5, 2012, Mosdos removed the *Chestnut Ridge* Action, consisting at that time of only the counterclaims that Mosdos interposed.  (Defs.' 56.1 ¶¶ 17, 97; *see also* No. 12-CV-8856 Notice of Removal.))  Discovery was completed in January 2014.  (*See* Letter from Michael D. Zarin, Esq., to Court (Jan. 13, 2014) (Dkt. No. 94) (acknowledging the completion of

13

fact discovery).)  In the interim, the 2008 Action and *Chestnut Ridge* Action were consolidated

on consent.  (*See* Letter from Joseph J. Haspel, Esq., to Court (June 5, 2013) (acknowledging

consolidation of the cases without opposition) (No. 12-CV-8856 Dkt. No. 9); *see also* Defs.'

56.1 ¶ 17.)[12]  The Court thereafter held a pre-motion conference on February 11, 2014, and set a

schedule for motions for summary judgment.  (*See* Order (Dkt. No. 96).)  After granting three

extensions (*see* Dkt. Nos. 97–99), the Parties filed their Motions for Summary Judgment and

associated documents on May 9, 2014.  (Dkt. Nos. 101–112.)[13]  The Parties filed opposition

materials on June 20, 2014, (Dkt. Nos. 114–126), and replies on July 11, 2014, (Dkt. Nos. 127–

129).  On February 6, 2015, the Court ordered supplemental briefing from Defendants on

whether Mosdos should be granted leave to amend its counterclaims, (Dkt. No. 131), which

Defendants submitted on February 13, 2015, (Dkt. No. 132).  On the same day, the Court ordered

a response from Mosdos on the same issue, (Dkt. No. 133), which Mosdos filed on February 23,

2015, (Dkt. No. 134).  The Court held oral argument on March 5, 2015, (*see* Dkt. No. 130

(calendar notice)), and on March 17, 2015, ordered additional briefing from the Parties on the

issue of whether Defendants had notice of the existence of certain comparator sites, (Dkt. No.

138).  The Court granted two extensions to the briefing deadline, (Dkt. Nos. 137, 139), and the

Parties submitted their letter briefs in response on March 25, 2015, (Dkt. Nos. 140–41).

---

[12] The Court also remanded a contempt order to New York Supreme Court on December 6, 2013.  (*See* No. 12-CV-8856 Dkt. No. 34).

[13] Due to a docketing error, Plaintiffs refiled their Rule 56.1 Statement on May 10, 2014. (Dkt. No. 113.)

II.  Discussion

A.  Standard of Review

Summary judgment is appropriate where the movant shows that "there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed.

R. Civ. P. 56(a); *see also Psihoyos v. John Wiley & Sons, Inc.*, 748 F.3d 120, 123–24 (2d Cir.

2014) (same).  "In determining whether summary judgment is appropriate," a court must

"construe the facts in the light most favorable to the non-moving party and . . . resolve all

ambiguities and draw all reasonable inferences against the movant."  *Brod v. Omya, Inc.*, 653

F.3d 156, 164 (2d Cir. 2011) (internal quotation marks omitted); *see also Borough of Upper

Saddle River. v. Rockland Cnty. Sewer Dist. No. 1*, No. 07-CV-109, 2014 WL 1621292, at *12

(S.D.N.Y. Apr. 22, 2014) (same).  Additionally, "[i]t is the movant's burden to show that no

genuine factual dispute exists."  *Vt. Teddy Bear Co.. v. 1-800 Beargram Co.*, 373 F.3d 241, 244

(2d Cir. 2004); *see also Aurora Commercial Corp. v. Approved Funding Corp.*, No. 13-CV-230,

2014 WL 1386633, at *2 (S.D.N.Y. Apr. 9, 2014) (same).  "However, when the burden of proof

at trial would fall on the nonmoving party, it ordinarily is sufficient for the movant to point to a

lack of evidence to go to the trier of fact on an essential element of the nonmovant's claim," in

which case "the nonmoving party must come forward with admissible evidence sufficient to

raise a genuine issue of fact for trial in order to avoid summary judgment."  *CILP Assocs., L.P. v.

PriceWaterhouse Coopers LLP*, 735 F.3d 114, 123 (2d Cir. 2013) (alterations and internal

quotation marks omitted).  Further, "[t]o survive a [summary judgment] motion . . . , [a non-

movant] need[s] to create more than a 'metaphysical' possibility that his allegations were

correct; he need[s] to 'come forward with specific facts showing that there is a genuine issue for

trial,'"  *Wrobel v. County of Erie,* 692 F.3d 22, 30 (2d Cir. 2012) (emphasis omitted) (quoting

*Matsushita Elec. Indus. Co.. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986)), and "cannot rely on the mere allegations or denials contained in the pleadings," *Walker v. City of New York*, No. 11-CV-2941, 2014 WL 1244778, at *5 (S.D.N.Y. Mar. 26, 2014) (internal quotation marks omitted).

"On a motion for summary judgment, a fact is material if it might affect the outcome of the suit under the governing law." *Royal Crown Day Care LLC v. Dep't of Health & Mental Hygiene of City of N.Y.*, 746 F.3d 538, 544 (2d Cir. 2014) (internal quotation marks omitted). At summary judgment, "[t]he role of the court is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried." *Brod*, 653 F.3d at 164 (internal quotation marks omitted); *see also In re Methyl Tertiary Butyl Ether ("MTBE") Prods. Liab. Litig.*, MDL No. 1358, No. M21-88, 2014 WL 840955, at *2 (S.D.N.Y. Mar. 3, 2014) (same). To facilitate such action, "[a] plaintiff opposing a motion for summary judgment must lay bare his proof in evidentiary form and raise an issue of fact sufficient to send to the jury." *Weiss v. La Suisse, Société D'Assurances Sur La Vie*, 293 F. Supp. 2d 397, 408 (S.D.N.Y. 2003) (internal quotation marks omitted). A court's goal should, accordingly, be "'to isolate and dispose of factually unsupported claims.'" *Geneva Pharm. Tech. Corp. v. Barr Labs. Inc.*, 386 F.3d 485, 495 (2d Cir. 2004) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986)); *see also Schatzki v. Weiser Capital Mgmt., LLC*, No. 10-CV-4685, 2013 WL 6189465, at *14 (S.D.N.Y. Nov. 26, 2013) (same).

    B.  <u>Analysis</u>

        1.  <u>Plaintiff's Rule 56.1 Statement</u>

The facts laid out above are primarily derived from Defendants' Rule 56.1 Statement and Plaintiffs' Counter Rule 56.1 Statement. The Court relies on these documents to determine the

undisputed facts because Plaintiffs' 56.1 Statement is almost entirely based on the May 9, 2014

Affirmation of A. Zaks ("Zaks Affirmation"), (*see* Defs.' Mem. of Law in Opp'n to Pls.' Mot.

for Summ. J. 2 n.4 ("Defs.' Opp'n") (Dkt. No. 118) (noting that 27 of 38 statements in Plaintiffs'

56.1 Statement cite to the Zaks Affirmation)), which is largely inadmissible for the following

reasons.[14]

Defendants assert that A. Zaks lacks personal knowledge of several statements in his

Affirmation.  (*See id.* 2 (citing Aff'n of A. Zaks ("A. Zaks May Aff'n") ¶¶ 7–10 (discussing the

motivation for the incorporation of the Villages), ¶ 12 (describing the Villages' 2001 position

that changes in zoning would cause water shortages and increases in traffic), ¶ 17 (explaining

that the Villages "were notified as interested municipalities" about certain comparator projects),

¶ 18–24 (discussing characteristics of certain comparator projects), ¶ 31 (explaining the

motivation for the Villages' "campaign to defeat and block" Ramapo's Comprehensive Plan),

¶ 35 (explaining the motivation for Ramapo's adoption of the ASHL), ¶¶ 37–38 (contending that

the Villages brought the *Chestnut Ridge* Action to prevent the expansion of the Orthodox and

Hasidic communities), ¶¶ 40–52 (discussing the motivation for the incorporation of each Village,

---

[14] Certain statements contained in Plaintiffs' 56.1 Statement also lack citations to any evidence in violation of Local Rule 56.1(d) and Federal Rule of Civil Procedure 56(c).  *See Baity v. Kralik*, — F. Supp. 3d —, 2014 WL 5010513, at *1 (S.D.N.Y. Sept. 30, 2014) (finding statements "lack[ing] citations to admissible evidence" to violate these rules); *id.* at *3 (disregarding facts "not supported by citations to admissible evidence in the record"); *see also Holtz v. Rockefeller & Co.*, 258 F.3d 62, 73–74 (2d Cir. 2001) (explaining that where there are no citations to admissible evidence, or the cited materials do not support the purported undisputed facts in a party's Rule 56.1 statement, those assertions may be disregarded).

and the alleged conduct of each Village in targeting the Hasidic community) (May 9, 2014) (Dkt. No. 112).)[15]

   After reviewing the record, the Court finds that Plaintiffs have not established that A. Zaks has personal knowledge of these statements.  For example, without evidence indicating otherwise, the Court is skeptical that A. Zaks is familiar with the motivation behind Defendants' actions, both in incorporating the Villages and in filing the *Chestnut Ridge* Action, given that he did not attend Village meetings while either was occurring.  (*See* Defs.' Decl. Ex. M (A. Zaks Dep. Tr.), at 128 ("Q. Now, did you attend any meetings of the villages named in the amended complaint?  A. I don't believe I attended the villages' meetings, per se.  But I believe I did see one meeting in a village.").  While the Court does not doubt that A. Zaks is *aware* of at least some of the assertions in his Affirmation, they remain inadmissible if not based on personal knowledge.  *See Payne v. Huntington Union Free Sch. Dist.,* 219 F. Supp. 2d 273, 279 (E.D.N.Y. 2002) ("Merely being 'aware' of purported facts is a far cry from having . . . personal knowledge."); *Thomas v. Stone Container Corp.,* 922 F. Supp. 950, 957 (S.D.N.Y. 1996) (finding the plaintiff's affidavit asserting that he understood a purported fact to be true was insufficient to create an issue of fact).  Therefore, and given Plaintiffs' failure to respond to this argument in their Reply, the Court will not consider these portions of the A. Zaks Affirmation.  *See DiStiso v. Cook,* 691 F.3d 226, 230 (2d Cir. 2012) ("[W]here a party relies on affidavits . . . to establish facts, the statements 'must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant . . . is competent to testify on the matters stated.'" (quoting Fed. R. Civ. P. 56(c)(4)) (citing Fed. R. Evid. 602)); *Sellers v.*

---

[15] As Defendants point out, much of the Affirmation appears to simply restate portions of the Amended Complaint.  (*See* Defs.' Opp'n 4 (arguing that the Rabbi A. Zaks Affirmation is "essentially . . . a 'cut and paste' of the allegations in the Complaint").)

*M.C. Floor Crafters, Inc,*, 842 F.2d 639, 643 (2d Cir. 1988) ("Rule 56 requires a motion for summary judgment to be supported with affidavits based on personal knowledge."); *Baity v. Kralik*, — F. Supp. 3d —, 2014 WL 5010513, at *2 (S.D.N.Y. Sept. 30, 2014) (disregarding "statements not based on [the] [p]laintiff's personal knowledge"); *Flaherty v. Filardi*, No. 03-CV-2167, 2007 WL 163112, at *5 (S.D.N.Y. Jan. 24, 2007) ("The test for admissibility is whether a reasonable trier of fact could believe the witness had personal knowledge." (internal quotation marks omitted)); *Zigmund v. Foster*, 106 F. Supp. 2d 353, 356 (D. Conn. 2000) (noting that "[a]n affidavit in which the plaintiff merely restates the conclusory allegations of the complaint" is insufficient to support a motion for summary judgment).

Second, Defendants argue that the portion of the A. Zaks Affirmation about whether certain comparator sites are similar to the Nike Site is inadmissible as unhelpful lay testimony. (*See* Defs.' Opp'n 4 (citing A. Zaks May Aff'n ¶¶ 20–24).)  Given, again, that Plaintiffs do not respond to this argument in their Reply, and that Plaintiffs have failed to proffer evidence, or even suggest, that A. Zaks has sufficient expertise to offer an opinion as to the similarity of development sites, the Court will not consider this portion of the A. Zaks Affirmation.  *See Lightfood v. Union Carbide Corp.*, 110 F.3d 898, 911–12 (2d Cir. 1997) (holding lay opinion inadmissible if it does not help the fact-finder "to understand the witness' testimony or to decide a fact a fact in issue" (citing Fed. R. Evid. § 701(b)); *Adams v. City of New York*, 993 F. Supp. 2d 306, 324 (E.D.N.Y. 2014) (same).

Third, Defendants argue that certain aspects of the A. Zaks Affirmation are hearsay.  (*See* Defs.' Opp'n 5–6.)  These include A. Zaks' statement that he "personally heard the Villages' counsel," who is not a defendant in this case, "articulate that litigation would slow down the process [of developing the Nike Site], and the consequences would be that the project 'would go

19

away,'" (A. Zaks May Aff'n ¶ 39), and A. Zaks' reference to the half-page affirmation of Leonard Perles, which is attached to the A. Zaks Affirmation, in which Perles says that he heard Wesley Hills Village Attorney Frank Brown ("Brown"), who also is not a Defendant in this case, say it would be a "'catastrophe'" if a Hasidic Yeshiva purchased, and built on, certain property in Wesley Hills, (*id.* ¶ 51).  Once again, Plaintiffs do not respond to this argument in their Reply.

A. Zaks does not reference the first statement for the truth of the matter asserted—that litigation would actually delay development on the Nike Site—but rather cites it for the fact that the statement was made, presumably as evidence that Defendants intended to use the *Chestnut Ridge* Action to undermine Kiryas Radin.  (*See* A. Zaks May Aff'n ¶ 37 (asserting, two paragraphs before the statement in question, that "the goal of the Villages [was] to prevent the spread of the Orthodox and Hasidic Communities").)  The Court therefore finds that this portion of the A. Zaks Affirmation is not hearsay.  *See* Fed. R. Evid. 801(c)(2); *Spector v. Experian Info. Servs. Inc.*, 321 F. Supp. 2d 348, 353–54 (finding statements in the plaintiff's affidavit to "not [be] hearsay because they [were] relied on only as evidence of what was said or reported to [the] plaintiff, [and] not as evidence of the truth of any statement . . . made").  By contrast, A. Zaks refers to the statement of Leonard Perles for the truth of the matter asserted, namely that Brown said what Perles claims he said, and so the Court will not consider that portion of the A. Zaks Affirmation because it is inadmissible hearsay.  *See Amnesty Am. v. Town of W. Hartford,* 361 F.3d 113, 131 n. 12 (2d Cir. 2004) (noting that district court was free to disregard hearsay statements in affidavits in considering a summary judgment motion); *Burlington Coat Factory Warehouse Corp. v. Esprit De Corp.,* 769 F.2d 919, 924 (2d Cir. 1985) (noting that the party opposing a motion for summary judgment cannot rely on inadmissible hearsay evidence); *Crippen v. Town of Hempstead,* No. 07-CV-3478, 2013 WL 1283402, at *11 (E.D.N.Y. March

29, 2013) ("[I]nadmissible hearsay cannot raise a triable issue of fact sufficient to defeat a motion for summary judgment." (internal quotation marks omitted)); *Century Pac., Inc. v. Hilton Hotels Corp.*, 528 F. Supp. 2d 206, 217 (S.D.N.Y. 2007) (noting that a court may disregard "portions of an affidavit that are not based upon the affiant's personal knowledge or contain inadmissible hearsay"), *aff'd*, 354 F. App'x 496 (2d Cir. 2009).[16]

### 2. Qualified Immunity

As the Court determined in *Mosdos I*, the filing of the *Chestnut Ridge* Action is protected activity under the First Amendment right to petition by application of the *Noerr-Pennington* doctrine, which, drawing on two Supreme Court antitrust cases, provides that "'litigation[,] as well as concerted efforts incident to litigation[,] may not serve as a basis for an antitrust claim.'" *See Mosdos I*, 701 F. Supp. 2d at 593–602 (quoting *Viva Optique, Inc. v. Contour Optik, Inc.*, No. 03-CV-8948, 2007 WL 4302729, at *2 (S.D.N.Y. Dec. 7, 2007)). The Court extended this doctrine, as courts in other federal circuits have done, to the civil rights claims at issue here. *See id.* at 595–97. Accordingly, Defendants are entitled to qualified immunity from liability for any civil rights violations stemming from their filing of that action. *See id.* at 604. While the Court determined that the *Chestnut Ridge* Action did not fall under the "sham exception" to *Noerr-Pennington*, *id.* at 602–03, it held that Plaintiffs could nonetheless overcome Defendants' immunity by showing that they acted unconstitutionally in bringing the *Chestnut Ridge* Action, namely by proving that in doing so, they violated of the Equal Protection Clause, *see id.* at 603–04; *see also Mosdos II*, 815 F. Supp. 2d at 688 (noting that, to defeat Defendants' qualified

---

[16] For the same reason, A. Zaks cannot rely on the affirmation of Noel Blackman, which he references in, and attaches to, his second Affirmation. (*See* A. Zaks June Aff'n ¶ 9.) Though the Perles and Blackman affirmations may be admissible on their own, Plaintiffs do not cite them in support of their 56.1 Statement.

Case 7:08-cv-00156-KMK   Document 142   Filed 03/27/15   Page 22 of 76


immunity, and to render Plaintiffs' claims "actionable, Defendants must have selectively chosen to bring suit regarding the Nike Site while treating other similarly situated properties differently").  Plaintiffs must therefore establish an issue of material fact as to whether Defendants committed an Equal Protection violation in order to proceed to trial, and the Court accordingly considers Plaintiffs' Equal-Protection-based § 1983 claims together with Defendants' qualified immunity defense.

The Court in *Mosdos II* defined the governing standard for Plaintiffs' Equal Protection claims as follows:

> To establish a denial of equal protection based on selective treatment, Plaintiffs must allege that:  "(1) . . . compared with others similarly situated, [they were] selectively treated, and (2) the selective treatment was motivated by an intention to discriminate on the basis of impermissible considerations, such as race or religion, to punish or inhibit the exercise of constitutional rights, or by a malicious or bad faith intent to injure the person." *Zahra v. Town of Southold*, 48 F.3d 674, 683 (2d. Cir. 1995) (internal quotation marks omitted); *see also Abel v. Morabito*, No. 04-CV-7284, 2009 WL 321007, at *4 (S.D.N.Y. Feb. 10, 2009) (citing *Harlen Assocs. v. Inc. Village of Mineola*, 273 F.3d 494, 499 (2d Cir. 2001)).  "A showing that the plaintiff was treated differently compared to others similarly situated" is a "prerequisite" and a "threshold matter" to a selective treatment claim.  *Church of the Am. Knights of the Ku Klux Klan v. Kerik*, 356 F.3d 197, 210 (2d Cir. 2004).

*Mosdos II*, 815 F. Supp. 2d at 692 (alterations in original); *see also United States v. Stewart*, 590 F.3d 93, 121 (2d Cir. 2009) (explaining that, to succeed on an equal protection claim, a plaintiff must plead and prove (1) that he or she "was treated differently from other similarly situated individuals"; and (2) that "such differential treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure [the plaintiff]" (internal quotation marks omitted)); *Mosdos II*, 815 F. Supp. 2d at 686 ("Thus, to plead a selective petitioning claim in the instant action, Plaintiffs must allege both: (1) that they were selectively treated compared to others similarly situated; and (2)

that the selective treatment was motivated by an intention to discriminate based on impermissible considerations, such as religion."). The Court will take up each prong of the standard—similarly-situated comparator sites and discriminatory motivation—in turn.

a.  Initial Matters

Two initial matters require the Court's attention before turning to whether Plaintiffs have met their evidentiary burden on their Equal Protection Clause claims. First, Plaintiffs argue that, in light of *Fortress Bible Church v. Feiner*, 694 F.3d 208 (2d Cir. 2012), the Court need not reach the heart of their Equal Protection Clause claims. (Pls.' Mem. 51 ("Under [*Fortress Bible*], it seems patently clear that whether there are comparables to the Villages, or not, the Villages should be liable for their inappropriate use of SEQRA."); Pls.' Mem. of Law in Opp'n to Defs.' Mot. for Summ. J. ("Pls.' Opp'n") 5 (Dkt. No. 116) ("[T]he Mosdos Claimants maintain that in light of *Fortress Bible*, the Court need not reach the issue of whether or not the comparators are comparable").) Plaintiffs argue that *Fortress Bible* stands for the proposition that because the concerns that purportedly motivated the *Chestnut Ridge* Action are land-use issues, rather than "true" environmental issues, Defendants were not entitled to rely on SEQRA to challenge Kiryas Radin at all. (*See* Pls.' Mem 50–51; *see also* Pls.' Opp'n 7–8.) The Court is unpersuaded.

In *Fortress Bible*, the Second Circuit held that "when a statutorily mandated environmental quality review process," in that case, SEQRA, "serves as a vehicle to resolve zoning and land use issues, the decision issued constitutes the imposition of a land use regulation as that term is defined in RLUIPA." 694 F.3d at 218. On this basis, the court found that the defendant town violated RLUIPA when it initiated a SEQRA review process for a proposed church that was allegedly motivated primarily by traffic concerns. *Id.* at 217–18. In this sense,

and as discussed in further detail below in the context of Plaintiff's RLUIPA counterclaims, *Fortress Bible* speaks to when SEQRA review constitutes the implementation of a land use regulation under RLUIPA.  The case does not indicate if or when the use of SEQRA, either directly or by virtue of suing another municipality to implement it, violates the Equal Protection Clause or has any effect on a defendant's qualified immunity.  Further, in *Fortress Bible*, the district court had previously found that the defendant town used traffic concerns as a pretext for initiating SEQRA review, thus violating RLUIPA.  *Id.* at 218, 221.  This Court has not yet made any such finding about the environmental issues Defendants' identified, though it is worth noting that this Court previously found that Defendants' lawsuit was not a "sham," *Mosdos I*, 701 F. Supp. 2d at 602, and the Second Department determined that Defendants' concerns were sufficiently meritorious to establish standing to sue Ramapo for failure to follow SEQRA, *see Chestnut Ridge I*, 841 N.Y.S.2d at 338339 (noting that the Villages had "establish[ed] a basis for legitimate concern . . . that the development permitted by the [ASHL] will have a substantial detrimental effect on the roads in their community, their shared water supply and sewer systems, and the character of their neighborhoods," but that only Wesley Hills "alleged any such interest in the [Nike Site] plan application").  Plaintiffs cite no other case law in support of their claim. Accordingly, because *Fortress Bible* addresses RLUIPA and not the Equal Protection Clause, and because the Court has not made a determination about the merits of Defendants' environmental concerns, the Court will consider the merits of Defendants' qualified-immunity-based defense.

Second, Defendants argue that they did not "intentionally" bring suit against Mosdos because the New York Supreme Court required that Mosdos be added as a party to the *Chestnut Ridge* Action.  (*See* Defs.' Mem. of Law in Supp. of Mot. for Summ. J. ("Defs.' Mem.") 10 (Dkt.

No. 105).)  Plaintiffs respond by noting that Mosdos was harmed, and became involved in the

litigation, when "the Villages requested and received a TRO enjoining the complet[ion] [of]

construction of . . . Kiryas Radin."  (Pls.' Reply Mem. of Law in Supp. of Mosdos Claimants

Mot. for Summ. J. 7–8 ("Pls.' Reply") (Dkt. No. 127).)

The Court agrees with Plaintiffs.  Even if Mosdos was not initially a party to the

litigation, it is the current owner of the Nike Site, the development of which was allegedly

stymied by the *Chestnut Ridge* Action.  Moreover, after Mosdos gained control of the Nike Site

and was added to the *Chestnut Ridge* Action, Defendants intentionally continued the suit, and

thus at that time acted with the requisite intent against Mosdos.  *See Brown v. City of Oneonta,*

221 F.3d 329, 337 (2d Cir. 1999) (noting that "[t]here are several ways for a plaintiff to plead

intentional discrimination," and that he must simply "allege that a government actor intentionally

discriminated against him"); *cf. Harris v. City of New York*, 186 F.3d 243, 249 (2d Cir. 1999)

("[T]o advance a continuing violation claim a plaintiff must point to his disparate treatment

stemming from a continuous practice of intentional discrimination.").  Thus, Mosdos's Equal

Protection claim does not fail on this narrow ground.

b.  Similarly-Situated Comparator Sites

To prevail on their Equal Protection claims, Plaintiffs must show that similarly-situated

development projects (the "Comparator Sites") were treated differently, i.e., that Defendants did

not file suit alleging that the environmental review of the Comparator Sites was insufficient

under SEQRA.[17]  The Court in *Mosdos II* discussed the standard to apply to whether the

_____

[17] Defendants argue that the Individual Plaintiffs must allege individual comparators,
(Defs.' Mem. 9; *see also* Pomona's Mem. of Law in Supp. of Mot. for Summ. J. 2, 6 (Dkt. No.
107)), contending that if the Court determined they could rely on institutional comparators, it
would "open up a floodgate" to Equal Protection litigation, (Defs.' Mem. 9).  Plaintiffs respond
by noting that the Court previously held that the Individual Plaintiffs had standing "based upon

Comparator Sites are sufficiently similar to Kiryas Radin.  It found that because Plaintiffs' Equal

Protection claims are based on alleged discriminatory SEQRA litigation, the proper standard to

apply in determining whether the Comparator Sites are similarly situated to Kiryas Radin is "less

stringent" than the standard that would apply if Plaintiffs had simply alleged that Defendants had

no rational reason for their disparate treatment.  *Mosdos II*, 815 F. Supp. 2d at 696.  Accordingly,

the Court found that it had to determine, at the motion to dismiss stage, "whether Plaintiffs ha[d]

adequately alleged that any of their . . . proffered comparators [was] similarly situated in all

material respects [such] that a prudent person would think [it] [was] roughly equivalent."  *Id.* at

697.[18]

---

their connection to [Kiryas Radin], and their being injured based on upon their inability to pursue
their vocations as a result of the Villages' actions."  (Pls.' Opp'n 6.)  Certainly, a plaintiff can
have standing, yet fail to state a claim.  *See, e.g., Torch Liquidating Trust ex rel. Bridge Assocs.*
*L.L.C. v. Stockstill*, 561 F.3d 377, 384 (5th Cir. 2009) ("Although [the] plaintiff has standing, it
fails to state a claim for which the court may grant relief.").  Here, however, if Mosdos is able to
demonstrate disparate treatment, then the Individual Plaintiffs also have a disparate treatment
claim because their injury stems from the same conduct directed at Kiryas Radin, namely the
*Chestnut Ridge* Action.  Moreover, alleging individual comparators would be merely an
academic exercise: if the Comparator Sites are sufficiently similar to Kiryas Radin, then there are
individuals who use those sites who are likewise similarly situated to the Individual Plaintiffs.
Nonetheless, the Court declines to decide this issue now because it finds below that Plaintiffs
have failed to present sufficient evidence to raise an issue of material fact as to whether the
Comparator Sites are sufficiently similar to Kiryas Radin.

[18] To satisfy this less-demanding test in the selective enforcement context, Plaintiffs
"must identify comparators [that] a prudent person would think were roughly equivalent[, but]
Plaintiff[s] need not show an exact correlation between [themselves] and the comparators."
*Abel*, 2009 WL 321007, at *5 (citation, alterations, and internal quotation marks omitted).  Put
another way:

> The test is whether a prudent person, looking objectively at the incidents, would
> think them roughly equivalent and the protagonists similarly situated.  Much as the
> lawyer's art of distinguishing cases, the 'relevant aspects' are those factual
> elements which determine whether reasoned analogy supports, or demands, a like
> result.  Exact correlation is neither likely or necessary, but the cases must be fair
> congeners.  In other words, apples should be compared to apples.

While the question of whether two projects "are similarly situated is [generally] a factual issue that should be submitted to the jury," *Harlen Assocs.*, 273 F.3d at 499 n.2, the Court may "properly grant summary judgment where it is clear that no reasonable jury could find the similarly situated prong met," *id.*  Thus, as the Court explained in *Mosdos II*, "at the summary judgment stage of selective enforcement claims, courts ask whether[,] based on the evidence, a reasonable jury could conclude that the plaintiff and the proposed comparators are similarly situated."  *Mosdos II*, 815 F. Supp. 2d at 697–98; *see also Salahuddin v. Goord*, 467 F.3d 263, 282 (2d Cir. 2006) ("On a motion for summary judgment, unlike on a motion to dismiss, [the plaintiff] must actually point to record evidence treating a genuine dispute as to those specific facts." (citation omitted)).  While the Second Circuit has "yet to decide the precise outlines of what it takes to be a valid comparator," *Third Church of Christ, Scientist, of N.Y.C. v. City of New York*, 626 F.3d 667, 669 (2d Cir. 2010), it is Plaintiffs' burden to provide evidence establishing similarity, *see Howard v. City of New York*, No. 12-CV-933, 2013 WL 6925088, at *9 (S.D.N.Y. July 3, 2013) (explaining that "[t]he plaintiff bears the initial burden of demonstrating" sufficient similarity), *adopted in relevant part by* 2014 WL 84357 (S.D.N.Y. Jan. 6, 2014), *aff'd* — F. App'x —, 2015 WL 895430 (2d Cir. Mar. 4, 2015).[19]

---

*T.S. Haulers, Inc. v. Town of Riverhead*, 190 F. Supp. 2d 455, 463 (E.D.N.Y. 2002) (internal quotation marks omitted); *see also Tasadfoy v. Ruggiero*, 365 F. Supp. 2d 542, 552 (S.D.N.Y. 2005) (same); *Estate of Morris ex rel. Morris v. Dapolito*, 297 F. Supp. 2d 680, 686 (S.D.N.Y. 2004) ("To be similarly situated, the persons with whom plaintiff compares [itself] must be similarly situated in all material aspects.  Exact correlation, however, is neither likely nor necessary[;] the test is whether a prudent person would think them roughly equivalent." (citations, alterations, and internal quotation marks omitted)); *Penlyn Dev. Corp. v. Inc. Village of Lloyd Harbor*, 51 F. Supp. 2d 255, 264 (E.D.N.Y. 1999) (same).

[19] Because "RLUIPA . . . codified existing Free Exercise, Establishment Clause, and Equal Protection rights against states and municipalities that discriminated against religious land use," *Chabad Lubavitch of Litchfield Cnty., Inc. v. Litchfield Historic Dist. Comm'n*, 768 F.3d 183, 198 (2d Cir. 2014) (alterations and internal quotation marks omitted), RLUIPA case law

Kiryas Radin, now fully operational, is a residential complex containing an educational building and 12 accessory, multi-story residential buildings which collectively contain sixty residential units at a density of 12.8 units per acre.  (Defs.' 56.1 ¶ 116; Pls.' Mem. 10.)  The non-residential areas include "a synagogue, study halls, classrooms, a library/Talmudic research center, [and] a ritual immersion bath."  (Pls.' Mem. 10.)  The development sits on a two-lane "collector road" of low-to-moderate capacity and of residential character, at least in major part, and is approximately one mile from the nearest commercial development.  (Defs.' 56.1 ¶¶ 118, 120.)  It is surrounded by a low-density residential district consisting, at least in major part, of single family homes built on individual lots, and is adjacent to a school which does not have on-site housing.  (Id. ¶¶ 49–50, 117, 119, 121.)[20]

Plaintiffs contend that Defendants challenged Kiryas Radin, but failed to challenge similarly-situated projects, namely six Comparator Sites: Airmont Gardens, Retreat at Airmont (a.k.a. Pulte Homes), Salvation Army, Sycamore Crest, Avalon at Crystal Hill, and Montebello Commons.  (Id. ¶¶ 106–107, 112.)[21]  Defendants admit that they did not commence litigation to challenge any of the Comparator Sites.  (Defs.' Counter 56.1 ¶ 37.)[22]

---

defining "similarly situated" under the law's equal terms provision is relevant to Plaintiffs' claim here.

[20] Plaintiffs allege that there are five other schools, "a commercial kitchen that serves 7,000 students of the East Ramapo School District, a commercial mulching and tree service, and a large storage building" within one half mile of the Nike Site.  (Pls.' Counter 56.1 ¶ 49.)

[21] Plaintiffs originally set forth eight comparators, but the Court dismissed two of those comparators as dissimilar.  See Mosdos II, 815 F. Supp. 2d at 703.

[22] It is not clear from the record when, exactly, the Comparator Sites were built. However, Plaintiffs allege that Airmont Gardens was built in 2003, Retreat at Airmont was built in 2002, and Salvation Army was built in 1997, with additions completed in 2007.  (Am. Compl. ¶¶ 52(a)–(c).)

Defendants retained Frank S. Fish ("Fish") of "BFJ Planning" as an expert to compare Kiryas Radin to the Comparator Sites according to the "(1) surrounding land use and built context, (2) transportation, and (3) zoning" of the half-mile area around each site.  (Defs.' 56.1 ¶¶ 108, 113.)  Surrounding land use and built context refers to "the actual use of land within the [s]tudy area," transportation "looks at the road system serving the area," and zoning "includes not only [that of] the particular site," but also the zoning of the rest of the study area.  (*Id.* ¶ 114.) Fish determined that no reasonable or prudent person could find that the Comparator Sites are "similarly situated or roughly equivalent" to Kiryas Radin.  (*Id.* ¶ 110.)  Because Fish's Expert Report is the only evidence in the record of the characteristics of the Comparator Sites, the Court uses it as the primary source for information about the sites.[23]

Airmont Gardens, located in the Village of Airmont ("Airmont"), is a multi-family residential complex with four interconnected four-story buildings located within an industrial and commercial area, and bordered by a self-storage facility, a power substation, a gas station,

---

[23] Plaintiffs challenge Fish's credentials, arguing that he has "little to no scientific background sufficient to address true environmental issues," (Pls.' Opp'n 4), and also appear to challenge some of his conclusions in their Counter 56.1 Statement, (*see, e.g.,* Pls.' Counter 56.1 ¶ 108 (noting that "the premises upon which . . . Fish bases his 'opinion' are flawed," and asserting that his opinion has "no value"); *id.* ¶¶ 116–156 (challenging some of Fish's findings). The Court does not consider these challenges because they (a) are unsupported by admissible evidence, and (b) are not explicitly directed at the admissibility of Fish's report and testimony under Federal Rule of Evidence 702 and the *Daubert* test.  Moreover, Fish does appear to have the requisite qualifications to compare the features of Kiryas Radin to the Comparator Sites. Among other credentials, Fish has a master's degree in Planning, is a Fellow of the American Institute of Certified Planners, has developed plans for municipalities of a variety of sizes and types (which included drafting environmental impact statements and assessing/protecting natural resources), and has testified as an expert in three land-use cases, including one SEQRA case and one RLUIPA case.  (*See* Decl. of Frank. S. Fish ("Fish Decl.") Ex. B ("Expert Report") Appendices B–C (Dkt. No. 103) (outlining Fish's qualifications).)

and an exit off of Interstate 287 ("I-287").  (*Id.* ¶¶ 122–24, 126.)[24]  It is located along North

Airmont Road, a heavily-trafficked, four-lane "arterial road" that is commercial in character,

abutted by retail stores, a motel, and a former restaurant, and is less than 1,000 feet from State

Route 59 ("Route 59"), another "major arterial" road that is heavily commercialized as a main

thoroughfare through Rockland County.  (*Id.* ¶¶ 125–26.)  The area is zoned as a Specialized

Housing Residential District ("RSH"), a "floating zone for senior housing" designed to be

located in areas of high intensity land use to ensure "access to transportation, community[,] and

commercial services," and is located adjacent to Village Center, Laboratory Office, Planned

Industry, and Medium-Density Affordable Housing zoning districts.  (*Id.* ¶¶ 127–28.)

     Retreat at Airmont (a.k.a. Pulte Homes), also located in Airmont, is a multi-family

residential complex with six, three-story residential buildings, as well as a community building,

located in an industrial and commercial area, and bordered by railroad tracks, a shopping center,

and a hotel.  (*Id.* ¶¶ 129–30.)[25]  It is located on the same road, with the same commercial

character and proximity to I-287 and Route 59, as Airmont Gardens.  (*Id.* ¶¶ 131–32.)

Additionally, like Airmont Gardens, Retreat at Airmont is zoned RSH, and is surrounded by

Village Center, Planned Industry, Laboratory Office, and Laboratory Office-Campus districts.

(*Id.* ¶¶ 133–34.)

     Salvation Army is an officer training facility with associated residential dormitories and

sixteen apartment buildings located in the Village of Suffern ("Suffern"), bordered on one side

---

[24] Plaintiffs allege that there are single-family homes within a half mile of Airmont Gardens.  (Pls.' Counter 56.1 ¶ 124.)

[25] Plaintiffs allege that there are single-family homes within a half mile of Retreat at Airmont.  (*Id.* ¶ 130.)

by a residential area containing a mix of high-density apartment buildings and single-family homes, and otherwise bordered by an office building, a hospital, and an abandoned quarry zoned for light industrial use.  (*Id.* ¶¶ 135–36.)[26]  The site is located along Route 59, which, as described above, is a heavily commercialized arterial road, and is less than one mile from downtown Suffern and the Suffern train station.  (*Id.* ¶ 137.)  Salvation Army is zoned for Medium-Density Residential and Office uses, and the surrounding districts are Multi-Family Residential, High Density Residential, Medium Density Residential, and Office Districts.  (*Id.* ¶ 138.)

Sycamore Crest is a large senior citizen apartment building in the Village of Spring Valley, built on 2.75 acres near institutional, utility, commercial, and residential "uses" on Route 59, including Spring Valley High School, Orange and Rockland Utilities, and the Kennedy Mall. (*Id.* ¶ 139.)[27]  The site is located on Route 59, which, as described above, is a heavily commercialized arterial road, and is less than one mile from downtown Spring Valley and the Spring Valley train station.  (*Id.* ¶ 140.)  Sycamore Crest is zoned for high-density residential development, and is adjacent to Medium-Density Residential, Office, and Light Industrial zoning districts, all of which separate Sycamore Crest from single-family homes to the south of the site. (*Id.* ¶¶ 141–42.)

Avalon at Crystal Hill, located in the Town of Haverstraw, is a large project of multiple residential apartment buildings bordered by Route 202, a major arterial road which in turn

---

[26] Plaintiffs allege that there are single-family homes within a half mile of Salvation Army.  (*Id.* ¶ 137.)

[27] Plaintiffs allege that there are single-family homes within a half mile of Sycamore crest.  (*Id.* ¶ 140.)

borders single-family residential neighborhoods, and is adjacent to South Mountain County Park, a shopping center, and a gas station.  (*Id.* ¶¶ 144–47.)  The single-family neighborhoods in the study area are accessed almost entirely by local streets, rather than by Route 202.  (*Id.* ¶ 149.) There is also a police station, motel, and two other multi-family complexes within the half-mile study area, a commercial development and mobile home community less than one mile down Route 202, and a Palisades Parkway exit less than 1.2 miles away.  (*Id.* ¶¶ 146, 148.)[28]  Avalon at Crystal Hill is zoned General Residential (a multi-family residential district), and is surrounded by commercial, office, and medium and low-density residential zoning districts, though the low-density district is occupied by South Mountain County Park.  (*Id.* ¶ 150.)

Montebello Commons is a multi-family residential complex located in Montebello adjacent to two other multi-family residential complexes of comparable size, and bordered by a Mack Cali office building and a single-family residential neighborhood that sits 10 feet above the site and is accessed by a different road.  (*Id.* ¶¶ 152–54.)  The site is located on Dashew Drive, 100 yards from the New York State Thruway and just off County Route 85, which is in close proximity to Route 59.  (*Id.* ¶¶ 151, 155.)  Montebello Commons and the adjacent multi-family residential complexes are zoned RSH, while the areas near the I-287 are zoned for commercial and multi-family uses.  (*Id.* ¶ 156.)

c.  Sufficiency of the Evidence

In considering the Comparator Sites, a threshold issue is what constitutes a "material respect" in which they must be similar to Kiryas Radin, namely "those factual elements which determine whether reasoned analogy supports" the idea that they should have been treated

---

[28] Plaintiffs allege that there are single-family homes within a half mile of Avalon at Crystal Hill.  (*Id.* ¶ 145.)

similarly.  *See, e.g., T.S. Haulers, Inc. v. Town of Riverhead*, 190 F. Supp. 2d 455, 463 (E.D.N.Y. 2002) (internal quotation marks omitted).  Plaintiffs imply that the material factors are those which Defendants identified in the *Chestnut Ridge* Action, namely concerns about water, traffic, sewer, and community character, (*see, e.g.,* Pls.' Mem. 5 (discussing allegation that Defendants "never made any legal challenge to any other proposed development, including developments which would have a greater impact on their purported [environmental] issues"), factors that SEQRA defines as "significant environmental impacts," N.Y. Comp. Codes R. & Regs. tit. 6, § 617.7(c)(1)(i), (v); *see also Chestnut Ridge I*, 841 N.Y.S.2d at 338–39 (explaining how these concerns are environmental, and discussing provision in SEQRA covering community character).  By contrast, Fish's expert report focuses more generally on "surrounding land use and build context," "transportation," and "zoning."  (Defs.' Mem. 15)  Defendants assert that these criteria are "the relevant aspects one must consider in determining whether comparator sites are similar."  (*Id.*)

In evaluating an Equal Protection claim, a central question is whether there is anything unique about the targets of the complained-of treatment such that a court can conclude that differential treatment was justified.  Naturally, the reasoning provided by Defendants for their conduct in this case is a focus of the inquiry; if the reasoning applies equally well to comparable sites that were not similarly treated, then Plaintiffs may have been victims of discrimination.  *Cf. McGuinness v. Lincoln Hall*, 263 F.3d 49, 54 (2d Cir. 2001) ("In other words, where a plaintiff seeks to establish the minimal prima facie case by making reference to the disparate treatment of other[s] . . . , [they] must have a situation sufficiently similar to [the] plaintiff's to support at least a minimal inference that the difference of treatment may be attributable to discrimination.").

Therefore, "material respects" in this case refers to the Comparator Sites' impact on water, sewer, traffic, and community character.

Moving to the core of Plaintiffs' Equal Protection claim, Defendants contend, in short, that Plaintiffs fail to offer any evidence, beyond their initial allegations, of similarly-situated projects that could have been, but were not subject to, legal challenge by Defendants based on SEQRA. (*See* Defs.' Mem. 11–14.) In *Mosdos II*, the Court found that it was "plausible that developments of the size alleged by Plaintiffs would have comparable impacts on water, traffic, sewer, and community character concerns." *Mosdos II*, 815 F. Supp. 2d at 699.[29] However, the summary judgment standard "is vastly different than the standard on a motion to dismiss." *Ginx, Inc. v. Soho Alliance,* 720 F. Supp. 2d 342, 362 n.8 (S.D.N.Y. 2010). The Court therefore noted in *Mosdos II* that "[t]o ultimately survive summary judgment or prevail at trial on the merits, Plaintiffs will need to provide evidence demonstrating that these comparators are in fact similarly situated to a degree that did not warrant disparate treatment," and that "[t]o the extent that the facts, developed after discovery, do not substantiate Plaintiffs' allegations, Defendants may seek summary judgment." *Mosdos II*, 815 F. Supp. 2d at 705 n.17, 706. Therefore, the Court now asks "whether[,] based on the evidence, a reasonable jury could conclude that [the Nike Site] and [at least one of] the proposed comparators are similarly situated." *Id.* at 697–98,

---

[29] Notably, in discussing the comparators, the Court found it important that the Nike Site did not abut Montebello, Pomona, or Chestnut Ridge, and thus while "neighboring zoning is a factor to be considered, the Court [was] unable to conclude that no prudent person could consider these properties roughly equivalent," and that differences in land use as alleged was "not different enough to render the properties implausibly similar." *Mosdos II*, 815 F. Supp. 2d at 702–03. The Court did later mention, however, that differences in surrounding zoning are not sufficient to indicate that there is not sufficient similarity "for purposes of a motion to dismiss." *Id.* at 704.

*see also Frank Sloup & Crabs Unlimited, LLC v. Loeffler*, 745 F. Supp. 2d 115, 129 (E.D.N.Y. 2010) ("Evidence of even one similarly situated individual is adequate . . . .").

Plaintiffs do, as Defendants suggest, appear to largely rest on the allegations they made at the motion to dismiss stage and findings previously made by the Court.  (*See, e.g.,* Pomona's Mem. of Law in Supp. of Mot. for Summ. J. 4, 8–9 ("Pomona's Mem.") 4, 8–9 (Dkt. No. 107) (contending that Plaintiffs did nothing more than provide "mere citation[s]" to alleged comparators).)  Consequently, Plaintiffs' claim that the Comparator Sites are similarly situated rests principally on four claims: (1) water is a county-wide concern because it is provided by a single company, (2) sewer access is a county-wide concern because the sewers are interconnected, (3) traffic is a county-wide concern, and (4) because the "projects set forth as comparators are mostly equal to or larger in size than" Kiryas Radin, they have a "corresponding equal . . . or larger impact on water, sewer and traffic," suggesting that, according to common sense, "a reasonable fact finder would undoubtedly determine them to be proper comparators." (Pls.' Opp'n 5–6.)

While the logic of these claims is appealing, the problem for Plaintiffs is that they have offered nothing more than conclusory, unsubstantiated assertions in support.  As noted, threadbare allegations alone will not suffice to defeat a summary judgment motion.  *See Fletcher v. Atex, Inc.*, 68 F.3d 1451, 1456 (2d Cir. 1995) ("[M]ere conclusory allegations . . . are not evidence and cannot by themselves create a genuine issue of material fact." (internal quotation marks omitted)); *Tucker v. Am. Int'l Grp., Inc.*, No. 09-CV-1499, 2012 WL 685461, at *4 (D. Conn. Mar. 2, 2012) ("[I]t is hornbook law that unproven, nonadjudicated allegations are not evidence."); *Blount v. Swiderski*, No. 03-CV-23, 2006 WL 3314635, at *12 (E.D.N.Y. Nov. 14, 2006) (noting that "on summary judgment, mere allegations are insufficient" and that the

plaintiff "need[ed] to adduce proof sufficient to create a genuine issue of material fact on her

selective treatment claim" (citing *Behrens v. Pelletier*, 516 U.S. 299, 309 (1996)); *see also*

*McCown v. Nexant, Inc.*, No. 13-CV-455, 2014 WL 3579640, at *7 (M.D. Tenn. July 21, 2014)

(noting that "[p]laintiff's unsupported allegations" regarding similarly situated individuals "are

not evidence, and cannot defeat a motion for summary judgment").  Plaintiffs' only evidence in

support of their characterization of the Comparator Sites is deposition testimony suggesting that

water and sewer impacts would be similar for similarly-sized sites, (*see, e.g.,* Pls.' Mem. 16

(citing Defs.' Decl. Ex. Q (Frankl Dep. Tr.)c at 41–43 (suggesting that all of Rockland County is

served by the same water company and that the sewer systems are, at least to some extent,

interconnected); *see also* Defs.' Decl. Ex. P (McPherson Dep. Tr.), at 103–04 (discussing water

sources in Rockland County and the fact that there is a single distributor); Defs.' Counter 56.1

¶ 23 (admitting Rockland County is served by a single water company)), statements from the A.

Zaks Affirmation, to the extent they are admissible, and facts about the nature of Kiryas Radin

and Comparator Sites that went uncontested in the competing 56.1 statements, (*see, e.g.,* Defs.'

56.1 ¶¶ 116–156).  Plaintiffs have failed to provide (or, as far as the Court is aware, even seek)

expert testimony, a deposition of Defendants' expert, affiants with personal knowledge of the

Comparator Sites, information detailing the impacts of each site (e.g., environmental or traffic

studies completed at the time those projects were proposed), or even information suggesting that

Plaintiffs' descriptions of the Comparator Sites and the surrounding areas are accurate.[30]  In fact,

---

[30] For example, while Plaintiffs, in their Counter 56.1 Statement, allege that there are certain aspects of the Nike Site and comparator sites that Fish does not include in his expert report, (*see, e.g.,* Pls.' Counter 56.1 ¶ 118 (alleging that "Grandview Avenue provides access to five schools," among other buildings); *id.*  ¶¶  124, 130, 137, 140, 145 (alleging "there are single family dwellings within ½ mile of" Airmont Gardens, Pulte Homes, Salvation Army, Sycamore Crest, and Avalon at Crystal Hill)), they provide no evidence to substantiate these claims.

as Defendants point out, and as confirmed by the Court's review of the record, A. Zaks was the

only Individual Plaintiff, or individual affiliated with the Individual Plaintiffs, to testify in any

detail about the characteristics of the Comparator Sites, and he suggested that there are

*differences* between Kiryas Radin and the Comparator Sites.  (*See* Defs.' Mem. 13–14 (citing

Defs.' Decl. Ex. H (Bernstein Dep. Tr.), at 39–41 (indicating unfamiliarity with the specific

Comparator Sites); Ex. I (Ambers Dep. Tr.), at 23–29 (same); Ex. J (Naftali Tescher Dep. Tr.), at

32–36 (same); Ex. K (Beatrice Zaks Dep. Tr.), at 50–51 (same); Ex. L (Sima Zaks. Dep. Tr.), at

55–57 (same)); *id.* Ex. M (A. Zaks Dep. Tr.), at 105–15 (admitting some differences between

Comparator Sites and Nike Site relating to surrounding road use and community character).)

The Court therefore evaluates the competing Motions for Summary Judgment in light of this

limited evidence, cognizant of the fact that the only comprehensive comparison of the

Comparator Sites and Kiryas Radin is the Fish Expert Report.

While the Court does not credit Fish's legal conclusion that "no reasonable or prudent

person or juror could find from a planning and/or community character perspective" that the

Comparator Sites are similar to Kiryas Radin, (Decl. of Frank. S. Fish ("Fish Decl.") Ex. B

("Expert Report"), at 41 (Dkt. No. 103)); *see also Hygh v. Jacobs*, 961 F.2d 359, 363 (2d Cir.

1992) (requiring the "exclusion of expert testimony that expresses a legal conclusion"), it is

persuaded by Fish's descriptions of the Comparator Sites, as outlined above, which indicate that

each is located adjacent to or near higher density or commercial/industrial zoning, on or near

roads that carry more traffic, and not in an area that is as dominated by single family homes as

the area around Kiryas Radin, (*see generally* Expert Report).  In response to the Fish Expert

Report, Plaintiffs contend that Fish "fails to address [the] professed 'concerns' of the municipal

defendants—water usage, sewer usage, [and] impact upon county[-]wide traffic."  (Pls.' Opp'n

6.)  Plaintiffs are partially correct, as Defendants appear to admit, that Fish only addressed factors related to traffic and community character, and did not explicitly discuss water or sewer use.  (*See* Defs.' Mem. 15.)[31]  However, as far as traffic and community character is concerned, and partially because Plaintiffs do not respond to Defendants' contentions about community character at all (other than to assert that all the Comparator Sites would have an effect on community character, (Pls.' Mem. 52), and to characterize it as an inappropriate consideration under *Fortress Bible*, (*see, e.g.,* Pls.' Counter 56.1 ¶ 142), the Court finds that, on the basis of the evidence in the record the Comparator Sites (a) have a comparatively minor effect on traffic, and (b) have a comparatively minor effect on surrounding "community character" as compared to Kiryas Radin, and therefore are not sufficiently similar in those respects.[32]

The question, then, is whether these differences between the Comparator Sites and Kiryas Radin alone are sufficient to render a reasonable juror unable to find that the Comparator Sites are sufficiently similar.  Plaintiffs make no argument—and offer *no evidence*—suggesting that

---

[31] As Plaintiffs argue, Defendants at times appear to have narrowed their explanation for why the *Chestnut Ridge* Action was commenced to "the impact of the ASHL specifically on the perceived community character of the low density single-family communities located within the Villages adjacent to the Town-designated ASHL Sites."  (Defs.' Opp'n 8; *see also* Pls.' Reply 5 ("A thread which runs throughout the opposition papers is the extent of the Villages' abandonment of 'water and sewer' and 'traffic impact' as the purpose of supporting the validity of their SEQRA action.").)  Plaintiffs contend that this is functionally an admission that the water, sewer, and traffic impacts of the Comparator Sites are sufficiently similar to those of Kiryas Radin.  (Pls.' Reply 5–6.)  Of note, this potential narrowing of Defendants' justification for the *Chestnut Ridge* Action was not always reflected in the depositions of the Individual Defendants, wherein some still expressed concerns about the impact on the water and sewer systems.  (*See, e.g.,* Defs.' Decl. Ex. O (Goldsmith Dep. Tr.), at 133–37 (noting water and sewer issues were a concern that motivated the *Chestnut Ridge* Action); *id.* Ex. P (McPherson Dep. Tr.), at 84–85, 104 (discussing water concerns).)

[32] The Court also agrees with Defendants that the effect on traffic is properly considered at a local level, based on "whether existing conditions [would] be similarly impacted," rather than at a county-wide level.  (Defs.' Reply Mem. of Law in Further Supp. of Defs.' Mot. for Summ. J. 7 (Dkt. No. 128).)

similarities in impact on water and sewer usage are sufficient to render the Comparator Sites sufficiently similar.  By contrast, Fish explicitly represents that the criteria he used in his report are central to planning decisions.  (*See* Fish Decl. ¶ 21 ("From a planning perspective, these are the relevant characteristics one must consider in determining whether comparator sites are similar, or could be viewed by a reasonable or prudent person as being 'roughly equivalent.'"); *see also* Expert Report at 5 (representing that the Rockland County Comprehensive Plan recognizes the importance of adjacent land uses and build context).)  In this sense, differences in traffic impact and community character do not appear to be the type of "minor differences" that are insufficient to render two sites dissimilar.  *See Chabad Lubavitch of Litchfield Cnty., Inc. v. Litchfield Historic Dist. Comm'n*, 768 F.3d 183, 197 (2d Cir. 2014) (noting that "minor differences in land use regimes may not defeat a comparison under the equal terms provision in all disputes").

Even assuming that differences in impacts on traffic and community character are insufficient on their own to show that the Comparator Sites are dissimilar to Kiryas Radin, however, Plaintiffs still fail to provide sufficient evidence that the Comparator Sites are otherwise similarly situated.  While the size, density, and locations of the Comparator Sites are not in dispute, the only evidence that Plaintiffs offer in support of their position that the impact on water and sewer use is similar are the aforementioned admissions that water and sewer access are county-wide issues, and the unsourced argument made by A. Zaks in his Affirmation that "[i]t would seem logically impossible . . . to believe that the 60 units at Kiryas Radin would consume more water and sewage capacity" than the Comparator Sites given their relative size.  (A. Zaks May Aff'n ¶ 22.)  These statements, even if admissible, are insufficient on their own to show that the Comparator Sites *in fact* have a similar impact on water and sewage.  Further,

Plaintiffs cite no evidence about the extent to which the Comparator Sites underwent SEQRA review, e.g., whether environmental or traffic studies were completed prior to, or during, their construction.  Whether and to what degree the Comparator Sites were assessed is self-evidently of central importance in a case where Plaintiffs imply that Defendants could have brought a SEQRA-based action against Ramapo about the Comparator Sites.  If Ramapo conducted greater review of the Comparator Sites than it did of Kiryas Radin, they are unlikely similarly situated.

Moreover, even if Plaintiffs had offered sufficient evidence on the nature of the impact of the Comparator Sites, there remains an additional, fundamental evidentiary deficiency.  Plaintiffs have not demonstrated that Defendants were aware of the Comparator Sites—or the extent to which those sites underwent SEQRA review—before they were built, such that they could have brought a SEQRA-based suit.  The Second Circuit has held that a plaintiff "ordinarily cannot establish an equal protection violation unless it shows that the [defendant] consciously applied a different standard of enforcement to similarly[-]situated [entitites]."  *Latrieste Rest. v. Village of Port Chester*, 188 F.3d 65, 70 (2d Cir. 1999).  To do so, the plaintiff must demonstrate that the defendant was aware of similarly-situated entities, and failed to take comparable action against them.  *See Diesel v. Town of Lewisboro*, 232 F.3d 92, 104 (2d Cir. 2000) ("Knowledge is ordinarily required to establish the first element of a selective treatment claim." (brackets and internal quotation marks omitted)); *Latrieste Rest.*, 188 F.3d at 70 ("Absent a showing that the [defendant] knew of other violations, but declined to prosecute them, [the plaintiff] would ordinarily be unable to show that it was treated selectively."); *Abel*, 2009 WL 321007, at *6 ("To establish the first element of his selective enforcement claim, [the] [p]laintiff must also offer evidence showing . . . that Defendants had knowledge of the similarly situated individuals at the time they decided to sue him . . . ."); *see also Lamothe v. Town of Oyster Bay*, No. 08-CV-2078,

40

2012 WL 6720781, at *9 (E.D.N.Y. Dec. 27, 2012) (granting motion for summary judgment on Equal-Protection-based selective treatment claim where there was "no evidence to demonstrate that the [defendant] [t]own was aware of [other] building code violations" when it enforced the building code against the plaintiffs).[33]  As applied to the instant case, therefore, Plaintiffs must offer evidence that Defendants were aware of the existence of the Comparator Sites—and the nature of the environmental review process that occurred at each site—before they were built in order for them to have "consciously applied a different standard of enforcement." *Latrieste Rest.*, 188 F.3d at 70.  Having thoroughly examined the record, and having specifically sought input from the Parties on this issue, the Court finds that Plaintiffs have offered insufficient evidence to raise an issue of fact as to whether Defendants were aware of the Comparator Sites.[34]

---

[33] Plaintiffs may also establish notice by proving that Defendants had adopted a "see-no-evil" policy of generally not taking steps to ensure Ramapo and other municipalities followed SEQRA, and then abandoning that policy only with respect to Plaintiffs. *LaTrieste*, 188 F.3d at 70 n.1; *Abel,* 2009 WL 321007, at *6.  While Plaintiffs have suggested that the *Chestnut Ridge* Action is unprecedented because the Villages banded together to file it, they have offered no evidence suggesting that Defendants previously ignored arguable SEQRA violations, or that such situations have ever existed.  *See LaTrieste*, 188 F.3d at 70 n.1 (rejecting see-no-evil theory because the plaintiff had "not explicitly called [the court's] attention to proof supporting this, or any such alternative theory of selective treatment"); *Diesel*, 232 F.3d at 105 n.7 (same); *Lamothe*, 2012 WL 6720781, at *9 (same).  Nor have Plaintiffs offered any rebuttal of Defendants' claim that the *Chestnut Ridge* Action was unique because of the allegedly unprecedented scope and effect of the ASHL.  (*See* Defs.' Opp'n 7–8.)  The instant case is also distinguishable from *Abel*, wherein the Court found that a jury could conclude that the lack of knowledge was due to a "see-no-evil" policy because, inter alia, the individual defendants, officials in defendant town, recognized how unprecedented their actions were in that case, and even consulted their town assessor about the issue.  *Abel*, 2009 WL 321007, at *6.

[34] In their letter brief, Plaintiffs appear to argue that they no longer have to prove that Kiryas Radin were treated differently than the Comparator Sites in order to prevail on their Equal Protection claims.  (Letter from Joseph J. Haspel, Esq., to Court (Mar. 25, 2015) ("Pls.' Mar. 25 Letter") 1 (Dkt. No. 141) (contending that Plaintiffs "have asserted two distinct theories of Equal Protection," namely that Defendants applied SEQRA "in a discriminatory manner on the basis of [Plaintiffs'] . . . religion," and that Defendants "treated [Plaintiffs] differently than similarly[-] situated property developers because of . . . [their] background").)  The Court has already held that Plaintiffs must show that they were selectively treated in order to overcome Defendants'

In their letter brief, Defendants contend that "Plaintiffs submitted no evidence whatsoever . . . that Chestnut Ridge, Pomona[,] or Wesley Hills had any knowledge of any of the Comparator[] [Sites] before they were built."  (Letter From Gregory Saracino, Esq., to Court (Mar. 25, 2015) ("Defs.' Mar. 25 Letter") 1 (Dkt. No. 140).)  Defendants maintain that the only Defendant that was aware of any of the Comparator Sites was Montebello, which received notice of Airmont Gardens, Retreat at Airmont, and Montebello Commons.[35]  (*Id.* 2; *see also* Pls.' 56.1 ¶ 32(h) (noting that Montebello "reviewed [Montebello Gardens] in the ordinary course").)  Plaintiffs make the same allegation in their letter.  (*See* Letter from Joseph J. Haspel, Esq., to

---

qualified immunity.  *See Mosdos II*, 815 F. Supp. 2d at 686 ("Thus, to plead a selective petitioning claim in the instant action, Plaintiffs must allege both: (1) that they were selectively treated compared to others similarly situated; and (2) that the selective treatment was motivated by an intention to discriminate based on impermissible considerations, such as religion."); *id.* at 692 ("In *Mosdos I*, the Court explained that Plaintiffs could establish that the *Chestnut Ridge* Action was pursued for discriminatory reasons by showing that Plaintiffs were selectively treated."); *see also id.* at 697 ("[A]t the summary judgment stage of selective enforcement claims, courts ask whether based on the evidence, a reasonable jury could conclude that the plaintiff and the proposed comparators are similarly situated.").  Indeed, Plaintiffs recognized this fact in their Memorandum of Law.  (*See* Pls.' Mem. 5 ("Thus, to successfully establish that [Defendants] violated . . . their civil rights, it is incumbent upon [Plaintiffs] to show that [Defendants] selectively treated [them] in instituting their failed legal proceedings regarding Kiryas Radin . . . .").)

Plaintiffs also contend that because this case is a "'selective treatment' and not a 'selective enforcement' case," the *Latrieste* line of cases do not apply.  In this context, this is a distinction without a difference.  The Court has already found that Plaintiffs' "'selective' petitioning" claim is "akin to a selective enforcement claim," *Mosdos I*, 701 F. Supp. 2d at 601; *see also Mosdos II*, 815 F. Supp. 2d at 693 (equating "selective enforcement or selective treatment claims"), and the *Latrieste* court itself refers to selective treatment as the basis of a selective enforcement claim, *see Latrieste*, 188 F.3d at 69.

[35] Defendants point out that they have previously alleged that Montebello submitted a comment letter to Airmont about Airmont Gardens and Retreat at Airmont.  (Defs.' Mar. 25 Letter 3 n.3; *see also* Dkt. No. 53 at 16, 18.)

Court (Mar. 25, 2015) ("Pls.' Mar. 25 Letter") 2 (Dkt. No. 141).)[36]  Defendants further explain that the reason Montebello was aware of these three Comparator Sites is because Montebello Commons is located within Montebello, while Airmont Gardens and Retreat at Airmont are located within 500 feet of Montebello, meaning Montebello was required to be notified by the adjoining municipality—in this case, Airmont—pursuant to § 239-nn of the New York General Municipal Law.  *See* N.Y. Gen. Mun. Law § 239-nn(3) ("The legislative body or other authorized body having jurisdiction in a municipality shall give notice to an adjacent municipality when a hearing is held by such body relating to . . . site plan review and approval on property that is within five hundred feet of an adjacent municipality.").  Defendants assert, and Plaintiffs do not contest, that the Comparator Sites are "well in excess of 500 feet" from the remaining Villages, and that Montebello is in excess of 500 feet from the other Comparator Sites.[37]  By contrast, Defendants note that each Village was "given formal notice prior to" the enactment of the ASHL, as required by law, because of its impact throughout Ramapo.  (Defs.' Mar. 25 Letter 3.)

　　　Plaintiffs suggest that the other Villages likely knew of the Comparator Sites because at least some of them shared an attorney, Doris Ulman, Esq. ("Ulman"), whose knowledge could

---

[36] Plaintiffs also assert that Pomona was aware of Minisceongo Park, but the Court has already held that such project is too dissimilar to Kiryas Radin to serve as a comparator.  *See Mosdos II*, 815 F. Supp. 2d at 703.

[37] None of the other provisions of the New York General Municipal Law that Plaintiffs cite provide for notice to municipalities, (*see* Pls.' Mar. 25 Letter at 3 (citing New York Gen. Mun. Law §§ 239-l, 239-m)), though Defendants admit that the Rockland County Planning Department sometimes copies municipalities "as a courtesy," (Defs.' Mar. 25 Letter 3).  The Court also disregards the multiple exhibits to Plaintiffs' letter that refer to other alleged "comparables," (*see* Pls.' Mar. 25 Letter 2–3 (describing these exhibits)), because Plaintiffs have not made any allegations about these Comparator Sites in their Amended Complaint.

then be imputed by virtue of "partnership doctrine." (*See* Pls.' Mar. 25 Letter 3). The dubious applicability of partnership doctrine notwithstanding, Plaintiffs offer no evidence that Ulman was aware of the Comparator Sites. In fact, Plaintiffs explicitly tie her knowledge to that of the Villages she represents—Wesley Hills, Pomona, and Chestnut Ridge—and Plaintiffs have failed to provide sufficient evidence indicating that any of those Villages had knowledge of any of the Comparator Sites.[38]

After carefully reviewing the record, the only additional evidence relevant to whether Defendants were aware of the Comparator Sites—and the degree of environmental review conducted on them prior to construction—is the depositions of the Individual Defendants, particularly officials from Wesley Hills and Chestnut Ridge who were asked about other multi-family developments in Ramapo. Goldsmith, in his deposition, indicated that Wesley Hills was sent a "site plan and narrative" by neighboring Villages and "asked to comment on" them when they were within "roughly a quarter mile" of Wesley Hills. (Defs.' Decl. Ex. O (Goldsmith Dep. Tr.), at 149–151.) This admission is insufficient to indicate that Wesley Hills may have been aware of the Comparators for two reasons. First, based on the only evidence available in the record, it appears that the Comparator Sites are all more than a quarter mile from Wesley Hills. (*See* Expert Report at 7 (map of comparator sites).) Second, while Goldsmith discussed other development sites that he did remember, none of which were the Comparator Sites, (*id.* at 152–158), he made clear that he did not "remember the Village having been sent anything on multi-family homes by neighboring municipalities to comment on," (*id.* at 159). In fact, Plaintiffs

---

[38] The Court notes that it does not rely on Defendants' counsel's representation that he has "spoke[n] with representatives of the . . . Villages," including Ulman, about which Comparator Sites Defendants were aware of, or on the alleged the results of those conversations, because they are outside the record in this case. (*See* Defs.' Mar. 25 Letter 2.)

themselves assert that "[d]uring the period of his tenure as mayor or trustee of . . . Wesley Hills, Goldsmith could not recall any multi-family housing proposals from outside Wesley Hills that were reviewed by Wesley Hills." (Pls.' Mem. 34.)

Frankl, in his deposition, indicated that as Mayor of Wesley Hills, he "kept abreast of most things that happened within the town" by speaking with attorneys and other Mayors, reading the newspaper, and listening to the radio. (Defs.' Decl. Ex. Q (Frankl Dep. Tr.), at 28–29.) Frankl further indicated that if a "site plan . . . [was] brought to [his] attention," and he thought it was "ridiculous," he would be "interested" in it, whether it was in Ramapo or anywhere else in New York State. (*Id.* at 40.) He also noted that "[h]earings are held for issues such as a site plan development," including meetings of the Ramapo Planning Board, Zoning Board, and Town Board, and that he and other Village Mayors attend those meetings. (*Id.* at 49–50.) While these statements suggest that Frankl had a general familiarity with developments throughout the region, they do not suggest that he was familiar with the specific Comparator Sites, much less the degree to which any environmental review was done at each site.

McPherson, in his deposition, indicated that, during the time that the Nike Site was under review, he was not aware of any other specific "site plan approval processes going on county[-]wide for multifamily dwelling[s]." (Defs.' Decl. Ex. P (McPherson Dep. Tr.), at 105.) While McPherson did recall some "discussion on the [Wesley Hills] board of . . . site plans that [were] being proposed outside of the Village . . . other than the Nike Site," he couldn't recall any that were ultimately approved, and neither mentioned, nor was asked about, the Comparator Sites. (*Id.* at 122–23.)

Kobre, in his deposition, was the only Defendant to be asked specifically about the Comparator Sites. (*See* Defs.' Mar. 25 Letter 2.) He indicated a complete lack of familiarity

45

with them.  (*See* Defs.' Decl. Ex. T (Kobre Dep. Tr.), at 125–26.)   In fact, Kobre was entirely unable to recall any "site plan proposals outside of . . . Chestnut Ridge which proposed multifamily housing greater than 60 units in the last 20 years." (*Id.* at 108.)  While Plaintiffs might argue that Kobre was not being truthful in his deposition, it remains the case that his testimony does not suggest an awareness of the Comparator Sites.

Taken together, it appears that, unless certain developments were specifically brought to their attention, the Individual Defendants have been generally unaware of the existence, and status, of multi-family developments in Ramapo.  Therefore, the evidence as a whole is insufficient to suggest that a reasonable jury could find that the Defendants had sufficient knowledge of the Comparator Sites to conclude that Defendants consciously applied a different standard of enforcement to Plaintiffs.[39]  While the Court is satisfied a reasonable jury could find that Montebello was aware of three of the Comparator Sites, there is no evidence in the record indicating that Montebello shared that information with the other Villages, or that they otherwise knew of the Comparator Sites, such that the Villages could have joined together to file suit.  Moreover, there is no evidence to suggest that any Defendant was aware of the degree to which the Comparator Sites underwent environmental review prior to their construction, such that Defendants may have concluded that a lawsuit was warranted.[40]  Rather, the only site for which

---

[39] As discussed above, the Court does not consider A. Zaks' claim that the Villages were notified about the Comparator Projects because Plaintiffs have not established that A. Zaks has any personal knowledge of that fact. (*See* A. Zaks May Aff'n ¶ 17.)

[40] The Court recognizes that Plaintiffs need only present evidence that Defendants chose not to file a SEQRA-based lawsuit against one similarly-situated Comparator Site.  *See Mosdos II*, 815 F. Supp. 2d at 705.  However, even given Montebello's knowledge of three of the Comparator Sites, the evidence in the record indicates that most of the Defendants, those who Plaintiffs allege colluded together to halt the expansion of the Hasidic community in Ramapo, were unaware of any of the Comparator Sites at all.  Similarly, there is no evidence that *any* Defendant was aware of what environmental studies were completed on the Comparator Sites, if

there is evidence in the record indicating that all Defendants were aware of its existence, and the degree to which it underwent environmental review, is Kiryas Radin, by virtue of its association with the ASHL.  For these reasons, Plaintiffs' Equal Protection claims do not survive Defendants' Motions.

Accordingly, on the basis of the only evidence in the record, the Court concludes that no reasonable jury could find that the Comparator Sites are similarly situated to Kiryas Radin. Defendants are entitled to summary judgment on Plaintiffs' Equal Protection claims and, by extension, immunity from Plaintiffs' remaining civil rights claims.  *See Grennan v. Nassau County*, No. 04-CV-2158, 2007 WL 952067, at *14 (E.D.N.Y. Mar. 29, 2007) (granting summary judgment on Equal Protection claim because there was "no evidence in [the] record of individuals similarly situated who were treated differently"); *Brown v. N.Y.C. Health & Hosps. Corp. Emergency Med. Serv.*, No. 96-CV-156, 1996 WL 743349, at *5 (E.D.N.Y. Dec. 13, 1996) (granting summary judgment on Equal Protection claim because "plaintiffs [had] adduced no evidence to support their allegations").

### d.  Discriminatory Purpose

Given that Plaintiffs have failed to offer sufficient evidence to raise an issue of fact with regard to whether the alleged comparators are sufficiently similar to Kiryas Radin, the Court need not reach the second prong of Plaintiff's Equal Protection claim.  However, assuming, *arguendo*, that the Comparator Sites are sufficiently similar to Kiryas Radin, the Court takes up the second prong of the standard: whether Defendants acted with a discriminatory purpose.

---

any were done, or of their results.  By contrast, it is not disputed that all Defendants were aware of the existence of the ASHL and the environmental review that Ramapo completed prior to its adoption.  By extension, it is not disputed that Defendants were aware of Kiryas Radin, the first site plan approval Ramapo granted under the ASHL, which explains why Defendants might have filed suit to challenge Kiryas Radin and not the Comparator Sites.

A plaintiff will only "be permitted to take his case to trial if he [or she] proffers evidence that strongly indicates that discrimination was a significant reason for a public body's actions and the defendant body, or its members, fails to counter that evidence with its own clear evidence that a majority acted with permissible motives." *Cine SK8 Inc. v. Town of Henrietta*, 507 F.3d 778, 786 (2d Cir. 2007). In other words, Plaintiffs must show that Defendants "selected or reaffirmed a particular course of action at least in part because of, not merely in spite of, its adverse effects upon an identifiable group." *Soberal-Perez v. Heckler*, 717 F.2d 36, 42 (2d Cir. 1983) (internal quotation marks omitted); *see also Stewart*, 590 F.3d at 121 (noting that, to maintain an Equal Protection claim, the plaintiff must prove that his or her "differential treatment was based on impermissible considerations such as . . . religion" (internal quotation marks omitted)); *Soberal-Perez*, 717 F.2d at 42 (explaining that the fact that "a particular action has a foreseeable adverse impact . . . is insufficient to establish discriminatory intent").[41] While "[d]iscriminatory intent may be inferred from the totality of the circumstances," including "historical background" and "contemporary statements made by the decision-making body," *LeBlanc-Sternberg v. Fletcher*, 67 F.3d 412, 425 (2d Cir. 1995) (internal quotation marks omitted), Plaintiffs cannot rely on mere conclusory allegations to establish this element of their claim, *see 33 Seminary LLC v. City of Binghamton*, 869 F. Supp. 2d 282, 310 (N.D.N.Y. 2012).

---

[41] The Court notes that, in the employment context, a plaintiff may raise an inference of discrimination by showing that he or she was subject to disparate treatment. *See Graham v. Long Is. R.R.*, 230 F.3d 34, 39 (2d Cir. 2000) ("A plaintiff may raise . . . an inference [of discrimination] by showing that the employer subjected him to disparate treatment, that is, treated him less favorably than a similarly situated employee outside his protected group."). The Court need not determine whether such inference is sufficient here, because, as discussed above, Plaintiffs have failed to demonstrate disparate treatment.

Defendants contend that they are entitled to summary judgment because "[t]he evidence demonstrates that not a single Plaintiff has first-hand knowledge of any alleged racist remarks or [can offer] any specificity as to the speaker, the location, the occasion[,] or the context." (Defs.' Mem. 4.) Plaintiffs appear to admit this fact by not objecting to such claim in their Counter 56.1 Statement. (*See* Pls.' Counter 56.1 ¶ 181 (admitting statement but arguing that "Defendants are sophisticated and savvy enough to insure the public record is free of statements [indicating] discriminatory intent").) Defendants argue, and the record confirms, that the Individual Defendants have "testified consistently," albeit self-servingly, "that they commenced the challenge to the ASHL and Nike Site [p]roject *because of* concerns regarding the incongruous density, and the impacts on water, sewer, traffic, and community character." (Defs.' Mem. 6 (citing Defs.' Decl. Ex. O (Goldsmith Dep. Tr.), at 122–123 (stating that Wesley Hills's concern about Kiryas Radin was "[t]he use of the site in terms of how many buildings were there, how many families were living there[,] and what activities were taking place"); *id.* Ex. P (McPherson Dep. Tr.), at 93 ("Our concern was that a SEQRA study be done . . . ."); *id.* Ex. Q (Frankl Dep. Tr.), at 102 (explaining that his concerns were rooted in the fact that Ramapo's SEQRA review "was not done properly"); *id.* Ex. R (Rhodes Dep. Tr.), at 86 (noting that Ramapo had failed to "deal adequately with environmental issues"); *id.* Ex. S (Oppenheim Dep. Tr.), at 75 (stating that *Chestnut Ridge* Action was filed because Ramapo "ignor[ed] state environmental quality review")).)

In response, Plaintiffs first cite the historical context, arguing that the Villages were formed to, inter alia, resist the "influx of people the [Villages] deemed undesirable," namely Orthodox and Hasidic Jews. (Pls.' Mem. 11.) The Court recognizes, of course, that such context is relevant to determining whether the Villages acted with discriminatory animus. *See LeBlanc-*

49

*Sternberg*, 67 F.3d at 425 (noting this context is relevant to a "totality of the circumstances" inquiry in determining whether a defendant acted with discriminatory intent); *United States v. Yonkers Bd. of Educ.*, 837 F.2d 1181, 1221 (2d Cir. 1987) (explaining that "[i]ntent to discriminate may be established in a number of ways," and may be "'inferred from the totality of the relevant facts,'" including "'historical background . . . particularly if it reveals a series of official actions taken for invidious purposes; [and] the specific sequence of events leading up to the challenged decision,' such as zoning changes for a given site enacted upon . . . learning of [the plaintiff's] plans for . . . construction" (alterations omitted) (quoting *Village of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 267–68 (1977); *Washington v.* Davis, 426 U.S. 229, 240 (1976)); *Fair Hous. in Huntington Comm. v. Town of Huntington*, No. 02-CV-2787, 2005 WL 3184273, at *4 (E.D.N.Y. Nov. 29, 2005) (listing "historical background" as an indicator of discriminatory intent (internal quotation marks omitted)).  However, here, Plaintiffs' claims about the reasons for the incorporation of the Villages are unsupported by evidence.  The Court notes the absence of evidence that any of the Individual Plaintiffs has personal knowledge of the reasons behind the Villages' incorporation, *see* Part II.B.1 *supra*, and the testimony of the Individual Defendants does not suggest that the Villages were incorporated for a discriminatory purpose (to the extent they know why the Villages were incorporated).  Moreover, the only authority for this argument cited in Plaintiffs' motion papers is the *LeBlanc-Sternberg* case, in which the court found that Airmont was incorporated "in a movement critical of the zoning measures adopted by [Ramapo]."  67 F.3d at 417.  Airmont is not a Defendant in this case, and was incorporated only *two days* before the *Le-Blanc Sternberg* action was commenced.  *Id.* at 419.  By contrast, while some of the Individual Defendants were Village officials when the Villages were incorporated, nearly two decades separate the most recent incorporation among the

Villages and the conduct at issue in this case.  (Pls.' Mem. 11; *see also* Defs.' Opp'n 11.)[42]

Therefore, the Court does not consider these allegations persuasive for purposes of determining

whether the *Chestnut Ridge* Action was initiated for discriminatory reasons.[43]

Plaintiffs also cite several portions of the depositions of the Individual Defendants, which

they allege show that the *Chestnut Ridge* Action was "unique and selective."  (Pls.' Mem. 5.)

Such portions include, in relevant part, Frankl admitting that the "financial impact" of the

*Chestnut Ridge* Action was relevant to its commencement, (*id.* 5–6 (citing Defs.' Decl. Ex. Q

(Frankl Dep. Tr.), at 112)), Frankl indicating that he thought that Ramapo passed the ASHL in

order to "pander[]" to the Hasidic community, and that individuals in the Hasidic community

---

[42] Based on their deposition testimony, the following Individual Defendants were in office at the following times: Goldsmith has been Mayor of Wesley Hills since 2008, and was a Trustee from 1994 through 2008, (Defs.' Decl. Ex. O (Goldsmith Dep. Tr.), at 11); McPherson has been a Trustee of Wesley Hills since it was formed, which he says was in 1982, (*id.* Ex. P (McPherson Dep. Tr.), at 11), though it is not clear how long he has been Deputy Mayor; Frankl was the Mayor of Wesley Hills from its incorporation, which he says was in 1983, through 2008, (*id.* Ex. Q (Frankl Dep. Tr.), at 26); Rhodes was a Trustee of Wesley Hills from roughly 1984 through 2004 (*id.* Ex. R (Rhodes Dep. Tr.), at 13); Oppenheim has been the Mayor of Montebello since 2007, and was a Trustee from 2003 through 2007, (*id.* Ex. S (Oppenheim Dep. Tr.), at 10); and Kobre was the Mayor of Chestnut Ridge from its incorporation, which he says was in 1986, until 2013, (*id.* Ex. T (Kobre Dep. Tr.) at 10, 32).

It is also worth noting that the evidence of discriminatory purpose was far stronger in *LeBlanc-Sternberg* than in the instant case.  For example, as the *Leblanc-Sternberg* court noted, the Airmont Civic Association, which was a driving force behind the town's incorporation, explicitly "emphasized the need for control over zoning in connection with the desire to keep Orthodox and Hasidic Jews out of the Airmont Community," which included statements by leaders of the organization like "'[I] . . . will not have a Hasidic community in my backyard,'" and a forecast in the official minutes of a meeting of "'a grim picture of a Hasidic belt.'" *LeBlanc-Sternberg*, 67 F.3d at 418 (emphasis omitted).

[43] For the same reason, the aforementioned statement from the Blackman affidavit, wherein Blackman indicates that Frankl told him, at a meeting held what appears to be almost thirty years ago, in response to his concerns, "What do you want should happen here?  Do you want synagogues all over the place?," is too remote from the *Chestnut Ridge* Action to indicate a discriminatory purpose.  (A. Zaks June Aff'n Ex. B.)

were going to "build projects . . . on very vulnerable pieces of land, not doing any environmental

studies," (*id.* 17 (citing Defs.' Decl. Ex. Q (Frankl Dep. Tr.), at 59–60)), McPherson admitting

that while water was an issue county-wide, he only appeared once at a public meeting to voice

concerns related to Kiryas Radin, (*id.* 23 (citing Defs.' Decl. Ex. P (McPherson Dep. Tr.), at

105–107), Rhodes testifying that the expansion of the Hasidic community was an important

issue, and that the Ramapo Town Supervisor was improperly influenced by them, (*id.* 20 (citing

Defs.' Decl. Ex. R (Rhodes Dep. Tr.), at 36, 46, 54)), and Oppenheim, in an email, encouraging

support for a bond to purchase certain property because otherwise it would "almost certainly be

purchased by a religious group from outside Montebello" (*id.* 25 (citing Defs.' Decl. Ex. S

(Oppenheim Dep. Tr.), at 105–06 (emphasis omitted)); *see also id.* 22 (portion of Save Ramapo

blog posts written by Rhodes expressing concern about rapid expansion of an allegedly largely-

impoverished Hasidic community)).) [44]  Plaintiffs also point out that none of the Individual

Defendants could recall another time when the Villages had banded together to commence any

---

[44] Plaintiffs also produced a video of a February 2006 "Preserve Ramapo" meeting held at Wesley Hills Village Hall, apparently hosted by Rhodes and Brown. (*See* A. Zaks June Aff'n ¶ 6 (noting attachment of video); *id.* Attach. ("Video").)  While there is no indication in the video that Preserve Ramapo was able to use the Village Hall free of charge, Brown's attendance, and the fact that Rhodes and Brown used the meeting as a means of raising money for the *Chestnut Ridge* Action, suggests some association between Preserve Ramapo and the Individual Defendants.  (*See* Video; *see also* Pls.' Counter 56.1 ¶¶ 175–76).  However, the Court sees no evidence in the video of discriminatory animus on the part of any Village officials.  The concerns that Rhodes and Brown articulated were almost exclusively about density, traffic, and water/sewer access.  In fact, at one point in the video, Rhodes chided one meeting attendee who was skeptical of the project, indicating that he trusted Mosdos's representation that the Kiryas Radin site would serve students rather than Hasidic families more generally.  (*See* Video at 44:30.)  Granted, that goodwill is contradicted by Rhodes's deposition testimony, wherein Rhodes says that he doesn't "know that Kiryas Radin really exists as a school."  (Defs.' Decl. Ex. R (Rhodes Dep. Tr.), at 106.)  Nonetheless, the video itself is not particularly supportive of Plaintiffs' claims.

litigation, and Defendants do not appear to contest this fact.  (*See generally* Pls.' Mem. 16–34 (citing testimony); Defs.' Counter 56.1 ¶ 37.)[45]

Defendants, in response, claim that the Villages chose to band together to file the *Chestnut Ridge* Action because of the unique village-wide effect of the ASHL, which affected multiple sites in each Village, and its perceived effect on "low density single-family communities."  (Defs.' Opp'n 7–8.)  Defendants also specifically challenge Plaintiffs' characterization of Frankl's testimony regarding the financial impact of the *Chestnut Ridge* Action, contending that Frankl intended to convey the idea that "'[a]ny rational litigant— particularly a municipality—would say that[,] when assessing whether to bring a lawsuit, costs to *both* sides are considered.'"  (Defs. Opp'n 9 (citing Decl. of Robert Frankl ¶ 24 (Dkt. No. 120)).)

More fundamentally, Defendants contend that while Plaintiffs' evidence demonstrates that the *Chestnut Ridge* Action was unique, it does not demonstrate that it was commenced for a discriminatory purpose.  (*Id.* 9–10)  The Court agrees.  Indeed, the evidence Plaintiffs point to as their "[b]est example" of discriminatory animus is Frankl's testimony regarding Defendants' alleged intent to "financially harm[]" Plaintiffs, which is as follows:

---

[45] Plaintiffs also cite *Yeshiva Chofetz Chaim Radin, Inc. v. Village of New Hempstead*, 98 F. Supp. 2d. 347 (S.D.N.Y. 2000), in support of their Motion.  (Pls.' Mem. 36–37.)  Self-evidently, this case is not evidence; the Court does not ascribe any relevance to it beyond the fact that it explains how YCC came into possession of the Nike Site, and provides legal standards relevant to some of the claims in this case.  (*See* Defs.' Opp'n 11–12.)  The Court will also not consider arguments of the sort advanced in this section by Plaintiffs, e.g., the suggestion that the Villages of Airmont and New Hempstead "learned their lesson" from prior litigation.  (Pls.' Mem. 36.)

Additionally, Plaintiffs quote over ten pages of the Court's prior opinion addressing Defendants' Motion To Dismiss.  (*See id.* 37–50.)  However, the Court's prior holding does not constrain the Court here because the standard for summary judgment "is vastly different than the standard on a motion to dismiss."  *Ginx*, 720 F. Supp. 2d at 362 n.8; *see also Manley v. Mazzuca*, No. 01-CV-5178, 2007 WL 162476, at *9 n.5 (S.D.N.Y. Jan. 19, 2007) ("To the extent [the] [p]laintiff is arguing that denial of a motion to dismiss requires denial of summary judgment, the law lends him no support.").

Q. [Mr. Haspel] Do you have an understanding of how many years the Village[s'] litigation stalled [the Kiryas Radin] project?

A. [Robert H. Frankl] Well, seven or eight years.

Q. Would you agree that that would have a financial impact on an organization?

A. Absolutely, absolutely.

Q. Is that something that was considered when the lawsuit was commenced?

A. You bet, you bet, you bet. In fact, it was my suggestion to the Village of New Hempstead that we buy the project as a coterminous community and build a park.

(Pls.' Reply 4–5.) First, it appears that, based on the quote, and as Defendants suggest, Frankl was concerned about the financial impact of the *Chestnut Ridge* Action on the Villages *and* the Plaintiffs, as reflected by his desire to "buy" the project at the outset. (*See* Defs.' Opp'n 9.)[46] Second, even giving the transcript a Plaintiff–friendly reading, and even if Defendants intended to inflict financial harm on Plaintiffs, there is no suggestion that they were motivated to do so by the religious nature of Kiryas Radin.

Pomona is also correct that the allegations made by the Individual Plaintiffs in their depositions are, for the most part, not specific to the Individual Defendants such that they suggest discriminatory animus on their part, but rather refer only to generalized instances of racist remarks and racial stereotyping. (*See* Pomona's Mem. 11–14; *see also* Defs.' Decl. Ex. H (Bernstein Dep. Tr.), at 38, 44 (expressing a "feeling" that the Villages were motivated by anti-

---

[46] Granted, the fact that A. Zaks "personally heard the Villages' counsel articulate that litigation would slow down the process [of developing the Nike Site], and the consequences would be that the project 'would go away,'" suggests that the effect of the litigation on the feasibility of Kiryas Radin was certainly on the minds of Defendants. (A. Zaks May Aff'n ¶ 39.) But, it still begs the question of whether any effort to "stall" Kiryas Radin was motivated by improper considerations, such as the religious affiliation of those behind the project, or by valid concerns, such as the environmental impact of the project.

Semitism in filing the *Chestnut Ridge* Action, and noting that individuals at town meetings made

bigoted remarks, though Bernstein could not remember if they were made by Defendants); *id.*

Ex. J (Naftali Tescher Dep. Tr.), at 40–41 (stating that while he "believe[ed]" he had heard

Defendants make racist remarks, he could not recall details, including which Defendant said

what); *id.* Ex. L (Sima Zaks Dep. Tr.), at 63–64 (explaining that while she believed she had

heard racist remarks, she could not cite "exact[], specific remarks").)  Also of note, Plaintiffs

offer no evidence of any statements made by Pomona Defendants at all.[47]  The Court will not

permit claims against Pomona to proceed to trial on an allegation of mere guilt by association,

and summary judgment for Pomona is appropriate on this basis alone.  *See Katz v. David W. Katz*

*& Co.*, No. 82-CV-6383, 1984 WL 2385, at *2 (S.D.N.Y. Feb. 14, 1984) (granting summary

judgment because "the plaintiff's case against [that defendant] [was] one of 'guilt by

association'").

 The only Individual Defendant Plaintiffs specifically identified in their depositions as

making discriminatory comments was Rhodes, (*see, e.g.,* Defs.' Decl. Ex. K (Beatrice Zaks Dep.

Tr.), at 55 (identifying comments made by Rhodes); *id.* Ex. N (M. Zaks Dep. Tr.), at 170–172

(admitting no personal knowledge of statements made by any Defendant other than Rhodes); *id.*

Ex. L (Sima Zaks Dep. Tr.), at 43–46 (noting comments made by Rhodes, and explaining

inability to specifically identify others who have made allegedly bigoted comments)), yet the

only specific comments they discuss are (a) his blog posts, as discussed above, and (b) an

---

 [47] Oddly, Plaintiffs made no attempt to depose any representatives of Pomona, (*see* Pomona's Mem. 11), and cite to no testimony of any Pomona official about the *Chestnut Ridge* Action.

allegation that he threatened to keep a rabbi out of a public meeting.[48]  In general, the blog posts themselves do not suggest discriminatory animus, but rather indicate a concern about water, sewage, and zoning control.  (*See, e.g.,* Aff'n of A. Zaks ("A. Zaks June Aff'n") Ex. A, at unnumbered 13–17, 19–20 (June 20, 2014) (Dkt. No. 114).)  Indeed, Rhodes specifically characterizes the conflict between his organization and Ramapo as "not a struggle between good and evil . . . [but] a struggle of rights in conflict," (*id.* at unnumbered 20), and he makes clear in his deposition that his concern relates to inaccurate population estimates in the Ramapo Comprehensive Plan and the associated failure to prepare for such increases, (*see* Defs.' Decl. Ex. R (Rhodes Dep. Tr.), at 58–60 (explaining how the Ramapo Comprehensive Plan contained erroneous population estimates, and failed to account for the rate of population increase).)  On the other hand, the Court is disturbed by Rhodes' discussion of the combination of poverty and high birth rates of the Hasidic community in his blog post, even though he relates these comments to a failure to account for increased Medicaid costs.  (*See* A. Zaks June Aff'n Ex. A, at 18–19.)[49]  However, even if the Court construes the blog post reference to an impoverished

---

[48] As noted, the Perles affidavit suggests that Brown did something along the lines of calling the prospect of a Hasidic Yeshiva buying and building on land in the Villages "'a catastrophe,'" which was not rebutted by Frankl despite the fact that he was "standing nearby," and the Blackman affirmation indicates that Frankl made a comment about avoiding having "'synagogues all over the place.'"  (A. Zaks June Aff'n Ex. B.)  While these statements are suggestive, Brown is not a Defendant in this action, and, as discussed above, Frankl's statement was made decades prior to the affirmation, and so the probative value of this evidence is minimal, at best.  *See Henry v. Wyeth Pharm., Inc.*, 616 F.3d 134, 149 (2d Cir. 2010) ("The more remote and oblique the remarks are in relation to the . . . action, the less they prove that the action was motivated by discrimination." (brackets and internal quotation marks omitted)); *Underdog Trucking, L.L.C. v. Cellco P'ship*, No. 10-CV-9189, 2012 WL 2422040, at *7 (S.D.N.Y. June 26, 2012) (applying the same standard to a claim of racial discrimination in contracting decisions), *aff'd* 514 F. App'x 31 (2d Cir. 2013).

[49] Rhodes also made a few somewhat inflammatory statements in his deposition, statements that Plaintiffs oddly do not cite in their submissions.  For example, Rhodes indicated his concern that an "extremely influential religion may run roughshod over planning, quality of

Hasidic community to indicate religious animus, and even if Rhodes made the aforementioned

attempt to keep a rabbi out of a public meeting because of his religion, "isolated racial remarks"

among one of the Individual Defendants "do not satisfy [Plaintiffs'] burden of establishing a

prima facie case of discrimination."  *Lawson v. Getty Terminals Corp.*, 866 F. Supp. 793, 802

(S.D.N.Y. 1994) (italics omitted).  Likewise, the mere "feeling" that there was an anti-Semitic

motivation to the *Chestnut Ridge* Action is insufficient to survive a motion for summary

judgment.  *See Lisa's Party City, Inc. v. Town of Henrietta*, 185 F.3d 12, 17 (2d Cir. 1999)

(affirming summary judgment on Equal Protection Clause claim because, inter alia, the plaintiff

had "failed to show a material issue of fact as to . . . impermissible motive" because his

assertions that a Town ordinance was enforced in a discriminatory fashion was "sheer conjecture

and speculation" (internal quotation marks omitted)); *Moore v. Syracuse City Sch. Dist.*, No. 05-

CV-5, 2009 WL 890576, at *6 (N.D.N.Y. Mar. 31, 2009) ("Conclusory allegations are

insufficient to survive summary judgment unless supported by facts that may prove invidious

discriminatory intent or purpose." (internal quotation marks omitted)).

While the mere generality of evidence with respect to the other Individual Defendants is

not a fatal flaw, the critical problem with Plaintiffs' evidence is that, as explained above, it does

not ascribe a discriminatory motive to Defendants.  Rather, the evidence suggests only that (a)

the *Chestnut Ridge* Action has no comparators, and (b) with the exception of a couple of

---

life[,] and the law," and, in reference to the Hasidic community, notes that "if you have a very
poor community, if you have a desperate need for housing, if you can't afford to pay taxes[,] you
take shortcuts."  (Defs.' Decl. Ex. R (Rhodes Dep. Tr.), at 142–43.)  Granted, Rhodes did
express a hope that poor individuals from the Hasidic community would band together with other
poor individuals from outside the community "and demand that our government provide for all
poor people, instead [of] focus[ing] on their own needs."  (*Id.* at 143–44.)  Rhodes claimed that
the only reason his concern was focused on the Hasidic community was because "that is the only
part of the community that's expanding."  (*Id.* at 145.)

instances of indiscretion on Rhodes' part, only unidentified individuals made bigoted remarks at town meetings, individuals who may or may not have been Defendants.  Therefore, "[w]hile [the] Court is cautious in granting summary judgment on motive based discrimination claims, it will not shirk its duty to do so" here, where "[P]laintiff[s'] proof is wholly inadequate."  *Blount*, 2006 WL 3314635, at *13 (granting summary judgment for defendants because there was "no evidence whatsoever to suggest that [defendants'] investigatory process or conclusions were influenced in any way by bias").  Accordingly, the Court finds that Plaintiffs have failed to raise an issue of material fact with respect to discriminatory intent.  *See Grillo v. N.Y.C. Transit Auth.*, 291 F.3d 231, 235 (2d Cir. 2002) (finding that the plaintiff "failed to produce sufficient evidence to withstand summary judgment on his discrimination claims" because he did "little more than cite to his alleged mistreatment and ask the court to conclude that it must have been related to his race" (brackets and internal quotation marks omitted)); *Dickerson v. State Farm Fire & Cas. Co.*, No. 95-CV-10733, 1996 WL 445076, at *3 (S.D.N.Y. Aug. 1, 1996) ("It is not enough merely to assert that the defendant took adverse action against the plaintiff, and that the action was the product of racial animus.  The complaint must allege specific facts supporting both the existence of the racial animus and the inference of a link between the adverse treatment and the racial animus.").  Therefore, even if Plaintiffs had provided sufficient evidence on the similarity of the Comparator Sites to Kiryas Radin, Defendants would be entitled to summary judgment on this claim and, by extension, immunity from Plaintiffs' civil rights claims.

The Court understands the seriousness with which Plaintiffs bring these allegations.  Indeed, Plaintiffs have made clear, in their moving papers and at oral argument, the sincerity of their belief that their Equal Protection claims have merit.  The allegations, while often supported only by inference, are grounded in the context of fifty plus years of distrust, hostility, and even

bigotry within the communities at issue here.  Having lived and worked with residents and

officials from the Villages during these many years, Plaintiffs firmly believe that they have been

targeted because of their religious beliefs, even if they cannot point to discriminatory statements

by Defendants.  The Court is sympathetic: who would know better than the Parties in this case

whether the current dispute is a product of the decades-long tension between the Hasidic

community and the Villages of Ramapo?  However, the Court's role in evaluating competing

motions for summary judgment is not to take the Plaintiffs (or Defendants) at their word,

however sure Plaintiffs might be; rather, the Court must evaluate the evidence, if any, in support

of their claims.  Because Plaintiffs have offered almost no evidence in support of their claims,

and certainly not enough to raise a contested issue of material fact, the Court must grant

summary judgment in favor of Defendants.  *See First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391

U.S. 253, 290 (1968) (holding the plaintiff could not defeat a summary judgment motion without

offering "any significant probative evidence tending to support the complaint").

    3.  <u>Sections 1981, 1982, 1983, and 1985</u>

Following the Court's *Mosdos II* opinion, the Individual Plaintiffs' §§ 1981, 1982, 1983,

1985(3) claims against the Villages and the Individual Defendants in their official capacities

survived.  Because, as discussed above, all Defendants are entitled to immunity under *Noerr-*

*Pennington* from civil rights claims arising out of the *Chestnut Ridge* Action, the §§ 1981, 1982,

1983, and 1985(3) claims fail.  Notably, other than by operation of Defendants' immunity,

Defendants only specifically seek summary judgment on Plaintiffs' Section 1982 and 1985(3)

claims.  Therefore, were Defendants not entitled to immunity, the Individual Plaintiffs' §§ 1981

and 1983 claims would survive, though the Individual Plaintiffs' § 1982 and Equal-Protection-

Clause-based § 1983 claims would likely fail nonetheless for the reasons discussed above.  *See*

*Oliveira v. Price Law Firm*, No. 14-CV-4475, 2014 WL 4088199, at *2 (S.D.N.Y. July 30, 2014) (noting that to state a claim under section 1983, a plaintiff must allege the deprivation of a constitutional right); *Lin v. Rohm & Haas Co.*, 293 F. Supp. 2d 505, 519 (E.D. Pa. 2003) (dismissing section 1981 claim because the plaintiff "failed to present sufficient evidence from which an inference of discrimination . . . [could] be drawn"), *on reconsideration*, 301 F. Supp. 2d 403 (E.D. Pa. 2004).[50]

With regard to the Individual Plaintiffs' § 1982 claims, Plaintiffs allege that Defendants impaired the Individual Plaintiffs' right to purchase and use real property, namely Kiryas Radin, for discriminatory reasons, (Am. Compl. ¶ 138), and likewise that Defendants "conspired to selectively, discriminatorily and improperly violate [the Individual] Plaintiffs' right to Freedom of Association" in the same manner, (*id.* ¶ 144).[51]  Defendants allege that the claim must fail because the Individual Plaintiffs have "fail[ed] to produce any evidence that they sought housing opportunities within the Villages."  (Defs.' Mem. 21.)  In response, the Individual Plaintiffs claim that, because Defendants initially obtained injunctive relief, each of the Individual Plaintiffs were unable "to move into . . . Kiryas Radin . . . and engage in their studies and/or their vocation of teacher."  (Pls.' Opp'n 8.)

The Individual Plaintiffs' claims are without merit.  To maintain a § 1982 cause of action, the Individual Plaintiffs must show that "(1) [they] are member[s] of a racial [or religious]

---

[50] Mosdos's counterclaims also include two § 1983 claims.  As discussed below, they fail because of Defendants' immunity, and because the counterclaims are moot.

[51] If the Individual Plaintiffs intended to allege a civil rights conspiracy to deprive the Individual Plaintiffs of their rights under § 1982, the claim still fails for the reasons discussed here.  Otherwise, the conspiracy claim is addressed below in the context of § 1985.

minority; (2) [D]efendant[s] intended to discriminate on the basis of race [or religion]; and (3) the discrimination involved one or more of the activities enumerated in the statute[]," *Grajales v. Mendez*, No. 11-CV-3069, 2011 WL 3163032, at *1 (E.D.N.Y. July 25, 2011), namely the right to "inherit, purchase, lease, sell, hold, and convey real and personal property," 42 U.S.C. § 1982. Given Kiryas Radin was not in any of the Defendant Villages, and the Villages likewise had no control over who could rent or buy housing at the complex, it was impossible for them to "discriminate in the sale or rental" of the property.  *See Warth v. Seldin*, 422 U.S. 490, 510 (1975) (rejecting a § 1982 claim because, inter alia, the petitioners were "not themselves subject to [the challenged] zoning practices"); *Evans v. Lynn*, 537 F.2d 571, 595 (2d Cir. 1975) (finding no standing for housing discrimination claim because the plaintiffs did not seek housing, nor were housing proposals that would benefit them arbitrarily rejected by the town).  Further, the Individual Plaintiffs have not alleged that they have attempted to buy or lease property, or that they have a property right in Kiryas Radin, but rather only that they were unable to "move in" due to the injunction resulting from the *Chestnut Ridge* Action.  This is insufficient to state a claim.  *See Grimes v. Fremont Gen. Corp.*, 785 F. Supp. 2d 269, 295 (S.D.N.Y. 2011) ("[T]o maintain an action under § 1982, a plaintiff must allege that [he] or she was intentionally deprived of a property right because of her [religions or] race." (brackets and internal quotation marks omitted)); *Puglisi v. Underhill Park Taxpayer Ass'n*, 947 F. Supp. 673, 700 (S.D.N.Y. 1996) (noting that to state a claim under § 1982, the plaintiff must allege that he or she was intentionally "deprived of a property right because of her race.").  Therefore, even if Defendants were not immune from suit, they would be entitled to summary judgment on the Individual Plaintiffs' § 1982 claims.

With regard to the Individual Plaintiffs' § 1985 claim, Plaintiffs allege that Defendants "conspired with one another and with others for purposes of depriving" the Individual Plaintiffs of "equal protection of the laws, or of equal privileges and immunities under the Constitution." (Am. Compl. ¶ 141.)  Defendants assert that Plaintiffs have "failed to present any facts other than the most general, unsupported[,] and conclusory allegations, that a significant reason for the commencement and pursuit of the [*Chestnut Ridge*] Action was because of the alleged adverse effect it would have on Plaintiffs, or discriminatory animus."  (Defs.' Mem. 20.)  Plaintiffs, by contrast, contend that "the four Villages conspired to deprive ultra-orthodox Jews . . . . [by] singling them out and presenting a meritless and unique SEQRA lawsuit . . . ."  (Pls.' Opp'n 7.)[52]

To maintain a cause of action under § 1985(3), Plaintiffs must demonstrate "(1) a conspiracy, (2) for the purpose of depriving any person or class of persons of equal protection of the laws . . . , (3) an act in furtherance of the conspiracy . . . ," and (4) that as a result, "a person is injured in his person or property or deprived of a right or privilege of a citizen."  *Wales v. City of New York*, No. 06-CV-13684, 2008 WL 728870, at *5 (S.D.N.Y. Mar. 18, 2008) (alterations in original) (internal quotation marks omitted).  The conspiracy "must be motivated by some class-based animus."  *Id.* (internal quotation marks omitted); *see also Cine SK8*, 507 F.3d at 791 ("A § 1985(3) conspiracy must also be motivated by some racial or perhaps otherwise class-based, invidious discriminatory animus behind the conspirators' action." (internal quotation marks omitted)).  The Court has addressed the issue of discriminatory animus above in the context of Defendants' qualified immunity/Plaintiffs' Equal Protection claim, and, other than stating the elements of such a claim, no Party presents any additional arguments here.

---

[52] Plaintiffs also allege that the *Chestnut Ridge* Action "presented no true environmental issues as are required when addressing religious land use."  (Pls.' Opp'n 7–8.)  This issue is addressed below.

Accordingly, even if Defendants were not immune from suit, they would be entitled to summary judgment on the Individual Plaintiffs' § 1985(3) claim because Plaintiffs have not presented evidence raising an issue of material fact as to whether Plaintiffs' acted with a discriminatory purpose in filing the *Chestnut Ridge* Action.

### 4. State Law Claims

In *Mosdos II*, this Court dismissed Plaintiffs' New-York-State-Constitution-based claims against Pomona for failure to file a Notice of Claim as required under New York law. *Mosdos II*, 815 F. Supp. 2d at 708–10. The non-Pomona Defendants move for these claims to be dismissed against them as well, and Plaintiffs have offered no response. (Defs.' Mem. 24–25.) Therefore, for the same reasons articulated in *Mosdos II*, and because Plaintiffs have not otherwise responded to the remaining Defendants' arguments about these claims, the Court grants summary judgment to the remaining Defendants on these claims. *See Lewis v. Town of Waterford*, No. 04-CV-1194, 2006 WL 2401646, at *2 (D. Conn. Aug. 17, 2006) (granting summary judgment as to a claim deemed abandoned due to the plaintiff's failure to respond to the defendant's arguments concerning that claim).

The non-Pomona Defendants also contend that the Court dismissed Plaintiffs' claim under New York Civil Rights Law 40-c against Pomona. (Defs.' Mem. 24–25.) This is mistaken; the Court specifically did not dismiss that claim because it found that the Notice of Claim requirement did not apply to state civil rights claims. *See Mosdos II*, 815 F. Supp. 2d at 709. However, "the claims asserted by Plaintiffs under the provisions of [the] New York Civil Rights Law are governed by similar standards as Plaintiffs' § 1983 claims." *T.E. v. Pine Bush Cent. Sch. Dist.*, — F. Supp. 3d —, 2014 WL 5591066, at *40 (S.D.N.Y. Nov. 4, 2014). Indeed, Plaintiffs' explanation of its New York State Civil Rights Law claim is very similar to that of its

Equal-Protection-based § 1983 claims: Plaintiffs claim that Defendants "selectively, discriminatorily[,] and improperly applied the law[] . . . in violation of Plaintiffs' right to . . . Equal Protection."  (*See* Am. Compl. ¶ 153.)  The Court has already granted summary judgment on Plaintiffs' Equal-Protection-based § 1983 claims on immunity grounds and because Plaintiffs have failed to offer sufficient evidence to raise an issue of material fact as to whether Defendants acted with discriminatory animus.  Accordingly, the Court also grants summary judgment to Defendants on Plaintiffs' New York Civil Rights Law claim.

### 5.  *Chestnut Ridge* Action Counterclaims

As discussed above, by application of *Noerr-Pennington*, Defendants are immune from suit for violations of civil rights stemming from the *Chestnut Ridge* Action.  Even if *Noerr-Pennington* does not apply, however, Defendants are entitled to summary judgment on the counterclaims.  Two preliminary issues raised in Defendants' Opposition to Plaintiffs' Motion warrant consideration first: standing and mootness.

### a.  Standing

Defendants argue that, after filing its counterclaims, Mosdos contended in a related case that because YCC's "conveyance of the Nike Site to Mosdos was not approved by a [c]ourt in accordance with N.Y. Religious Corporation Law Section 12, its title thereto is void."  (Defs.' Opp'n 17 (citing *Mosdos Chofetz Chaim, Inc. v. RBS Citizens, N.A.,* 14 F. Supp. 3d 191, 217 (S.D.N.Y. 2014) ("Mosdos argues that it does not hold valid title to the [Nike Site].").)  In that case, after the Court found that Mosdos did not have standing to challenge the validity of its title to the Nike Site, (*id.* (citing *RBS Citizens*, 14 F. Supp. at 219)), YCC filed a separate action seeking a declaration from the Court that Mosdos's title to the Nike Site is void or voidable, (*id.* (citing *Yeshiva Chofetz Chaim, Inc. v. Mosdos Chofetz Chaim, Inc.*, No. 14-CV-4149 (S.D.N.Y.

64

filed June 10, 2014)).  Defendants therefore argue that Mosdos does not have standing to bring its counterclaims.

In response, Mosdos makes two arguments.  First, it argues that the "issues presented by . . . Mosdos . . . do not require ownership of the subject real property," because regardless of how ownership is resolved, it was Mosdos's project that the *Chestnut Ridge* Action targeted, and Mosdos that expended funds on an allegedly frivolous lawsuit. (Pls.' Reply 7–8.)  Second, Mosdos argues that, according to this Court's prior holding, Mosdos's ownership of the Nike Site is "not void, but voidable," and therefore because the conveyance of the property has not been voided, Mosdos retains standing.  (*Id.* 8 (citing *RBS Citizens*, 14 F. Supp. 3d at 217).)

The Court agrees that Mosdos has standing to maintain its counterclaims.  Defendants do not allege that Mosdos's title to the Nike Site is void, nor has any court found that such title is void.  Therefore, it is undisputed that as of this date, and as of the date of the filing of the counterclaims, Mosdos had an interest in Kiryas Radin.  On that basis, and at this time, Mosdos has standing to maintain its counterclaims.  *See Berezovskaya v. Deutsche Bank Nat'l. Trust Co.*, No. 12-CV-6055, 2014 WL 4471560, at *8 (E.D.N.Y. Aug. 1, 2014) (finding standing to challenge certain actions made by a trustee because they were "voidable, not void"), *adopted by* 2014 WL 4470786 (E.D.N.Y. Sept. 10, 2014); *see generally Pac. Capital Bank, N.A. v. Connecticut*, 542 F.3d 341, 350 (2d Cir. 2008) (noting that, to satisfy Article III standing requirements, the plaintiffs must show (1) that they have "suffered an injury in fact that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision" (internal quotation marks omitted).

b.  Mootness

Defendants also argue that because Mosdos sought a permanent injunction enjoining

Defendants from "'interfering with Mosdos'[s] civil rights' and a '[d]eclaratory judgment

declaring that Mosdos'[s] use of its [p]roperty as a Yeshiva campus with fami[l]y residential

housing is permitted, subject to legitimate health and safety review,'" Mosdos's counterclaims

are moot.  (Defs.' Opp'n 18 (quoting Counterclaims at 68).)  In short, Defendants contend that

by virtue of the *Chestnut Ridge* Action being decided on the merits in Plaintiffs favor, Mosdos

"already obtained the relief it is seeking," and there is "no possibility that the alleged civil rights

violations complained of . . . will recur."  (*Id.* (citing *Irish Lesbian & Gay Org. v. Giuliani*, 143

F.3d 638, 647 (2d Cir. 1998) ("A case becomes moot when interim relief or events have

eradicated the effects of the defendant's act or omission, and there is no reasonable expectation

that the alleged violation will recur.").)

In response, Mosdos notes that, at the time it drafted its counterclaims, "it was not injured

by [Defendants'] actions, and accordingly it did not seek damages at law."  (Pls.' Reply 8.)

Mosdos contends that it sought damages in the claims that the Court dismissed in the 2008

Action, and that based on the consolidation of the 2008 Action and the *Chestnut Ridge* Action,

Mosdos had "been proceeding as if it was restored to [the 2008 Action] through the removal of

the [*Chestnut Ridge* Action]."  (*Id.* 8–9.)  Mosdos also makes clear, however, that if it "erred in

the manner in which it [was] proceeding," it would seek leave to amend the counterclaims.  (*Id.*

9.)

The Court sought supplemental briefing on the issue of whether Mosdos should be

granted leave to amend its counterclaims.  (*See* Dkt. Nos. 131, 133.)  In their Letter, Defendants

point to the fact that Mosdos had several years to amend its counterclaims, including after this

Court dismissed Mosdos's claims in 2010, and argue that Mosdos did not even actively pursue

its counterclaims until December 2012.  (Letter from Michael D. Zarin, Esq., and Jody T. Cross,

Esq., to Court ("Defs.' Feb. 15 letter") at unnumbered 2 (Feb. 13, 2015) (Dkt. No. 132).)

Defendants further argue that Mosdos could not "in good faith" have believed that consolidation

effectively undid the Court's dismissal of its claims in the 2008 Action.  (*Id.* at unnumbered 3.)

Defendants also suggest that amendment would require the reopening of discovery because

Defendants did not question the Individual Plaintiffs about monetary damages sustained by

Mosdos.  (*Id.* at unnumbered 5.)  Therefore, Defendants contend that leave to amend should not

be granted because of undue delay and prejudice.

Additionally, Defendants argue that amendment would futile.  Because Plaintiffs did not

produce a computation of damages during discovery, under Federal Rules of Civil Procedure 26

and 37, Defendants contend that Plaintiffs would not be able to prove such damages at trial.  (*Id.*

at unnumbered 4).  Defendants also assert that Mosdos is precluded from arguing damages based

on an inability to operate Kiryas Radin during the pendency of the *Chestnut Ridge* Action

because the Second Department held that Mosdos undertook construction "at its own risk."  (*Id.*

at unnumbered 5 (citing *Chestnut Ridge II*, 953 N.Y.S.2d at 82).)[53]

In response, Mosdos contends that the age of the case is not its fault, and that it diligently

proceeded with motion and appellate practice, which took several years.  (Letter from Joseph J.

Haspel, Esq., to Court (Feb. 24, 2015) 2 (Dkt. No. 134).)  Mosdos further argues that any

amendment to its counterclaims would not be a "surprise" because it previously sought damages

in the 2008 Action.  (*Id.* 2.)  Mosdos also asserts, without citing any case law, that the "law

---

[53] Defendants also argue that Mosdos would not be entitled to attorneys' fees because the
*Chestnut Ridge* Action was not "objectively baseless."  (Defs.' Feb. 13 Letter at unnumbered 2
(citing *Mosdos I*, 701 F. Supp. 2d at 603).)

surrounding proceeding with construction at 'its own risk' only comes into play when a respondent (in this case the Villages) ultimately prevails in the Article 78 proceeding," (*id.* 2–3), that liability could be determined without further discovery, (*id.* 3), and that discovery could be reopened for damages without delaying the case given no trial date is imminent, (*id*).

Plaintiffs ultimately prevailed in the *Chestnut Ridge* Action, and Defendants cannot further delay, or interfere with, Kiryas Radin, because it is already complete and operational. Therefore, Mosdos has, in essence, already received the injunctive and declaratory relief that it seeks in its counterclaim, the goal of which was to prevent Defendants from interfering with the completion and opening of Kiryas Radin.  Indeed, Mosdos does not appear to contest that, if the Court interprets its counterclaims as only seeking injunctive and declaratory relief, they are moot.  Therefore, because Defendants can no longer "commit the wrongful conduct alleged" in the counterclaims, the Court finds that Mosdos's counterclaims, as currently alleged, are moot. *Riverkeeper, Inc. v. Mirant Lovett, LLC*, 675 F. Supp. 2d 337, 348 (S.D.N.Y. 2009); *see also Friends of the Earth, Inv. v. Laidlaw Envtl. Servs., Inc.*, 528 U.S. 167, 189 (2000) ("A case might become moot if subsequent events made absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." (internal quotation marks omitted)).

Mosdos accordingly seeks to amend the counterclaims to add a request for damages.  Due to undue delay, the Court will not grant Mosdos leave to amend.  While the Court recognizes that "leave to amend . . . should be 'freely given when justice so requires,'" *Elek v. Inc. Vill. of Monroe*, 815 F. Supp. 2d 801, 804 (S.D.N.Y. 2011) (quoting Fed. R. Civ. P. 15(a)), it may deny leave "for good reason, including futility, bad faith, undue delay, or undue prejudice," *McCarthy*, 482 F.3d at 200.  As Defendants point out, courts in the Second Circuit have consistently denied leave to amend in cases where discovery was complete and motions for summary judgment have

been filed.  *See id.* at 202 (finding that decision not to grant leave to amend "did not exceed [the

district court's] discretion" because the request came "after an inordinate delay" such that

"discovery had closed, defendants had filed for summary judgment, and nearly two years had

passed since the filing of the original complaint"); *Ansam Assocs., Inc. v. Cola Petroleum, Ltd.*,

760 F.2d 442, 446 (2d Cir. 1985) (affirming denial of motion to amend after completion of

discovery and filing of motion for summary judgment); *see also Wolk v. Kodak Imaging

Network, Inc.*, 840 F. Supp. 2d 724, 738 (S.D.N.Y. 2012) (denying motion to amend because,

inter alia, "it is improper to amend a complaint . . . in response to a motion for summary

judgment when discovery is complete"), *aff'd sub nom. Wolk v. Photobucket.com, Inc., 560 F.

App'x* (2d Cir. 2014); *cf. Gem Global Yield Fund, Ltd. v. Surgilight, Inc.*, No. 04-CV-4451, 2006

WL 2389345, at *10 (S.D.N.Y. Aug. 17, 2006) (explaining that, in adjudicating a motion to

amend, the "court may . . . consider whether the motion comes on the eve of trial after many

months or years of pretrial activity" (brackets and internal quotation marks omitted)).  Here,

Mosdos filed its counterclaims seven years ago, and the Court dismissed its claims in the 2008

Action five years ago.  Discovery has been complete for over a year, and competing motions for

summary judgment have been filed.  Accordingly, Mosdos should not be allowed to amend its

counterclaims, and, even if Defendants were not immune from the counterclaims, they would be

entitled to summary judgment on mootness grounds.

### c.  RLUIPA

Mosdos's two RLUIPA counterclaims allege that "the Villages['] actions deprived and

continue to deprive [Plaintiffs] of [their] right to free exercise of religion, as secured by

[RLUIPA], through the guise of SEQRA and the misuse of the Court system of the State of New

York," purportedly citing 42 U.S.C. §§ 2000cc(2)(a) and 2000cc(2)(b)(2).  (*See* Counterclaims

¶¶ 376–83.)  Because neither section exists, based on Mosdos's characterization of the causes of action as "Substantial Burdens" and "Nondiscrimination," (*id.*), the Court assumes, as Defendants do in their Memorandum of Law, (Defs.' Mem. 22), that Mosdos intended to cite Sections 2000cc(a)(1), which provides that "[n]o government shall impose or implement a land use regulation in a manner that imposes a substantial burden on . . . . religious exercise," and 2000cc(b)(2), which provides that "[n]o government shall impose or implement a land use regulation that discriminates against any assembly or institution on the basis of religious or religious denomination."  In both cases, RLUIPA defines "land use regulation" as "a zoning or landmarking law, or the application of such a law, that limits or restricts a claimant's use or development of land."  42 U.S.C. § 2000cc-5(5).  The Parties address both counterclaims together in their memoranda of law, and so the Court does the same here.

In Plaintiffs' Opposition, Mosdos, for the first time, alleges that pursuant to 42 U.S.C. § 2000cc-2(b), which provides that a plaintiff has the "burden of persuasion on whether the law (including a regulation) or government practice that is challenged by the claim substantially burdens plaintiff's exercise of religion," it has adequately stated a claim.  (Pls.' Opp'n 9 (emphasis omitted).)  Mosdos contends that, under RLUIPA, a plaintiff can plead either "the improper imposition of a land use law (or regulation) *or* a government practice."  (*Id.* (emphasis added).)

Defendants, by contrast, contend that because Kiryas Radin is located outside the jurisdiction of the Villages, and was approved by Ramapo under Ramapo law, the *Chestnut Ridge* Action was not a "land use regulation subject to RLUIPA."  (Defs.' Mem. 22–23.)  In response, Mosdos cites § 2000cc-3(g), which provides that RLUIPA "shall be construed in favor of a broad protection of religious exercise, to the maximum extent permitted by the terms of this

chapter and the Constitution," and argues that it would "inane and entirely contrary to the policy of RLUIPA" for it not to apply to practices of governments that have effects outside of their jurisdictional limits.  (Pls.' Opp'n 9.)

The applicability of RLUIPA to this case is thus dependent on the answer to two questions: (1) In filing the *Chestnut Ridge* Action, did Defendants "impose or implement" a land use regulation, and (2) If not, can any other "government practice" serve to violate RLUIPA?

The Court begins with the first question: the definition of "impose or implement."  While the Court is cognizant that "Congress enacted RLUIPA . . . in order to provide very broad protection for religious liberty," *Holt v. Hobbs,* 135 S. Ct. 853, 859 (2015) (internal quotation marks omitted), it finds Mosdos's interpretation to be without merit.  There is a difference between imposing or implementing a land use regulation, and filing a lawsuit to ensure that another municipality imposes or implements its own land use regulation.  RLUIPA's reach may be expansive, but it does not stretch so far as to implicate the latter circumstance.  Such a reading of RLUIPA would expand its scope far beyond its intended targeting of the "widespread practice of individualized decisions to grant or refuse permission to use property for religious purposes," 146 Cong. Rec. S7775 (daily ed. July 27, 2000) (joint statement of Sens. Hatch and Kennedy), to include governing any action a local government may take that *could* result in the enforcement of a land use regulation.  *See Omnipoint Commc'ns, Inc. v. City of White Plains*, 202 F.R.D. 402, 403 (S.D.N.Y. 2001) (noting that RLUIPA "was passed because Congress found that churches were frequently discriminated against where zoning codes frequently exclude churches in places where they permit theaters, meeting halls, and other places where large groups of people assemble for secular purposes." (internal quotation marks omitted)).  The Court declines to delimit RLUIPA in in this way, particularly given Mosdos cites no case—nor can the Court

locate one—in which the any court has done so.  *Cf. Westchester Day Sch. v. Village of Mamaroneck*, 386 F.3d 183, 190 (2d Cir. 2004) (noting the importance, in interpreting RLUIPA, of not allowing the law to expand "beyond the proper function of protecting the free exercise of religion into the constitutionally impermissible zone of entwining government with religion in a manner that prefers religion over irreligion and confers special benefits on it." (citing *City of Boerne v. Flores,* 521 U.S. 507, 537 (1997) (Stevens, J., concurring)).

As the Second Department recognized, there is a distinction under SEQRA between an "involved agency," which "has jurisdiction by law to fund, approve[,] or directly undertake an action," and an interested agency, which does not have such authority. *Chestnut Ridge I*, 841 N.Y.S.2d at 332 (citing N.Y. Comp. Codes R. & Regs. tit. 6, § 617.2) (internal quotation marks omitted).  Ramapo is the involved agency in this case, while the Villages are the interested agencies.  As such, Ramapo is the only entity with the capacity to impose or implement SEQRA, and the Villages have only attempted to ensure such action through a lawsuit.  *Cf. Westchester Day Sch.*, 386 F.3d at 189 (equating "implementation of a land use regulation" with "regulation or rejection" of actions by a zoning board).  This interpretation is borne out in what actually happened in the *Chestnut Ridge* Action: Defendants did not prevail, and as such, the lawsuit had no bearing on the actions that Ramapo took in implementing SEQRA.  It is also consistent with the plain meaning of RLUIPA; Congress made no mention of "enforcing," or "litigation relating to," land use regulations in RLUIPA, even though it could have easily done so.  *Cf. Faith Temple Church v. Town of Brighton*, 405 F. Supp. 2d 250, 255 (W.D.N.Y. 2005) (holding that RLUIPA does not apply to eminent domain proceedings because Congress made no mention of it and the concept "is hardly . . . arcane or little-known").  The Court therefore agrees with Defendants that

the *Chestnut Ridge* Action was directed at Ramapo's actions under SEQRA, and did not

constitute an imposition or implementation of SEQRA itself.

Mosdos's reliance on RLUIPA's mention of "government practice"—the subject of the

second question—is also without merit.  The term "government practice" is included in the

portion of the statute governing "judicial relief," and in the subsection that defines the burden of

persuasion, rather than in the prior section, § 2000cc, which defines the actionable conduct to

which that subsection explicitly pertains.  *Compare* 42 U.S.C. § 2000cc-2 (referring to

"violation[s] of section 2000cc"), *with id.* § 2000cc (defining "Substantial burdens," "Equal

terms," and "Nondiscrimination" violations).  Reading the subsection that Mosdos cites in

context, the term "government practice" appears to be included in order to cover all of the

possible violations of RLUIPA defined in § 2000cc.  Without including such term, the portion of

the subsection in which "government practice" appears, which provides when a plaintiff "bear[s]

the burden of persuasion" even after "produc[ing] prima facie evidence," would only cover a

"law . . . that is challenged" itself, *id.* § 2000cc-2, and would not apply to a RLUIPA violation

stemming from the "manner" in which a law is implemented, e.g., the selective enforcement of a

facially neutral statute, *see Primera Igelsia Bautista Hispana of Boca Raton, Inc. v. Broward

County*, 450 F.3d 1295, 1308 (11th Cir. 2006) (describing one type of RLUIPA violation as the

"selective[] enforce[ment]" of "a truly neutral statute . . . against religious, as opposed to

nonreligious[,] assemblies or institutions")

Tellingly, Plaintiffs cite no case in which "government practice" is interpreted to define a

RLUIPA violation, never mind a case in which filing a lawsuit is characterized as the

enforcement of a land use regulation.  Therefore, even construing the statute broadly, no reading

of it suggests that RLUIPA applies to the *Chestnut Ridge* Action by virtue of it being a "government practice."

In a final attempt to resurrect its claims, Mosdos again cites *Fortress Bible*, contending that the case makes clear that a municipality "may not use SEQRA as a pretext for issues that are, in essence, zoning/land use issues." (Pls.' Mem. 50.) Therefore, and distinct from the Equal-Protection-related use of *Fortress Bible* discussed above, Mosdos contends that because the Villages "used . . . zoning/land use issues to challenge Ramapo's actions," namely traffic, community character, and water concerns, they inappropriately used SEQRA in violation of RLUIPA. (*Id.* 51.)[54]

While the *Fortress Bible* case is certainly relevant to whether SEQRA may be considered a "land use regulation," the case takes no stance on the central issue governing the applicability of RLUIPA to this matter: whether the filing of a lawsuit constitutes the imposition or implementation of SEQRA, or is otherwise a government practice governed by the statute. Mosdos's attempt to apply *Fortress Bible*'s analysis to this question assumes its own conclusion. Plaintiffs argue that "*Fortress Bible* cannot be limited to only the lead agency engaged in SEQRA review," as "i[t] would simply defy logic to hold that one party is precluded from using SEQRA to challenge religious land use, while another party is free to do so," i.e., that "an illegitimate use of SEQRA could be legitimized by changing the identity of the challenger." (Pls.' Reply 6.) This is precisely the issue that *Fortress Bible* does not address. In fact, if anything, *Fortress Bible* suggests that the Villages' actions in this case are different in a fundamental way: In ruling on a related issue, the *Fortress Bible* court noted that the defendant

---

[54] As discussed above, the Court notes that, unlike the district court *Fortress Bible*, it has made no finding that the Villages' justification for the *Chestnut Ridge* Action was pretextual.

town "was acting in its regulatory capacity as a sovereign . . . making decision about the ways in which property owners could use their land." *Fortress Bible*, 694 F.3d at 222.  As discussed, the Villages do not, and cannot, act in such capacity here, because the Nike Site is outside the jurisdiction of the Villages.  Accordingly, Mosdos's RLUIPA counterclaims are without merit, and Defendants are entitled to summary judgment.[55]

### d.  FHA

Defendants argue that Mosdos's two Fair Housing Act counterclaims, brought pursuant to 42 U.S.C. §§ 3604 and 3617, respectively, should be dismissed.  (Defs.' Mem. 23.)  However, as Plaintiffs recognize in their Opposition Memorandum, this Court dismissed Plaintiffs' identical FHA claims in *Mosdos II.  See Mosdos II*, 815 F. Supp. 2d at 707.  (*See also* Pls.' Opp'n 10 ("This Court addressed [the FHA] allegations in *Mosdos II*, and the cause of action was dismissed.  It need not be further addressed herein." (italics added).)  Accordingly, the Court declines to revisit the issue here, and finds that Defendants are entitled to summary judgment on Mosdos's FHA counterclaims.

---

[55] Of note, Mosdos's "Nondiscrimination" counterclaim also fails because, as noted above, Plaintiffs have failed to demonstrate discriminatory intent.  *See Chabad Lubavitch*, 768 F.3d at 198 ("[E]stablishing a claim under RLUIPA's nodiscrimination provision . . . requires evidence of 'discriminatory intent.'").

III. Conclusion

For the foregoing reasons, Defendants' Motions for Summary Judgment are granted, and Plaintiffs' Motion for Summary Judgment is denied. The Clerk of the Court is respectfully requested to terminate the pending Motions, (No. 08-CV-156 Dkt. Nos. 101, 106, 108; No. 12-CV-8856 Dkt. Nos. 39, 44), and to close both cases.

SO ORDERED.

DATED:       March 27, 2015
             White Plains, New York

KENNETH M. KARAS
UNITED STATES DISTRICT JUDGE